**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

KENTH FALLEN and
LAURA FALLEN,

Plaintiffs,

v. No. 1:15-CV-00146 JB/SCY

GREP Southwest, LLC;
SCI CAMINO REAL FUND, LLC d/b/a
CAMINO REAL APARTMENTS;
NATIONAL CREDIT SYSTEMS, INC.;
INSURECO AGENCY & INSURANCE SERVICES, INC.
d/b/a SUREDEPOSIT; EQUIFAX INFORMATION
SERVICES, LLC; EXPERIAN INFORMATION
SOLUTIONS, INC.; and TRANSUNION, LLC,

Defendants.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Kenth Fallen and Laura Fallen, by and through their attorneys, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu LLP, bring this Complaint for Damages, Declaratory, and Injunctive Relief against Defendants National Credit Systems, Inc.; GREP Southwest, LLC; SCI Camino Real Fund, LLC d/b/a Camino Real Apartments; SureDeposit; Equifax Information Services, LLC; Experian Information Solutions, Inc.; and TransUnion, LLC. Plaintiffs seek relief under the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681 et seq., the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 et seq., the New Mexico Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 et seq., the New Mexico Uniform

Owner-Resident Relations Act (UORRA), NMSA 1978, §§ 47-8-1 et seq., and New Mexico common law.

**PARTIES**

1. Plaintiffs Kenth Fallen and Laura Fallen are residents of Albuquerque, New Mexico. They are "consumers" as defined by the FCRA, 15 U.S.C. § 1681a(c), and the FDCPA, 15 U.S.C. § 1692a(3).

2. Defendant GREP Southwest, LLC (GREP) is a limited liability company incorporated under the laws of Delaware and registered to do business in New Mexico. GREP manages an apartment complex, the Camino Real Apartments, in Albuquerque, New Mexico.

3. Defendant SCI Camino Real Fund, LLC d/b/a Camino Real Apartments (Camino Real) is a limited liability company incorporated under the laws of Delaware and registered to do business in New Mexico. Camino Real owns Camino Real Apartments in Albuquerque, New Mexico.

4. Defendant National Credit Systems, Inc. (NCS) is a corporation incorporated under the laws of Georgia and registered to do business in New Mexico. NCS is a national debt collection agency. NCS is a "furnisher of information" as contemplated by the FCRA, 15 U.S.C. § 1681s–2(b). NCS is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

5. Defendant SureDeposit is a surety bond company. When a landlord purchases a surety bond from SureDeposit, SureDeposit pays the landlord the amount of any financial obligations in a lease agreement that are unmet by a resident. SureDeposit then takes over the collections process and seeks reimbursement from the resident for the amount that SureDeposit paid to the landlord. SureDeposit is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6). Upon information and belief, GREP and Camino Real contract with SureDeposit to

insure resident debt to the apartment building named Camino Real Apartments at the address 3305 Calle Cuervo NW, Albuquerque, New Mexico.

6. Defendant Equifax Information Services, LLC (Equifax) is a foreign corporation incorporated under the laws of Georgia and registered to do business in New Mexico. Equifax is a "consumer reporting agency" as defined by the FCRA, 15 U.S.C. § 1681a(f). Equifax assembles consumer credit information or other information on consumers for the purpose of furnishing credit reports to third parties. It uses means of interstate commerce for the purpose of preparing or furnishing credit reports.

7. Defendant Experian Information Solutions Inc. (Experian) is a foreign corporation incorporated under the laws of Ohio and registered to do business in New Mexico. Experian is a "consumer reporting agency" as defined by the FCRA, 15 U.S.C. § 1681a(f). Experian assembles consumer credit information or other information on consumers for the purpose of furnishing credit reports to third parties. It uses means of interstate commerce for the purpose of preparing or furnishing credit reports.

8. Defendant TransUnion LLC (TransUnion) is a limited liability company incorporated under the laws of Delaware and registered to do business in New Mexico. TransUnion assembles consumer credit information or other information on consumers for the purpose of furnishing credit reports to third parties. It uses means of interstate commerce for the purpose of preparing or furnishing credit reports.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this action pursuant to the FCRA, 15 U.S.C. § 1681p; the FDCPA, 15 U.S.C. § 1692k(d); and 28 U.S.C. §§ 1331 and 1337.

10. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

**FACTS RELEVANT TO ALL CLAIMS**

12. On September 19, 2012, Plaintiffs entered into an Apartment Rental Agreement (Agreement) with Camino Real and GREP to rent Apartment #518 at the Camino Real Apartments for a period of ten months and ten days beginning September 21, 2012 and ending July 31, 2013.

13. Under the terms of the rental agreement, Plaintiffs had the right to terminate the Agreement with 60 days written notice.

14. The living conditions at the Camino Real Apartments proved to be intolerable for Plaintiffs and their infant son.

15. Because Plaintiffs' apartment was not properly insulated and their heating unit was poorly maintained by Camino Real and GREP, Plaintiffs received exorbitant electric bills.

16. The noise level of the complex was not monitored in any way, so that it was always very loud inside Plaintiffs' apartment, both day and night.

17. The sewer system backed up in the apartment's plumbing on multiple occasions, leading to instances of sewage overflowing in Plaintiffs' kitchen sink.

18. As a result, Plaintiffs endured a persistent smell of sewage throughout the apartment.

19. On at least one occasion, the sewage back-up was so severe that Plaintiffs had to remove several large pitchers' full of sewage from their kitchen sink, and the sewage overflowed from the sink onto the countertop, spilling onto the kitchen floor.

20. Numerous other problems with the apartment were not adequately addressed.

21. Plaintiffs brought each of these issues to the attention of Camino Real and GREP, but these issues were never adequately remedied.

22. On information and belief, many of these issues continue to plague Camino Real residents, including the current residents of Plaintiffs' former apartment, over two years after Plaintiffs vacated their apartment.

23. After several months of living under these conditions, Plaintiffs concluded that their apartment was uninhabitable and that they had no choice but to vacate.

24. Despite enduring the kind of living conditions that would constitute a constructive eviction and allow them to vacate the premises immediately, Plaintiffs provided Camino Real and GREP with 60 days' written notice of their intent to vacate the apartment.

25. On April 1, 2013, Plaintiffs went to the Camino Real Apartments leasing office, where they personally met with Camino Real Community Manager, Teri Shaffer.

26. During the meeting, Plaintiffs informed Ms. Shaffer of their intent to vacate Apartment #518 by the end of May 2013.

27. Ms. Shaffer then produced a "Notice of Intent to Vacate" form, which she completed in Plaintiffs' presence.

28. On that form, Ms. Shaffer designated May 31, 2013 as Plaintiffs' move-out date.

29. The form states that "**This Notice to Vacate is not valid until all residents have signed and initialed where indicated."

30. Plaintiffs both initialed and signed the form, thus agreeing to the move-out date of May 31, 2013.

31. At the time Plaintiffs provided written notice to vacate Apartment #518, Ms. Shaffer urged Plaintiffs to reconsider their decision to move out.

32. She suggested that Plaintiffs meet with the GREP Regional Manager, Lora Villa, who would be on site later that week, to see if Ms. Villa could resolve the problems that prompted Plaintiffs to give notice.

33. Plaintiffs informed Ms. Shaffer that such a meeting would not impact their decision to move out, and that they would move out of the Camino Real Apartments by May 31, 2013.

34. On or about April 5, 2013, both Ms. Shaffer and the GREP Regional Manager, Ms. Villa, visited Plaintiffs in their apartment, despite Plaintiffs' having told Ms. Shaffer that they did not wish to have such a meeting.

35. Ms. Villa urged Plaintiffs to reconsider their decision to move, promising to make repairs if they remained.

36. Plaintiffs told her that they still intended to move out by May 31, 2013, as previously agreed upon in the April 1, 2013 Notice of Intent to Vacate.

37. Ms. Villa expressed her disappointment.

38. Neither Ms. Shaffer nor Ms. Villa ever challenged Plaintiffs' right to move out by May 31, 2013, the move-out date provided in the April 1, 2013 Notice of Intent to Vacate completed by Plaintiffs and Ms. Shaffer.

39. On or about April 15, 2013, Plaintiffs received a certified letter from Ms. Villa, informing them that they needed to fill out a Notice of Intent to Vacate, if they still intended to move out of Camino Real Apartments.

40. The letter made no reference to the fact that Plaintiffs had already provided Camino Real with their Notice of Intent to Vacate form, prepared with Ms. Shaffer's assistance and involvement, more than two weeks earlier.

41. Plaintiffs went to the Camino Real front office to inform management that they would not fill out a new Notice of Intent to Vacate form, as they had already done so on April 1, 2013.

42. Under New Mexico law, the original April 1, 2013 Notice of Intent to Vacate was perfected when it was filled out by the parties in the management office for the apartments. NMSA 1978, § 47-8-14 (C) (1) & (2).

43. Kenth Fallen informed Ms. Shaffer's assistant, Bernadette Maestas, that he would compose a letter to Camino Real and GREP, providing additional evidence of Plaintiffs' previously-stated intent to vacate Apartment #518.

44. However, Mr. Fallen informed Bernadette Maestas that he would date the letter April 1, 2013, to reflect the date that Plaintiffs had submitted their written Notice of Intent to Vacate form with the assistance of Ms. Shaffer.

45. Plaintiffs prepared the letter and submitted it to the Camino Real leasing office that same day.

46. On April 18, 2013, Plaintiffs received a certified letter dated April 17, 2013 from Ms. Shaffer.

47. The letter stated that Ms. Shaffer was in possession of a "60 day notice to vacate as of the 16th of April, 2013."

48. Enclosed with the letter was an entirely new Notice of Intent to Vacate form drafted by Ms. Shaffer and dated April 16, 2013.

49. Like the original Notice of Intent to Vacate form, the new form was completed by Ms. Shaffer using her own handwriting to fill in the information required by the form.

50. The new form altered Plaintiffs' move-out date from May 31, 2013 to June 16, 2013, and purported to obligate Plaintiffs to pay 16 days of pro-rated rent for the month of June 2013.

51. Also enclosed with the letter was a copy of Plaintiffs' recent notice letter − dated April 1, 2013 to reflect the date that Plaintiffs submitted their Notice of Intent to Vacate − which was stamped as "RECEIVED APR 16 2013."

52. The new Notice of Intent to Vacate form was not prepared with Plaintiffs' knowledge or cooperation.

53. The new Notice of Intent to Vacate form filled out by Ms. Shaffer was not signed or initialed by Plaintiffs as was required for the notice to be valid.

54. Plaintiffs adhered to the agreement in the original Notice of Intent to Vacate form completed on April 1, 2013, and moved out of their Camino Real apartment a week before the move-out date, on May 24, 2013.

55. Even though they moved out early, Plaintiffs paid May's rent in full.

56. Camino Real and GREP management performed a move-out inspection on May 24, 2013 after Plaintiffs had removed all of their possessions from the apartment.

57. The move-out inspection of Plaintiffs' apartment noted that everything was in order, and gave passing checkmarks on every item on the check list; Camino Real and GREP also had a representative signed off on the move-out form as completed.

58. Camino Real and GREP always fully understood that Plaintiffs move-out date was May 31, 2013, based on the written notice it received and acknowledged on April 1, 2013, as

well as the fact that Plaintiffs actually moved out by that date and had their move-out inspection reviewed and approved of by a Camino Real and GREP management representative.

59. On June 19, 2013, Camino Real and GREP issued a Move-Out Statement to Plaintiffs billing them for $412.00 in allegedly unpaid rent for the period June 1 – June 16, 2013.

60. This amount was based on the fictitious move-out date of June 16, 2013 as claimed in the fraudulent and invalid April 16, 2013 Notice of Intent to Vacate drafted by Ms. Shaffer but not endorsed by Plaintiffs.

61. In response to the June 19, 2013 statement, Mr. Fallen called Ms. Villa to dispute the charge.

62. Plaintiffs refused to pay the $412.00 for the fictitious unpaid rent claimed by Camino Real and GREP.

63. On information and belief, Camino Real and GREP have perpetrated similar acts of fraud against other departing residents of the Camino Real Apartments.

64. On August 13, 2013, Camino Real and GREP opened a claim with SureDeposit based on their fraudulent assessment of unpaid rent for $412.

65. SureDeposit then assigned Plaintiffs' alleged debt for $412 to NCS as the collection agency.

66. After the fraudulent debt was assigned to NCS, Plaintiffs each received notice from NCS dated August 23, 2013 informing them that the alleged debt had been acquired by NCS for collection.

67. The notices stated that "if you contact our office, we will work with you to satisfy this debt in a friendly manner."

68. The notices also stated that "**If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt** . . . ."

69. Plaintiffs immediately contacted NCS and informed it that they disputed the validity of the debt.

70. On August 26, 2013, NCS responded by what appears to be a form letter.

71. Although only three days had passed since its original notice, NCS stated that it had "investigated" Plaintiffs' dispute of the debt, but had "yet to find sufficient evidence to validate your claim(s)."

72. NCS told Plaintiffs to provide all documentation supporting their position that the debt was invalid. It stated that:

> In the event that new information is obtained which places doubt on the validity of this debt, we will promptly update our records accordingly. In addition, National Credit Systems, Inc. will revise or delete the information it may have reported to the three major credit bureaus, in full compliance with the provisions of The Fair Credit Reporting Act, The Fair Debt Collections Practices Act and any state regulations that may be applicable.

73. NCS also enclosed the "documentation" provided to it by Camino Real and GREP that supposedly supported the claim, which was the fraudulent bill for the pro-rated June rent.

74. On August 27, 2013, Plaintiffs sent NCS the Notice of Intent to Vacate that was actually filled out by Ms. Shaffer and signed by Plaintiffs on April 1, 2013.

75. On August 30, 2013, Ms. Shaffer informed Mr. Fallen by email that all future communications regarding the fraudulent debt should be addressed to Camino Real and GREP's attorney.

76. NCS sent Plaintiffs second notices addressing the fraudulent debt on September 27, 2013.

77. The notices stated that Plaintiffs had "failed to make suitable arrangements concerning" the alleged debt.

78. The notices advised them that NCS was "processing this account for placement on your credit history with all three national credit bureaus."

79. The notices told them that it was "not too late for us to place a hold on your account if you act now" and that Plaintiffs "may be able to avoid adverse credit reporting entirely if we can work out a reasonable arrangement." The notice urged Plaintiffs to contact the NCS office.

80. Plaintiffs did so immediately and NCS agreed to place a hold on the account pending mediation with Camino Real and GREP.

81. On October 10, 2013, Mr. Fallen emailed Ms. Shaffer, Ms. Villa, and Camino Real and GREP's attorney, informing them of the hold with NCS and requesting that they either dismiss or mediate the $412.00 dispute.

82. Mr. Fallen also provided evidence of the April 1, 2013 notice and May 24, 2013 move-out inspection to Camino Real and GREP's attorney by email on October 10, 2013.

83. Mr. Fallen received no substantive response to his emails.

84. Having been ignored by Camino Real and GREP, on November 5, 2013, Plaintiffs, through counsel, wrote to NCS and Camino Real and GREP's attorney.

85. The letter formally requested that NCS stop contacting Plaintiffs regarding the alleged debt.

86. The letter also requested copies of copies of all correspondence between NCS and Plaintiffs, verification of the alleged debt, information about the claim made against Plaintiffs, and information concerning NCS's investigation of the claim and alleged debt.

87. NCS responded by letter dated November 11, 2013, enclosing copies of the documentation that it had of the fraudulent debt and demanding that Plaintiffs pay the debt.

88. Included with NCS's documentation was the April 1, 2013 Notice of Intent to Vacate form filled out by Ms. Shaffer and signed by Plaintiffs, which clearly stated that Plaintiffs' move-out date was scheduled for May 31, 2013.

89. NCS did not respond to the numerous other inquiries in Plaintiffs' November 5, 2013 letter.

90. On December 12, 2013, Plaintiffs, again through counsel, sent NCS a second letter, explaining in detail why the $412.00 alleged debt was not legitimate and why Camino Real's, GREP's, SureDeposit's, and NCS's actions were unlawful.

91. Enclosed with the letter was a copy of the May 24, 2013 move-out inspection form proving that Plaintiffs moved out of the apartment on that date.

92. Plaintiffs never received a response from Camino Real, GREP or NCS.

93. Unbeknownst to Plaintiffs, NCS had already reported the fraudulent debt to the three national credit reporting agencies, resulting in significant drops in Plaintiffs' credit scores.

94. NCS never informed Plaintiffs that it had reported the alleged debt to the national credit bureaus.

95. Plaintiffs did not discover that NCS had reported the fraudulent debt until February 20, 2014.

96. On that date, Plaintiffs were attempting to refinance an automobile loan and Plaintiffs' bank informed Mr. Fallen that his credit score was reported by Experian as a 665, which was a significant drop from his usual credit score.

97. The 665 credit score entitled Plaintiffs to an interest rate of 4.29%. Had their credit score been 760 or above, which it previously had been, he would have been eligible for an interest rate of 2.74%.

98. Thereafter, Plaintiffs ran Mrs. Fallen's credit report and discovered that her credit score had suffered a similar and significant decrease.

99. On September 8, 2014, Plaintiffs wrote to all three national credit reporting agencies (collectively, "CRAs") – Equifax, Experian, and TransUnion -- to request that they investigate the accuracy of the information furnished to them by NCS. The letters included a detailed history of the dispute as well as ample supporting documentation.

100. Upon information and belief, the three CRAs each contacted NCS about Plaintiffs' dispute of the fraudulent debt.

101. NCS wrongfully verified the nature of the debt to the three CRAs, relying on fraudulent information provided by SureDeposit, Camino Real, and GREP, and ignoring the April 1, 2013 Notice of Intent to Vacate and the completed May 24, 2013 move-out inspection form.

102. NCS knew or should have known that the uncompleted Notice of Intent to Vacate dated April 16, 2013 was a fraud, as NCS had provided a copy of the original, fully completed April 1, 2013 Notice of Intent to Vacate Apartment #518 in its November 11, 2013 letter to Plaintiffs' attorney.

103. Ultimately, the CRAs all responded to Plaintiffs with letters refusing to correct or delete the fraudulent claim on their account or adjust Plaintiffs' credit scores based on NCS's misrepresentations that the debt was proper and legitimate.

104. Before this event, Plaintiffs credit scores as reported by the CRAs were in the range of 790.

105. On January 13, 2015, through counsel, Plaintiffs sent a second request for investigation to the three CRAs, which included even more documentation supporting Plaintiffs' version of events, and detailing the fraud committed by NCS, SureDeposit, Camino Real**,** and GREP.

106. Plaintiffs' January 13, 2015 letter to the CRAs explained the entire history of this transaction, and included copies of the original source documents, explaining that the claim was inaccurate and fraudulent based on:

A. the timely Notice of Intent to Vacate form for Apartment #518 dated April 1, 2013.

B. the move-out inspection form that was completed on May 24, 2013 at 9:50 a.m. by Marvin Gutierrez on behalf of Camino Real and GREP.

C. the history of the entire case as explained to the CRAs in Plaintiffs' September 8, 2014 letter substantively detailing the fraudulent assessment of sixteen days of June 2013 rent by Camino Real and GREP.

D. a full explanation of how Camino Real and GREP manufactured the fraudulent assessment of $412 rent for June of 2013 against Plaintiffs.

E. a letter from Sandia Area Federal Credit Union detailing how Plaintiffs' failed to qualify for a top-tier loan rate of 2.74% because their credit score was reported as 665 when they had applied for their auto loan.

107. The January 13, 2015 letter from Plaintiffs requesting a re-investigation of their claim informed the CRAs that if their documentation concerning this case was given "a fair consideration, you will conclude that the Fallens' well-supported version of events is true and accurate, and adjust their credit scores accordingly."

108. Upon information and belief, when the CRAs received Plaintiffs' January 13, 2015 request for a reinvestigation by the CRAs, the CRAs contacted the furnisher of information concerning this debt, NCS, via an automated, electronic communication system and had them conduct the reinvestigation.

109. Upon information and belief, NCS then used the automated, electronic communication system to alert the CRAs to the outcome of NCS's reinvestigation into Plaintiffs' documentation that this $412 debt was fraudulently made against them.

***Experian's Reinvestigation***

110. On January 29, 2015 Experian wrote to Plaintiffs' attorney confirming that Experian was "currently re-investigating the information with which your client disagrees."

111. In that letter, Experian noted that the outcome of the re-investigation would be provided "directly to your clients."

112. On February 9, 2015 Experian wrote to Plaintiffs about Experian's updated credit reports based on Experian's reinvestigation and NCS's communication with Experian.

113. Experian informed Plaintiffs that NCS had reported a past due amount of $412 against Plaintiffs from the original creditors SureDeposit/Camino Real, and noted that this account was in collections and past due as of February 2015.

114. Experian also reported that the consumers disputed the account information from SureDeposit/Camino Real.

115. Experian did not indicate to Plaintiffs that Experian had considered the accuracy or validity of the purported debt in any way, or even considered any of the substantial information that Plaintiffs had provided to Experian to assess the fraudulent nature of this debt.

116. Despite Plaintiffs' detailed explanation to Experian addressing why the furnisher of information in this case was not reliable, Experian failed to consider any of Plaintiffs' information included in their January 13, 2015 letter when updating Plaintiffs' credit report.

117. Instead, Experian merely parroted back to Plaintiffs information that Experian had received from NCS in the updated credit report.

118. Experian did not fulfill its statutory duty to reinvestigate the accuracy of the debt or whether the $412 debt was fraudulently reported as requested by Plaintiffs in their January 13, 2015 letter.

***Equifax's Reinvestigation***

119. On February 9, 2015 Equifax wrote to Plaintiffs about Equifax's updated credit reports based on NCS's communication with Equifax.

120. Equifax informed Plaintiffs that Equifax had "verified that this information belongs to you."

121. Plaintiffs had not disputed whether the information was associated with them; Plaintiffs had asked Equifax to investigate the fraudulent nature of the purported debt, and to assess its validity and accuracy, which Equifax did not do.

122. Equifax's letter then informed Plaintiffs that NCS had reported the collection account for its client, SureDeposit/Camino Real.

123. Equifax's letter informed Plaintiffs that NCS had reported that NCS's client SureDeposit/Camino Real had reported an unpaid account in the amount of $412, that the first delinquency on that account was reported during June of 2013, and that as of February of 2015 the status of that account was still unpaid.

124. Equifax's letter also informed Plaintiffs that NCS had reported that the consumer had disputed this account information.

125. As to Plaintiff Laura Fallen, Equifax's letter informed her that "[a]dditional information has been provided from the original source regarding this item," but failed to say what the additional information concerning her account had been.

126. Equifax did not indicate to Plaintiffs that Equifax had considered the accuracy or validity of the purported debt in any way, or even considered any of the substantial information that Plaintiffs had provided to Equifax to assess the fraudulent nature of this debt.

127. Despite Plaintiffs' detailed explanation to Equifax addressing why the furnisher of information in this case was not reliable, Equifax failed to consider any of Plaintiffs' information included in their January 13, 2015 letter when updating Plaintiffs' credit report.

128. Instead, Equifax merely parroted back to Plaintiffs information that Equifax had received from NCS in the updated credit report.

129. Equifax did not fulfill its statutory duty to reinvestigate the accuracy of the debt or whether the $412 debt was fraudulently reported by SureDeposit/Camino Real as requested by Plaintiffs in their January 13, 2015 letter.

***TransUnion's Reinvestigation***

130. On January 26, 2015 TransUnion sent a letter to Plaintiffs' attorney.

131. TransUnion's letter informed Plaintiffs' attorney that its goal was to "maintain complete and accurate information on consumer credit reports."

132. TransUnion's letter then informed Plaintiffs' attorney that the results of Plaintiffs' request to reinvestigate their case "would be forwarded to him or her to review."

133. On February 11, 2015 TransUnion sent letters to Plaintiffs.

134. TransUnion's letters thanked Plaintiffs for "helping ensure the accuracy of your credit information."

135. TransUnion's letters then informed Plaintiffs that TransUnion's re-investigation into the $412 debt had "VERIFIED" the existence of the $412 debt, and that "NO CHANGE" would be made to their credit reports.

136. TransUnion's letter also provided Plaintiffs with copies of their individual credit reports concerning the "Adverse Accounts" listed by NCS.

137. Those reports noted that NCS had furnished the following information concerning this alleged $412 debt.

A. NCS reported that the original creditor was SureDeposit/Camino Real, and that the original amount of the account was $412.

B. NCS also reported that this account had been placed in collections on August 19, 2013, and had been updated on November 21, 2013.

C. NCS had remarked that the account information was "disputed by consumer."

138. TransUnion did not indicate to Plaintiffs that TransUnion had considered the accuracy or validity of the purported debt in any way, or even considered any of the substantial information that Plaintiffs had provided to TransUnion to assess the fraudulent nature of this debt.

139. Despite Plaintiffs' detailed explanation to TransUnion addressing why the furnisher of information in this case was not reliable, TransUnion failed to consider any of Plaintiffs' information included in their January 13, 2015 letter when updating Plaintiffs' credit report.

140. Instead, TransUnion merely parroted back to Plaintiffs information that TransUnion had received from NCS in the updated credit report.

141. TransUnion did not fulfill its statutory duty to reinvestigate the accuracy of the debt or whether the $412 debt was fraudulently reported by SureDeposit/Camino Real as requested by Plaintiffs in their January 13, 2015 letter.

***Collective Results of the Reinvestigations***

142. To date, the CRAs have refused to correct the information in Plaintiffs' credit record, and continue to report that NCS has verified a $412.00 debt owed by Plaintiffs.

143. On February 26, 2015, Plaintiffs sent a letter through counsel to each of the CRAs, requesting a description of how the two credit dispute requests submitted by Plaintiffs on September 8, 2014 and January 13, 2015 were handled by the CRAs. Specifically, Plaintiffs sought the names, addresses, and telephone numbers of any furnisher of information contacted in

connection with the dispute, as well as a summary of any additional measures taken by the CRAs to ensure that the information they received was valid.

144. On March 12, 2015, Experian wrote to Plaintiffs through Plaintiffs' legal counsel, asserting that "When a consumer questions information on a personal credit report and they tell us specifically why they believe the information is inaccurate or incomplete, we contact the source of the information directly through an automated verification system or letter. We ask the source to check their records to verify all of the information regarding the item questioned, and report back within 30 days of the date that we received your request. . . .".

145. Experian did not specifically assert whether the above-described procedure was followed with respect to Plaintiffs' dispute.

146. Experian suggested that if Plaintiffs "question[] the results of our investigation, they may want to contact the data furnisher directly."

147. Experian further provided Plaintiffs with another record of their "dispute results," which continued to report their alleged debt of $412 to NCS as "past due."

148. On March 26, 2015, Equifax wrote to Plaintiffs separately, with a form purporting to offer the results of Plaintiffs' reinvestigation request. Equifax did not explain what measures it undertook pursuant to its reinvestigation.

149. Equifax asserted only that it had "researched the collection account" and that it had verified that "this item belongs to you."

150. On April 10, 2015, TransUnion wrote to Plaintiffs stating only that it had "conducted a reinvestigation and the results are enclosed." TransUnion did not specify what measures it undertook pursuant to its reinvestigation.

151. The results of TransUnion's "reinvestigation" continued to be designated "VERIFIED, NO CHANGE."

152. Plaintiffs have been damaged by the actions and inactions of Camino Real, GREP, SureDeposit, and NCS in wrongfully, recklessly, and falsely reporting a fictitious debt to the three CRAs and refusing to acknowledge that the alleged debt is bogus.

153. Plaintiffs have been damaged by the willful actions and inactions of Equifax, Experian, and TransUnion in failing to maintain and follow reasonable procedures to assure the accuracy of Plaintiffs' credit reports and by continuing to count the disputed debt towards the calculation of Plaintiffs' credit scores.

154. Plaintiffs have been damaged by the impairment of their previous excellent credit ratings, and by damage to their reputations for creditworthiness, by the actions and inactions of Defendants.

155. Plaintiffs have suffered actual damages including lost time, out of pocket expenses, emotional distress, embarrassment and humiliation, and aggravation and frustration, as well as lost economic opportunities.

**FIRST CAUSE OF ACTION**
**(Violations of the FCRA by NCS)**

156. The preceding paragraphs are incorporated as if fully stated herein.

157. NCS failed to review and evaluate all of the relevant information provided by Plaintiffs showing that the debt was illegitimate.

158. NCS failed to report that the $412.00 debt was inaccurate and based on a fraudulently manufactured move out date by Camino Real and GREP.

159. NCS persisted in reporting information that they knew or should have known was inaccurate and damaging.

160. NCS's actions and inactions were willful or negligent violations of the FCRA, including but not limited to 15 U.S.C. §1681s–2(b).

161. Plaintiffs are entitled to statutory damages, actual damages and punitive damages, plus reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**(Violations of the FDCPA by SureDeposit and NCS)**

162. The preceding paragraphs are incorporated as if fully stated herein.

163. Upon information and belief, SureDeposit and NCS engaged in a pattern and practice of attempting to collect alleged debts of consumers without first reviewing the original account documents to ensure that the debt is valid.

164. Upon information and belief, SureDeposit and NCS engaged in a pattern and practice of not conducting a reasonable investigation of debts disputed by consumers.

165. SureDeposit's and NCS's actions and inactions violate the FDCPA, including but not limited to 15 U.S.C. §§ 1692e (2), (8) & (10); 1692f(1); and 1692g(b).

166. Plaintiffs are entitled to a recovery of statutory damages, actual damages, and reasonable costs and attorneys' fees against SureDeposit and NCS.

**THIRD CAUSE OF ACTION**
**(Violations of the UPA Against GREP, Camino Real, SureDeposit, Equifax, Experian, and TransUnion)**

167. The preceding paragraphs are incorporated as if fully stated herein.

168. GREP's, Camino Real's, SureDeposit's, Equifax's, Experian's, and TransUnion's actions constitute unfair and/or deceptive trade practices within the meaning of the UPA.

169. GREP, Camino Real, SureDeposit, Equifax, Experian, and TransUnion willfully engaged in these unlawful trade practices.

170. Plaintiffs are entitled to recover actual or statutory damages, trebled, plus reasonable attorneys' fees and costs.

171. Plaintiffs also are entitled to injunctive and declaratory relief.

**FOURTH CAUSE OF ACTION**
**(Tortious Debt Collection Against GREP, Camino Real, and SureDeposit)**

172. The preceding paragraphs are incorporated as if fully stated herein.

173. GREP's, Camino Real's, and SureDeposit's actions and inactions constitute unreasonable and tortious debt collection practices in violation of New Mexico common law. *See Montgomery Ward v. Larragoite*, 81 N.M. 383, 467 P.2d 399 (1970).

174. Specifically, GREP, Camino Real, and SureDeposit knowingly and intentionally pursued and tried to force payment of an invalid debt.

175. GREP's, Camino Real's, and SureDeposit's debt collection activity was wanton, willful, and malicious.

176. Plaintiffs are entitled to recover actual and punitive damages in an amount to be determined at trial as a direct and proximate result of GREP's, Camino Real's, and SureDeposit's improper conduct.

**FIFTH CAUSE OF ACTION**
**(Breach of Contract Against GREP and Camino Real)**

177. The preceding paragraphs are incorporated as if fully stated herein.

178. The Agreement and Notice of Intent to Vacate are valid, written contracts between Plaintiffs and GREP and Camino Real.

179. The contracts include the implied covenant of good faith and fair dealing, pursuant to which GREP and Camino Real were obligated to perform its obligations in good faith, *i.e.*, to act honestly and in accordance with standards of fair dealing under the surrounding circumstances.

180. GREP and Camino Real breached their contracts with Plaintiffs, including the covenant of good faith and fair dealing, by failing to honor Plaintiffs move-out date of May 31, 2016, by billing Plaintiffs for pro-rated rent that was not actually owed, and by sending the alleged debt to NCS (via SureDeposit) for collection.

181. As a direct and proximate result of GREP's and Camino Real's breaches, Plaintiffs have suffered damages.

182. GREP's and Camino Real's breaches, including breaches of the duty of good faith and fair dealing, were willful, intentional, and malicious, entitling Plaintiffs to punitive damages.

**SIXTH CAUSE OF ACTION**
**(Violations of the UORRA Against GREP and Camino Real)**

183. The preceding paragraphs are incorporated as if fully stated herein.

184. Under the UORRA, GREP and Camino Real were obligated, among other things, "to make repairs and do whatever is necessary to put and keep the premises in a safe condition"; "maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances"; and "supply running water and a reasonable amount of hot water at all times and reasonable heat." NMSA 1978, §§ 47-8-20(A)(2), (4), (6).

185. The UORRA imposes an obligation of good faith on GREP and Camino Real in their performance of obligations under the act. NMSA 1978, § 47-8-11.

186. GREP and Camino Real breached their obligations to Plaintiff, including their obligation of good faith.

187. Plaintiffs are entitled to recover damages for GREP's and Camino Real's material noncompliance with their obligations under the UORRA and their Agreement with Plaintiffs.

188. Plaintiffs also are entitled to injunctive and declaratory relief.

**SEVENTH CAUSE OF ACTION**
**(Violations of the FCRA Against Equifax, Experian, and TransUnion)**

189. The preceding paragraphs are incorporated as if fully stated herein.

190. Equifax, Experian and TransUnion are "consumer reporting agencies" (CRAs) as codified at 15 U.S.C. § 1681a(f).

191. Plaintiffs notified Equifax, Experian and TransUnion directly that Plaintiffs disputed the fraudulent debt furnished to the CRAs by NCS.

192. Equifax, Experian, and TransUnion apparently notified NCS of Plaintiffs' two separate requests for an investigation into the dispute about this fraudulent debt.

193. However, Equifax, Experian and TransUnion failed to maintain and follow reasonable procedures to investigate the fraud in order to assure maximum possible accuracy of Plaintiffs' credit reports.

194. Equifax, Experian and TransUnion failed to conduct a reasonable, proper, and lawful investigation or reinvestigation of the underlying credit dispute about the fraudulent conduct of those reporting this debt. For example, Plaintiffs provided all of the CRAs with documents that showed the fraudulent conduct of Camino Real, GREP, and SureDeposit in attempting to collect on an illegitimate debt, as well as the fraudulent conduct of NCS in

reporting that bogus debt to the CRAs. Notwithstanding Plaintiffs' efforts, Equifax, Experian and TransUnion failed to reasonably assess the information provided by Plaintiffs or conduct a reasonable investigation or reinvestigation to determine whether the disputed information was indeed valid.

195. Equifax, Experian and TransUnion failed to correct or delete information that reasonably could be found to be inaccurate or incomplete, information that could not be routinely verified by using their automated procedure for investigations and automated reinvestigations.

196. By willfully using an automated investigation and reinvestigation procedure, Equifax, Experian and TransUnion knew or should have known that their actions would very likely harm Plaintiffs, in violation of the FCRA.

197. Equifax, Experian and TransUnion counted the fraudulent debt reported by NCS toward Plaintiffs' credit scores, despite the fact that it was apparently reported as disputed by NCS.

198. The actions of Equifax, Experian and TransUnion created an unjustifiably high risk of harm to Plaintiffs that was either known or so obvious that it should have been known.

199. Alternatively, Equifax, Experian and TransUnion acted negligently in failing to comply with the requirements imposed by the FCRA with respect to Plaintiffs.

200. Equifax's, Experian's, and TransUnion's actions and inactions were willful or negligent violations of the FCRA, including but not limited to 15 U.S.C. §§ 1681i(a) and 1681e.

201. Equifax's, Experian's, and TransUnion's violations of the FCRA proximately caused the injuries and damages set forth in this Compliant.

202. Plaintiffs are entitled to actual and punitive damages, plus reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for and demand judgment against Defendants as follows:

(a) For judgment against Defendants for compensatory damages, statutory damages, consequential damages and incidental damages under the causes of action, in an amount to be determined at the trial of this cause;

(b) For judgment declaring that Plaintiffs are not liable for any debt incurred in relation to their rental of a Camino Real Apartment #518;

(c) For injunctive relief to remove the derogatory information from Plaintiffs' credit reports;

(d) For reasonable attorneys' fees and costs incurred herein;

(e) For pre-judgment and post-judgment interest in amounts to be determined according to law;

(f) For an award of punitive and exemplary damages, in an amount to be determined at the trial of this cause; and

(g) For such other and further relief as the Court deems just and proper.

**JURY TRIAL REQUEST**

Plaintiffs hereby demand trial by jury pursuant to the terms and conditions of Federal Rule of Civil Procedure 38 in regard to all issues in the above-referenced cause.

Respectfully submitted,

ROTHSTEIN, DONATELLI, HUGHES,
DAHLSTROM, SCHOENBURG & BIENVENU, LLP

MARC M. LOWRY
ALICIA C. LOPEZ
500 4th Street, N.W., Suite 400
Albuquerque, New Mexico 87102
(505) 243-1443
mlowry@rothsteinlaw.com
alopez@rothsteinlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September, 2015, I filed the foregoing pleading electronically through the CM/ECF system, which caused the following counsel for Defendants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Claud Eugene Vance
gene@vancechavez.com
*Attorney for GREP Southwest, LLC and SCI Camino Real Fund, LLC d/b/a Camino Real Apartments*

Charity A. Olson
colson@olsonlawpc.com
*Attorney for National Credit Systems, Inc.*

Christina West
csw@sutinfirm.com
*Attorney for Insureco Agency & Insurance Services, Inc. d/b/a SureDeposit*

Michelle Cohen Egan
mcegan@kslaw.com
Patricia G. Williams
pwilliams@wwwlaw.us
*Attorneys for Equifax Information Services, LLC*

Jennifer Sun
jennifersun@jonesday.com
Charles J. Vigil
cvigil@rodey.com
*Attorneys for Experian Information Solutions, Inc.*

Amanda Loughmiller
Amanda.Loughmiller@strasburger.com
Rodney L. Schlagel
rlschlagel@btblaw.com
*Attorneys for TransUnion, LLC*

Marc Lowry

ROTHSTEIN, DONATELLI, HUGHES,
DAHLSTROM, SCHOENBURG & BIENVENU, LLP