# ROTHSTEIN, DONATELLI, HUGHES, DAHLSTROM, SCHOENBURG & BIENVENU, LLP

———— *ATTORNEYS AT LAW* ————

MARC M. LOWRY

505.243.1443
FAX: 505.242.7845
mlowry@rothsteinlaw.com

September 16, 2016

**VIA HAND-DELIVERY**

The Honorable James O. Browning
U.S. District Court, District of New Mexico
Pete V. Domenici U.S. Courthouse
333 Lomas Blvd. NW, Suite 660
Albuquerque, NM 87102

> RE:  *Fallen v. GREP Southwest, et al.*
> *USDC DNM No. 1:15-cv-00146 JB/SCY*

Dear Judge Browning:

As discussed at the September 13, 2016 motion's hearing concerning attorney's fees in the above-captioned matter, please find attached for your review the following documents:

1. Plaintiffs' Confidential Settlement Letter to Defendants GREP Southwest, LLC & SCI Camino Real Apartments dated December 25, 2015, with highlights;

2. Plaintiffs' Confidential Settlement Letter to the Honorable Steven C. Yarbrough dated January 8, 2016, with highlights.

As this case has settled, Plaintiffs hereby waive the cloak of confidentiality imposed under Fed. R. Evid. 408 for these documents.

Should you have any questions or concerns, please do not hesitate to contact our office at (505) 243-1443.

Thank you,

Chandice L. Saavedra, Paralegal to
MARC M. LOWRY
ALICIA C. LOPEZ
Attorneys at Law

/cls
Enclosures

Cc:    Claude E. Vance (w/ attachments)

9/20/16
9-19-16

# ROTHSTEIN, DONATELLI, HUGHES, DAHLSTROM, SCHOENBURG & BIENVENU, LLP

— *ATTORNEYS AT LAW* —

ALICIA C. LOPEZ

505.243.1443
FAX: 505.242.7845
aclopez@rothsteinlaw.com

January 8, 2016

**VIA ELECTRONIC MAIL**

The Honorable Steven C. Yarbrough
United States Magistrate Judge
United States District Court
District of New Mexico
333 Lomas Blvd. NW
Albuquerque, NM 87102
scyproposedtext@nmcourt.fed.us

**CONFIDENTIAL RULE 408**
**SETTLEMENT COMMUNCATION**

Re:   ***Fallen v. GREP Southwest, LLC, et al.***
       **USDC DNM No. 1:15-CV-00146 JB/SCY**

Dear Judge Yarbrough:

This letter, in compliance with the Court's Order Setting Settlement Conference (Doc. 70) of November 20, 2015, sets forth an internal analysis of the facts, law, strengths and weaknesses of Plaintiffs' case, status of discovery and outstanding motions, itemization of damages, and the status of settlement negotiations with Defendants. This letter is tendered under Fed.R.Evid. 408. While it repeats some of the content of Plaintiffs' settlement letters to defense counsel, it also contains an honest critique of the weaknesses of Plaintiffs' case as well.

**FACTS UNDERLYING CLAIMS AGAINST CAMINO REAL/GREP**

Plaintiffs in this case are Kenth and Laura Fallen, former residents of Camino Real Apartments in Albuquerque. Camino Real Apartments is owned by Defendant SCI Camino Real ("Camino Real") and managed by Defendant GREP Southwest, LLC ("GREP"). Camino Real/GREP's failure to acknowledge a binding notice to vacate and subsequent assessment of a fraudulent debt for unpaid rent to Plaintiffs started a chain of events – in which remaining Co-Defendants Insureco d/b/a/ SureDeposit ("SureDeposit") and National Credit Systems, Inc. ("NCS"), each played a significant role – that culminated in Plaintiffs' credit becoming severely damaged, causing them significant stress, worry, and mortification, and chilling them from refinancing their home and automobile, or from attempting to seek a business loan or purchase a property for their growing business. To wit:

Plaintiffs endured intolerable living conditions at Camino Real – including a malfunctioning heating unit which led to exorbitant electric bills; constant loud noise; a persistent



smell of sewage and frequent sewage back-ups; and the need for numerous repairs – that management failed to resolve.  While considering themselves constructively evicted, Plaintiffs decided to instead take advantage of a provision in their lease that allowed tenants to vacate a unit before the end of their lease with 60 days' written notice.

To that end, on April 1, 2013, Plaintiffs personally met with Community Manager, Teri Shaffer, announcing their intent to vacate their apartment early.  Shaffer duly produced and completed in Plaintiffs' presence a standard "Notice of Intent to Vacate" form, which designated May 31, 2013 – 60 days from the day Plaintiffs gave their notice – as Plaintiffs' move out-date. Plaintiffs signed and initialed the form as required.

In the two weeks following, Camino Real/GREP contacted Plaintiffs and urged them to reconsider their decision, but did not challenge their right to move out on May 31, as agreed to in the Notice of Intent to Vacate.  Plaintiffs rejected these overtures.  Nevertheless, on or about April 15, 2013, Plaintiffs received a letter from GREP's Regional Manager, Lora Villa, informing them that they needed to fill out a Notice of Intent to Vacate, if they intended to move out of Camino Real before the expiration of their lease.  Plaintiffs were understandably confused, and promptly went to the leasing office to dispute the need to fill out a second such form, when they had already given notice two weeks prior.  After failing to get a straightforward answer, Kenth Fallen informed Camino Real that he would compose a letter providing additional evidence supporting Plaintiffs' previously-expressed intent to vacate, but would date the letter April 1, 2013, to reflect the date of the binding "Notice of Intent to Vacate," already completed by Shaffer and signed by Plaintiffs, and in the possession of both parties.

Following Mr. Fallen's submission of that additional letter, on April 18, 2013, Plaintiffs received another letter from Shaffer, which included an entirely new Notice of Intent to Vacate form – which, like the original such form, was completed by Shaffer in her own hand – that altered Plaintiffs' move-out date from May 31, 2013 to June 16, 2013.  This form thus purported to obligate Plaintiffs to pay 16 days of pro-rated rent for the month of June.  The new Notice of Intent to Vacate was not signed or initialed by Plaintiffs or prepared with their knowledge or involvement.

Plaintiffs adhered to the binding April 1, 2013 Notice of Intent to Vacate, paid their rent in full through May 31, 2013, and passed a move-out inspection on the day they officially moved out of their unit, May 24, 2013. Nevertheless, on June 19, 2013, Camino Real and GREP issued a bill to Plaintiffs for $412.00 in allegedly unpaid rent for the period June 1 – June 16, 2013, based on the fictitious move-out date of June 16, 2013 as claimed in the fraudulent and invalid April 16, 2013 Notice of Intent to Vacate drafted by Shaffer but not endorsed by Plaintiffs.  Mr. Fallen called Ms. Villa to dispute the charge and refuse to pay the fraudulent debt.

On August 13, 2013, Camino Real and GREP opened a claim with Co-Defendant Insureco, doing business as "SureDeposit," based on their fraudulent assessment of unpaid rent for $412.

## FACTS UNDERLYING CLAIMS AGAINST SUREDEPOSIT D/B/A INSURECO

Pursuant to a Tenant Bond Enrollment & Bond Acknowledgment ("the Tenant Bond")(attached hereto)[1] signed by Plaintiffs at the time they signed their lease with Camino Real, SureDeposit was purportedly entitled to collect on any "valid claim" by Camino Real that Plaintiffs "owe[d] it money because [they] . . . did not fulfill lease obligations, such as paying rent or applicable fees." Without making any attempt to establish the validity of Plaintiffs' purported debt, SureDeposit assigned the alleged $412 debt to NCS as the collection agency.

## FACTS UNDERLYING CLAIMS AGAINST NCS

On August 23, 2013, NCS issued a notice to Plaintiffs informing them that it had acquired the alleged debt, and further promising that, "If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt . . . .". Plaintiffs immediately contacted NCS and informed it that they disputed the validity of the debt. Nevertheless, just three days later, NCS responded by form letter stating that it had "investigated" Plaintiffs' dispute of the debt, but had "yet to find sufficient evidence to validate your claim(s)." The only "documentation" NCS had to support the debt was the fraudulent bill from Camino Real for the pro-rated June rent.

---

[1] Plaintiffs are considering moving the Court for leave to amend their Complaint to add additional factual allegations relating to SureDeposit's and Camino Real/GREP's sale of the Tenant Bond to Plaintiffs. Plaintiffs only came to recognize these potential new claims after engaging in discussions with SureDeposit's counsel once the instant suit was filed. Indeed, after initially representing to Plaintiffs that Insureco was the appropriate defendant in this case, following which Plaintiffs amended their Complaint to name Insureco, counsel for Insureco then contacted the undersigned counsel to insist that another subsidiary, ABIC of Florida, of the same corporate parent, Assurant Inc., was the real party in interest, *not* Insureco. *See* Doc. 73 at 3 n.1 (counsel for Insureco/ABIC acknowledging her inconsistent representations to Plaintiffs). In any event, the undersigned counsel's subsequent attempt to research the convoluted relationships between the various Assurant properties led it to uncover a growing body of case law from jurisdictions throughout the U.S., setting forth how Insureco's/ABIC's sale of insurance products to rental tenants as an alternative to a traditional security deposit violated state law. *See Converge Services Group, LLC d/b/a SureDeposit v. Curran*, 383 Md. 462, 468 n.3 (2004) (observing, in attempting to "resolve the ambiguity" surrounding the relationships of Assurant subsidiaries, that a similar apartment tenant bond in Maryland "states that tenants 'agree to purchase a security deposit bond from Bankers Insurance Company . . .' There is little evidence in the record as it reaches us in the posture of this case distinguishing Bankers Insurance Company (BIC) . . . from SureDeposit.")

The facts underlying such a claim here would be: SureDeposit d/b/a Insureco and Camino Real/GREP claimed to Plaintiffs that the Tenant Bond was not insurance, when it was; Bernadette Maestas, the Camino Real employee who sold the Tenant Bond to Plaintiffs, was not an insurance agent, and was not licensed to sell surety insurance; and SureDeposit and Camino Real did not explain to Plaintiffs that the insurance provider assigned to them under the Tenant Bond would not contact Plaintiffs to determine whether any claim made by Camino Real under that agreement was a valid claim, but would instead simply accept the word of Camino Real/GREP.

Plaintiffs responded by supplying NCS with the original April 1, 2013 Notice of Intent to Vacate filled out by Ms. Shaffer and signed and initialed by Plaintiffs. NCS responded by issuing a second collection letter to Plaintiffs on September 27, 2013. Upon receipt of that letter, Plaintiffs immediately called NCS who agreed to place a hold on the account pending mediation with Camino Real and GREP.

Plaintiff Kenth Fallen emailed Ms. Shaffer, Ms. Villa, and Camino Real's/GREP's attorney, informing them of the hold placed by NCS on the account at issue and requesting that they either dismiss or mediate the $412.00 dispute. Plaintiffs, through counsel, then sent a letter to NCS requesting copies of all correspondence between NCS and Plaintiffs, verification of the alleged debt, information about the claim made against Plaintiffs, and information about NCS' investigation of the claim and alleged debt.

On November 11, 2013, NCS reiterated their demand that Plaintiffs pay the fabricated debt. Attached to NCS' letter was the original April 1 Notice of Intent to Vacate form, which clearly stated that Plaintiffs' move-out date was May 31, 2013. Plaintiffs subsequently wrote to NCS with yet another explanation of the underlying dispute, including documentation, but did not receive a response.

Without notice to Plaintiffs, NCS reported the fraudulent debt to the three national credit bureaus, resulting in significant drops in Plaintiffs' credit scores. Plaintiffs did not discover that NCS had reported the fraudulent debt until February 20, 2014.

On September 8, 2014, Plaintiffs wrote to all three national credit reporting agencies (collectively, "CRAs") – Equifax, Experian, and TransUnion – to request that they investigate the accuracy of the information furnished to them by NCS. The letters included a detailed history of the underlying dispute as well as ample supporting documentation, including the signed, binding April 1 Notice of Intent to Vacate form prepared by Shaffer and signed by Plaintiffs, and the fraudulent April 16 Notice of Intent to Vacate form, again prepared by Shaffer but not signed or initialed by Plaintiffs. Upon information and belief, each of the CRAs then contacted the furnisher of information concerning the debt, NCS, and reported Plaintiffs' dispute of the debt, including Plaintiffs' letters and supporting documentation with their investigation request. The three CRAs subsequently issued letters to Plaintiffs refusing to adjust Plaintiffs' credit scores, based on NCS' representations that the debt was legitimate.

On January 13, 2015, Plaintiffs sent a second request[2] for investigation to the three CRAs, which included even more documentation supporting Plaintiffs' version of events. The CRAs again contacted NCS and provided it with the documents obtained from Plaintiffs. NCS once

---

[2] Plaintiffs attach hereto the most inclusive second request for investigation sent to the CRAs dated January 13, 2015. In an attempt to save the Court time in reviewing the attached materials, Plaintiffs have only attached the letter to Defendant TransUnion, LLC, however, this identical letter went to all three CRAs. Attached to the January 13, 2015 letter is also Plaintiffs' first letter requesting investigation, including all the attachments, sent to the CRAs on September 8, 2014. These two letters and attachments consist of nearly every document for which Plaintiffs base their claims against the various Defendants.

again wrongfully verified the nature of the debt to the three CRAs, relying only on the fraudulent information provided by SureDeposit, Camino Real, and GREP.

## APPLICABLE LAW & EVIDENTIARY ISSUES

### I.   Claims Against GREP/Camino Real

#### A.   Tortious Debt Collection

Camino Real/GREP are liable to Plaintiffs for "improper conduct in knowingly and intentionally pursuing a person to force payment of a debt." *Montgomery Ward v. Larragoite*, 81 N.M. 383, 467 P.2d 399 (1970). Camino Real's/GREP's actions in first billing Plaintiffs for pro-rated rent in June 2013, and then reporting the alleged debt to SureDeposit, constitute tortious debt collection because Camino Real/GREP were well aware that the only signed, valid Notice of Intent to Vacate in this case was entered into on April 1, 2013, and obligated Plaintiffs to pay rent only through May 2013. In their settlement letter, Camino Real/GREP do not attempt to account for the April 1 Notice (let alone explain why the April 16 Notice, which Plaintiffs refused to sign, created the obligation resulting in the so-called debt in issue) or explain why they refused to acknowledge it. Rather, they bizarrely assert that Plaintiffs "provided a signed copy of the [April 1] notice" for the first time in Fall 2013. If Camino Real/GREP intend to argue that Plaintiffs have falsified the April 1 Notice, it should prove difficult for them, as it is plainly filled out in the same hand – *i.e.*, Camino Real Community Manager Teri Shaffer's – as the fraudulent April 16 Notice.

#### B.   Unfair Trade Practices

Camino Real/GREP are liable for unfair or deceptive trade practices, including by making a false or misleading oral or written statement in connection with their lease of an apartment to Plaintiffs. As set forth in their settlement letter, Plaintiffs see two fronts to this claim. First, Plaintiffs contend that Camino Real/GREP willfully ignored the binding April 1 Notice of Intent to Vacate and created a new, invalid Notice, in order to illegally collect rent not owed to them, which constitutes a violation of the UPA. Plaintiffs will show that Camino Real/GREP perpetuated this fraud in order to punish Plaintiffs for demanding suitable living conditions at Camino Real. Camino Real's/GREP's response that they first viewed the April 1 Notice months after Plaintiffs vacated their apartment is patently false and contradicted by the evidence, as described above.

Second, Plaintiffs are considering seeking leave of the Court to amend their Complaint to allege that Camino Real/GREP (and Insureco, d/b/a SureDeposit) used deceptive, unfair or unconscionable trade practices when they unlawfully sold Plaintiffs surety insurance, in the form of the Tenant Bond, a document that purported to protect Plaintiffs from claims made by Camino Real against Plaintiffs' security deposit. *See supra*, n.1. The record shows that Camino Real/GREP and SureDeposit failed to disclose to Plaintiffs that they were purchasing an insurance product from agents of Camino Real who were not insurance agents, not licensed to sell surety insurance, and not adhering to any provision of New Mexico's insurance code that applied to insurance sales. Camino Real's/GREP's (and SureDeposit's) conduct was unfair, deceptive, and unconscionable, and led Plaintiffs into purchasing insurance from SureDeposit that would ultimately serve these Defendants' needs, not Plaintiffs' interests – a conclusion that was borne out by SureDeposit's

failure to contact Plaintiffs about the validity of the alleged debt before reporting it for collection to NCS. As noted above, the exact same conduct has been found to violate the law of several other states, and Insureco and ABIC have indeed admitted (in New Jersey) that it is illegal for apartments who are under contract with Insureco and ABIC to sell this insurance product in the manner that SureDeposit and Camino Real/GREP sold this product to Plaintiffs. *See* Consent Order # E 14-132, attached hereto.

Plaintiffs continue to weigh the viability of adding a UPA claim based on the Tenant Bond sale against the difficulty with articulating Plaintiffs' damages, as set forth below.

### C.    Breach of Contract

Plaintiffs may recover punitive damages for a contractual breach when the defendant's conduct is fraudulent or committed with a reckless disregard for plaintiff's rights. *Bogle v. Summit Investment Co.*, 137 N.M. 80 (2005). Camino Real/GREP breached their lease with Plaintiffs, which contained a provision allowing residents to terminate a lease early by "deliver[ing] a signed 'VACATE NOTICE' at least sixty (60) days prior to move out." As set forth above, there is ample evidence that Camino Real/GREP were on notice that Plaintiffs fully complied with this provision, as the April 1 Notice was created by Camino Real's own employee, Teri Shaffer, and filled out by her in the same handwriting as the fraudulent April 16 Notice. Camino Real's/GREP's subsequent conduct in creating the April 16 Notice and behaving as if it were binding was malicious and fraudulent, and warrants the assessment of significant punitive damages.

### D.    Uniform Owner Resident Relations Act (UORRA)

UORRA mandates that owners and managers "make repairs and do whatever is necessary to put and keep the premises in a safe condition" and "maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appliances." NMSA 1978 §§ 47-8-20(A)(2) & (4). Here, there is ample evidence in the record that, while living in Camino Real, Plaintiffs' malfunctioning heating unit resulted in their routinely paying exorbitant heating bills. Plaintiffs also dealt with sewage problems and overflows; a long list of appliances in need of repair; and constant noise, in an apartment they shared with their infant son. Because Plaintiffs can demonstrate that Camino Real failed to successfully address these problems, Plaintiffs contend that they are entitled to reasonable damages. However, Plaintiffs acknowledge that under a different provision of the UORRA, a constructively-evicted resident is obligated to "deliver a written notice to the owner specifying the acts and omissions constituting the breach," giving the owner "seven days after receipt of the notice" to make "a reasonable attempt to remedy the breach" before the rental agreement is terminated. NMSA 1978 § 47-8-27.1.

### E.    Camino Real/GREP's General Defense to All Claims

Camino Real/GREP finally assert the general defense that Plaintiffs cannot support any claim based on their early departure from their apartment, because their lease obligated them to pay a $994 termination fee, in addition to giving 60 days' notice of intent to vacate. Plaintiffs are reasonably confident that this argument will fail because the provision in question states that, in

order for the termination-fee obligation to be valid, it must be initialed by "the parties." The lease was not initialed by a representative of Camino Real/GREP. The defendants' counter argument that the April 1 Notice was not initialed by a representative of Camino Real/GREP would also fail, as the April 16 Notice which the defendants claim to be valid, was not initialed by either the Plaintiffs or a representative of Camino Real/GREP. Further, the UORRA asserts that, in order for an owner to assert a debt against a departing resident "the owner shall provide the resident with an itemized written list of the deductions from the deposit and the balance of the deposit, if any, within thirty days of the date of termination of the rental agreement or resident departure, whichever is later," which Camino Real/GREP failed to do. NMSA 1978 § 47-8-18(C). Accordingly, Camino Real/GREP's position has neither a contractual nor a statutory basis, which is probably why they never pursued such a termination fee from Plaintiffs – a factor that also bears some relevance here.

## II.   Claims Against Insureco d/b/a SureDeposit

### A.   Tortious Debt Collection

Plaintiffs are confident that common-law principles support their position that SureDeposit committed "improper conduct in knowingly and intentionally pursuing a person to force payment of a debt." *Montgomery Ward*, 81 N.M. 383. Plaintiffs intend to show that SureDeposit did so by failing to contact Plaintiffs to determine the validity of the claim made on the Tenant Bond by Camino Real. Plaintiffs' claim is buttressed by the fact that Plaintiffs were the supposed beneficiaries of the insurance product offered by the Tenant Bond, the terms of which promised to protect them from invalid claims by Camino Real. SureDeposit, for its part, claims that it had no such obligation to determine the validity of a debt reported as valid by Camino Real/GREP, as it "had a right to rely upon the information provided to it by Camino Real." At the time of this writing, Plaintiffs have yet to engage in extensive research for or against the parties' respective positions.

### B.   Unfair Trade Practices

Like their UPA claim against Camino Real/GREP, Plaintiffs' UPA claim against SureDeposit will likely – presuming that Plaintiffs seek leave to amend the operative Complaint – be based on two separate actions. First, as already set forth in the operative Complaint, Plaintiffs' claim that SureDeposit is liable for unfair or deceptive trade practices by failing to establish the validity of Plaintiffs' alleged debt as reported by Camino Real/GREP. This failure constituted a material breach of the Tenant Bond, which acknowledged that only "valid claims in strict compliance with the lease terms" would be honored. By failing to contact Plaintiffs to assess the validity of the claim for unpaid rent made by Camino Real/GREP against Plaintiffs, defendants took false and deceptive information and reported that false information to another debt collector, NCS. That act ultimately caused NCS to falsely report that debt to the national credit reporting agencies, and caused over a one-hundred point drop in Plaintiffs' FICO scores. Under the UPA, SureDeposit's decision to bypass contacting the Plaintiffs and forward false information to NCS violated the UPA because it constituted a false or misleading statement made (1) in connection with the lease of an apartment and (2) in connection with the insurance product that defendants sold to Plaintiffs. Those false claims that tended to deceive Plaintiffs and everyone else in the debt collection stream of commerce. Plaintiffs see no legal argument in SureDeposit's settlement letter

addressing this aspect of Plaintiff's UPA claim that gives Plaintiffs pause to question the viability of their claim.

Second, Plaintiffs are considering seeking leave of the Court to amend their Complaint to allege that SureDeposit (along with Co-Defendants Camino Real and GREP) used deceptive, unfair or unconscionable trade practices when they unlawfully sold Plaintiffs surety insurance, in the form of the Tenant Bond, a document that purported to protect Plaintiffs from claims made by Camino Real against Plaintiffs' security deposit. *See supra*. As noted above, the exact same conduct has been found to violate the law of several other states, and Insureco and ABIC have specifically admitted (in New Jersey) that it is illegal for landlords who are under contract with Insureco and ABIC to sell this insurance product in the manner that SureDeposit and Camino Real/GREP sold this product to Plaintiffs. In fact, every insurance law that Insureco and ABIC admitted to violating in New Jersey was violated in this case under New Mexico law. *See* Consent Order # E 14-132, which is attached. The conduct of Insureco and ABIC in selling this product to uninformed and unsuspecting apartment residents like Plaintiffs is unfair, deceptive, and unconscionable under the UPA. The sale of this insurance product certainly "took advantage of the lack of knowledge, ability, experience, or capacity of" Plaintiffs ability to assess the value or purpose of this insurance product "to a grossly unfair degree." NMSA 1978, § 57-J 2-2(E).

By way of response, SureDeposit contends that the Tenant Bond was not an insurance policy, but rather a "surety bond," and as such was not created for Plaintiffs' protection. While SureDeposit was doubtless careful to designate the Tenant Bond as "not insurance" on its face, this appears to be a facile attempt to get away with the same behavior for which SureDeposit had already been found liable in several states, using an essentially identical Tenant Bond that did not contain such a disclaimer. *See* "SureDeposit Enrollment and Bond Acknowledgment" form from the Wisconsin Commissioner of Insurance, attached hereto, which lacks only the proviso that the bond "is not insurance."

Further, SureDeposit claims that even if amendment is allowed and this UPA claim is added, there is no private right of action available to Plaintiffs on account of the fact that insurance policies are regulated by the State. In the absence of any decisive authority offered by SureDeposit in support of this argument, Plaintiffs are not persuaded that the above-described actions fail to constitute a violation of the UPA. However, as noted above, Plaintiffs have yet to decide whether to seek leave to amend the Complaint to add a UPA claim based on the Tenant Bond sale, in light of the difficulty of showing Plaintiffs' damages.

C.    *Fair Debt Collection Practices Act ("FDCPA")*

Under the FDCPA, a debt collector is defined as "any person ... who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The FDCPA makes it unlawful for a debt collector to:

> (1) make a "false representation of the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A).
> (2) communicate "to any person credit information which ... should be known to be false, including the failure to communicate that a disputed debt is disputed. 15

U.S.C. § 1692e(8).
(3) make "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

Plaintiffs maintain that SureDeposit's conduct violated all three of these provisions, including by (1) making a false representation that the alleged debt was valid, when a reasonable investigation or inquiry to Plaintiffs would have shown that it was not; (2) communicating that false information to NCS; and (3) attempting to indirectly collect the fraudulent debt through NCS. SureDeposit responds that neither ABIC – the non-party Insureco affiliate that is eager to be in this case – nor Insureco/SureDeposit are debt collectors within the meaning of the statute. Whether Plaintiffs' claim is viable will depend on whether SureDeposit is ever able to satisfactorily make that showing. While SureDeposit attempts to demonstrate that ABIC, at least, was a creditor and not a debt collector, to Plaintiffs, it makes no attempt to define its own role in the attempted collection of the fraudulent debt in issue. Because the credit reports generated in this case list SureDeposit, not ABIC, as reporting the debt, (*see* attached Experian Credit Report for Plaintiff Kenth Fallen) Plaintiffs reasonably construe SureDeposit as a debt collector within the meaning of the FDCPA, albeit one acting indirectly through NCS.

### III.   Claims Against National Credit Systems, Inc.

#### A.   Fair Credit Reporting Act ("FCRA")

Under the FCRA, a furnisher of credit information, like NCS, "shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A). The bases for the instant claim are as follows:

First, as set forth above, the Plaintiffs wrote to NCS several times over the Summer and Fall of 2013 complaining that the debt reported to NCS by SureDeposit was fictitious and had been made in a fraudulent manner. Plaintiffs also informed NCS that, if the claim was not dropped, Plaintiffs would file suit to correct the fraud. Moreover, in a response to one of Plaintiffs' letters, NCS attached Plaintiffs' binding April 1 "Notice of Intent to Vacate" form, clearly an official form generated by the apartment complex, which indicated that the Plaintiffs had notified Camino Real that they would move out no later than May 31, 2013. Thus, NCS reasonably knew that the claim that Plaintiffs owed pro-rated rent for the month of June was incorrect. Under the FCRA, NCS had "reasonable cause to believe that the information is inaccurate" meaning that NCS had "specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information." 15 U.S.C. § 1681s-2(a)(1)(D). Nevertheless, NCS reported the debt associated with Plaintiffs to the CRAs.

After NCS reported the fictitious and fraudulent debt claimed by SureDeposit and Camino Real apartments to the CRAs, Plaintiffs wrote detailed letters to the CRAs, along with supporting documentation, requesting that this asserted debt be investigated, and then reinvestigated, in order to have this information removed from Plaintiffs' credit files. Each one of the CRAs requested that NCS investigate, and then reinvestigate, the nature of the $412 debt asserted by SureDeposit and

Camino Real apartments. Indeed, the record will show that the CRAs provided NCS with the information it needed – including both the signed, authentic April 1 and unsigned, fraudulent April 16 forms, completed by the same Community Manager – to conduct a reasonable investigation and reinvestigation, which NCS pointedly failed to do.

The request to investigate and then reinvestigate this claimed debt by the CRAs triggered the legal obligation of NCS to reasonably investigate this debt. *See* 15 U.S.C. § 1681s-2(b). Based on all of the information that Plaintiffs provided to the CRAs, any furnisher of information would have been reasonably able to determine that (1) Plaintiffs provided proper notice to move out of their apartment on April 1, 2013, (2) Plaintiffs' move-out date was to be no later than May 31, 2013, (4) Plaintiffs actually moved out on May 24, 2013, and (4) that the debt claimed by SureDeposit and Camino Real apartments was based on a fictitious move-out date of June 16, 2013 that did not have any meaningful justification or reasonable documentary support. Plaintiffs provided documents to the CRAs (and hence NCS) showing that Plaintiffs and Camino Real had agreed to the May 31, 2013 move-out date. Any attempt by NCS to rely on SureDeposit's or Camino Real's documentation showing that Plaintiffs' move-out date was for June 16, 2013, would not be reasonable, as those documents failed to have the Plaintiffs written endorsement.

Ultimately, though, rather than permanently blocking the reporting of the bogus debt claimed by SureDeposit and NCS as mandated under 15 U.S.C. § 1691s-2(b)(1)(D)&(E), NCS verified the nature and amount of the $412 debt to the CRAs.

Because NCS makes no attempt to show that it undertook at any time to meet its obligations under the FCRA, Plaintiffs are confident that they can demonstrate that NCS violated the FCRA by furnishing false information to the national credit bureaus that it had reason to believe was inaccurate.

B.   *Fair Debt Collection Practices Act ("FDCPA")*

Based on the above facts and cited evidence, Plaintiffs are confident in their ability to show that NCS violated the FDCPA by making a false representation to the CRAs that the alleged debt reported to it by SureDeposit was valid, when a reasonable investigation or inquiry to Plaintiffs would have shown that the alleged debt was fraudulent and in dispute. *See* 15 U.S.C. § 1692e(2)(A); 15 U.S.C. § 1692e(8); 15 U.S.C. § 1692f(1); *see also* discussion of provisions of the FDCPA as set forth, *supra*, in relation to SureDeposit. In its settlement letter, NCS observes that another section of the statute provides that a debt collector such as NCS "may not be held liable" if it "Shows by a preponderance of the evidence that the violation . . . resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error." 15 U.S.C. § 1692K(c). While NCS contends that discovery will show that it had such procedures in place, it makes no attempt to describe them in its settlement letter.

C.   *NCS' Claim of Failure to Mitigate Damages*

Finally, NCS' letter disingenuously recites that "a large portion of the fees and costs set forth in your settlement correspondence were incurred during the span of many months in which

both [it and its counsel] repeatedly requested a demand," and that "the inexplicable delay in providing such a demand must be considered in the context of our present negotiations." On the contrary, Plaintiffs will show that the bulk of the attorneys' fees associated with NCS in this case were incurred during the pre-filing investigation and drafting of the instant Complaint. Indeed, NCS could have avoided the prospect of paying such fees had it simply engaged Plaintiffs on one of the several occasions on which they attempted to bring this dispute to NCS' attention, as far back as 2013.

## STRENGTHS

As the attached letter to the CRAs and supporting exhibits shows, the record in this case fully supports Plaintiffs' allegations. At the heart of this case, of course, is the April 1, 2013 Notice of Intent to Vacate prepared by Camino Real agent Teri Shaffer and signed by Plaintiffs. When this objective evidence is put beside the April 16, 2013 Notice of Intent to Vacate – also obviously prepared by Shaffer and lacking any endorsement from Plaintiffs – Camino Real/GREP's insistence that April 16, 2013 was the operative notice date looks patently absurd.

Further, Plaintiffs' documentation of its dispute with Camino Real/GREP at every juncture, including in its correspondence with both NCS and the CRAs, should prove fatal to NCS' claim that it did a reasonable investigation and reinvestigation of Plaintiffs' alleged debt.

Finally, Plaintiffs themselves are credible, thoughtful, and likable young parents, so that, to the extent that Camino Real and GREP intend to argue that the April 1, 2013 Notice of Intent to Vacate is in any way fraudulent, Plaintiffs are confident that such an allegation will rightly be rejected by a jury.

## WEAKNESSES

There are always risks inherent in any jury trial, well known to Plaintiffs' counsel. In addition to these inherent risks, Plaintiffs have identified these individual weak areas in this case:

First, if the provision of the UORRA that a constructively-evicted resident is required to giving the landlord written notice specifically allowing the landlord "seven days after receipt of the notice" to make "a reasonable attempt to remedy the breach," applies, Plaintiffs' UORRRA claim against GREP/Camino Real is likely subject to dismissal. *See* NMSA 1978 § 47-8-27.1.

Second, while it could not be clearer that SureDeposit's activities in selling Tenant Bonds via unlicensed agents is a violation of New Mexico law, Plaintiffs have not had sufficient opportunity to research SureDeposit's argument that this and other factual allegations underlying Plaintiffs' proposed amended UPA claim do not support a private cause of action.

Most importantly, Plaintiffs are well aware of the difficulty of showing their damages, which largely stem from their emotional distress, worry, and mortification over the steep decline in their credit scores. In this way, Plaintiffs' own dutifulness harms them, as the decline in their credit scores prevented them from realizing business opportunities or refinancing their

automobiles, as they elected to preserve the status quo rather than buy or refinance property at unfavorable interest rates.

## STATUS OF SETTLEMENT NEGOTIATIONS

Plaintiffs have reached settlement agreements with Defendants Equifax Information Services, LLC, Experian Information Solutions, Inc., and TransUnion, LLC, after participating in informal discovery and settlement negotiations ordered by this Court at the October 27, 2015 status conference.

Undersigned counsel met telephonically with counsel for Defendant NCS on December 9, 2015 to discuss settlement negotiations. Plaintiffs' extended a settlement offer to NCS and advised that Plaintiffs would provide an additional breakdown of attorneys' fees. On December 15, 2015, Plaintiffs provided NCS with a breakdown of the attorneys' fees in this matter. Since that time, counsel for Plaintiffs and Defendant NCS have been engaged in productive settlement negotiations, and may potentially reach a settlement agreement prior to the settlement conference scheduled for January 13, 2016.

Plaintiffs received a settlement offer from Defendant Insureco d/b/a SureDeposit and met in person with counsel for Insureco to negotiate a possible settlement on December 8, 2015. Plaintiffs provided Insureco with a written counter-demand, however, Insureco chose not to respond due to the "very different views on damages and fees." Insureco did inform Plaintiff that they will make a "good faith effort in negotiations at the settlement conference." Insureco's settlement letter received by Plaintiffs on January 6, 2016 confirms that Plaintiffs and Insureco do, in fact, have very different views of the damages and fees in this matter.

Plaintiffs provided a "global settlement demand" to all parties, including Defendants GREP and Camino Real on September 1, 2015. Plaintiffs never received a response or acknowledgement of the demand from Defendants GREP/Camino Real. In fact, Plaintiffs believed Defendants GREP/Camino Real to have defaulted after not receiving an answer to the Second Amended Complaint (Doc. 48), filed September 22, 2015, until this very week on January 1, 2016, nearly six and a half months after the First Amended Complaint was served on Defendants GREP/Camino Real. Given the settlement offer extended by Defendants GREP/Camino Real in their letter dated January 6, 2016, Plaintiffs do not believe it is worth extending a counter offer at this time, and defer to Your Honor to help facilitate a potential resolution in this matter.

## STATUS OF DISCOVERY

Pursuant to Your Honor's instructions at the October 27, 2015 status conference, the remaining parties, with the exception of Defendants GREP and Camino Real, have mainly focused on settlement negotiations.

Plaintiffs and Defendant Insureco have been engaged in settlement negotiations since the October 27, 2015 status conference. Plaintiffs have received only one page of documents, the Tenant Bond and Bond Acknowledgment form, in Defendant Insureco's Initial Disclosures, with

no supplements since.  No written discovery has been exchanged by either Plaintiff or Defendant Insureco to date.

Since the October 27, 2015 status conference, Plaintiffs and Defendant NCS have been engrossed in settlement negotiations, without the necessity for discovery, even informally, and no written discovery has been exchanged by either Plaintiff or NCS to date.  Plaintiffs also note that NCS never provided Plaintiffs with their Initial Disclosures.

As stated before, Plaintiffs believed Defendants GREP/Camino Real to be in default after receiving no answer to their Second Amended Complaint.  Defendants GREP/Camino Real also failed to provide Plaintiffs with Initial Disclosures.  In fact, Defendants GREP/Camino Real's January 6, 2016 Settlement Letter to Plaintiffs is the one and only substantive response Plaintiffs have received as to Defendants GREP/Camino Real's position in this matter, including documents that Defendants claim support their position. No written discovery has been exchanged to date by either Plaintiff or Defendants GREP/Camino Real.

## PENDING MOTIONS

At this time, the only outstanding motion in this matter is American Bankers Insurance Company of Florida's Motion to Intervene (Doc. 72).  Plaintiffs filed their Response (Doc. 79) on December 31, 2015, and, should a settlement between Plaintiffs and Defendant Insureco be unsuccessful, Defendant Insureco's Reply will be due on or before January 18, 2016.

## ITEMIZATION OF DAMAGES

### I.    Defendants GREP Southwest, LLC & SCI Camino Real

Unfair Trade Practices & Tortious Debt Collection:  Plaintiffs seek $30,000 in damages for their lost security deposit, and the emotional distress of having to correct their damaged credit score, as well as all of the attorneys' fees and costs associated with this litigation.

Breach of Contract:  In addition to the $30,000 damages for the loss of their security deposit, emotional distress, and the loss of credit opportunities, Plaintiffs seek an additional $30,000 in punitive damages.

Uniform Owner Resident Relations Act (UORRA):  Plaintiffs seek to abate the rent for the month of April and May, 2013 by one-third of the monthly rate, as the problems with the apartment were never rectified. See NMSA 1978, § 47-8-27.2(A)(1). Such an abatement would result in the refund of $629.33 to Plaintiffs for the rent they paid for April and May of 2013, and the abatement of one-hundred percent of any rent that defendants claim to be due after May 31, 2013, as Plaintiffs did not consider the apartment to be inhabitable, see NMSA 1978, § 4 7-8-27.2(A)(2).  Plaintiffs also seek attorneys' fees and costs under NMSA 1978, § 47-8-48(A).

II.      **Defendant National Credit Systems, Inc.**

<u>Fair Credit Reporting Act</u>:  Plaintiffs seek $9,000 in emotional distress and actual damages, as well as their attorneys' fees and costs, which currently stand at approximately $18,000 but will increase by participating in the settlement conference.  However, if the parties cannot arrive at a mutually agreeable settlement, Plaintiffs will seek punitive damage claims at a trial on this matter, as well as the additional fees and costs associated with this case.

<u>Fair Debt Collection Practices Act</u>:  Plaintiffs are entitled to damages for the emotional distress, humiliation and defamation related to the false reporting of this debt, including, but not limited to, having their FICO credit scores adversely affected by defendant's conduct. Plaintiffs seek $9,000 in emotional distress damages, a figure that also includes the value of the lost savings from the refinance that they attempted on their automobile, but did not complete due to the higher loan rate they would have had to pay due to their damaged credit rating, plus the attorneys' fees and costs.

III.     **Defendant Insureco Agency & Insurance Services, Inc., d/b/a SureDeposit**

<u>Unfair Trade Practices & Tortious Debt Collection</u>:  Plaintiffs seek $10,000 in damages for the emotional distress of having to correct their damaged credit score, which, due to the willful conduct of defendants, should be trebled to $30,000, see NMSA 1978, § 57-12-l0(B), the refund of the premium for the surety insurance they purchased, $87.50, as well as all of the attorneys' fees and costs associated with this litigation.

<u>Fair Debt Collection Practices Act</u>:  Plaintiffs are entitled to damages for the emotional distress concerning this false claim, including, but not limited to, the humiliation, the embarrassment, and the defamation of having their FICO credit scores adversely affected by defendants ' conduct. As stated above, Plaintiffs seek $10,000 in emotional distress damages, the refund of the $87.50 premium paid for the hazardous, illegal, and unethical insurance product that defendants sold to them using an unlicensed and unregistered insurance agent, and the value of the lost savings from the refinance that they attempted on their automobile, but did not complete due to the higher loan rate they would have had to pay, plus the attorneys' fees and costs for this litigation.

## ATTENDEES ON BEHALF OF PLAINTIFFS

In addition to the attendance of Kenth and Laura Fallen as the Plaintiffs, who will have the final say in any negotiations in this matter, Marc Lowry and I, Alicia Lopez, will be present at the settlement conference as counsel on behalf of the Plaintiffs to present the Plaintiffs' case.  Also present will likely be our paralegal, Chandice Saavedra, who has worked on this case throughout its entirety, to assist in gathering documents when necessary.

Counsel looks forward to working with you as a mediator in this matter.  Thank you for the time and energy you will devote to preparing for this mediation.  Plaintiffs will come prepared to negotiate.

Sincerely yours,

MARC M. LOWRY
ALICIA L. LOPEZ

*Attorneys for Plaintiffs*

ACL/cls

# ROTHSTEIN, DONATELLI, HUGHES, DAHLSTROM, SCHOENBURG & BIENVENU, LLP

*ATTORNEYS AT LAW*

MARC M. LOWRY

505.243.1443
FAX: 505.242.7845
mlowry@rothsteinlaw.com

December 25, 2015

**VIA EMAIL**

Claude E. Vance
Vance Chavez & Associates LLC
P.O. Box 1547
Albuquerque, New Mexico  87103
gene@vancechavez.com

> **Re:**   ***Confidential Settlement Letter Under Fed. R. Evid. 408***
> ***for GREP Southwest, LLC & Camino Real Apartments***

Dear Mr. Chavez,

Please review this settlement letter that Plaintiffs were directed by the Court to provide to you.  The purpose of this letter is to outline how the Plaintiffs intend to establish liability and damages in this case.

As you know, the Plaintiffs in this matter, Kenth and Laura Fallen, have asserted the claims against your clients, GREP Southwest, LLC and Camino Real Apartments for (1) Unfair Trade Practices, (2) Tortious Debt Collection, (3) Breach of Contract, and the Uniform Owner Resident Relations Act under New Mexico law.  For ease of reference, Plaintiffs will address each claim separately.

### *1.      Unfair Trade Practices*

Under New Mexico's Unfair Trade Practices Act, a defendant is liable for unfair or deceptive trade practices, or unconscionable trade practices. *See* NMSA 1978, § 57-12-3.

i.      Unfair or deceptive trade practices are defined as a "false or misleading oral or written statement, visual depiction or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person" and includes, but is not limited to:

- Causing confusion as to the source of services;
- Causing confusion as to the connection with another;
- Failing to state a material fact if doing so tends to deceive.

NMSA 1978, § 57-12-2(D)(2)(3)&(14).

ii.      Unconscionable trade practices are defined as "an act or practice in connection with the sale, lease, rental or loan . . . of any goods or services, . . . or in the collection of debts to that person's detriment [that] takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree. NMSA 1978, § 57-12-2(E).

The evidence that the Plaintiffs will use to establish the UPA claim is of falls under two separate claims. First, Plaintiffs will show that the apartment complex provided them with a move out date of May 31, 2013 on the Notice of Intent to Vacate form (which is attached here) filled out by the apartment employees on April 1, 2013. Plaintiffs will also show that, in keeping with that form, they moved out in May, and had the apartment complex inspect their vacant apartment on May 24, 2013 (which is attached here) in order to assess any damage fees. As Plaintiffs departed their apartment in perfect condition in May, the inspector employed by the apartment, Marvin Gutierrez, did not assess any damage fees to Plaintiffs on May 24, 2013.

Plaintiff will show that the apartment managers did not want them to move out, and sent over a regional manager to try to talk them out of moving. That conversation, which took place in the days after April 1, 2013, did not alter the Plaintiffs' intention to move out, but did result in the

2

regional manager requesting that Plaintiffs draft a move-out letter.  Plaintiffs did write such a letter, but dated it April 1, 2013, in keeping with their original Notice of Intent to Vacate provide to the apartment management.

The evidence in this case will show that the defendants' Notice of Intent to Vacate, dated April 16, 2013 was not signed by the Plaintiffs, as was the April 1, 2013 Notice of Intent to Vacate drafted by defendants' employees.  In fact, Plaintiffs will show that the defendants intentionally ignored Plaintiffs' Notice of Intent to Vacate the apartment dated April 1, 2013, as well as the fact that they had moved out of the apartment in May. Defendants did so in order to punish Plaintiffs for moving out, and fabricated the move out date of June 16, 2013 in order to illegally collect rents that were not owed to defendants.  Defendants fabricated this move out date, and reported a false claim for pro-rated June rent against the surety insurance sold to Plaintiffs, in order to punish Plaintiffs for demanding suitable living conditions at the apartment complex.

Second, Plaintiffs will show that defendants use deceptive, unfair or unconscionable trade practices when defendants unlawfully sold Plaintiffs surety insurance, in the form of a Tennant Bond Enrollment & Bond Acknowledgement document.  That document purportedly would protect Plaintiffs from claims made by the apartment against Plaintiffs' security deposit.  Defendants did not inform Plaintiffs that they were not insurance agents, were not licensed to sell surety insurance, and were not adhering to any provision of New Mexico's insurance code that applied to insurance sales.  Defendants conduct was unfair, deceptive, and unconscionable and led Plaintiffs into purchasing insurance, from an insurance company that would ultimately serve defendants' needs, not Plaintiffs' interests. Defendants' conduct was unfair, deceptive or unconscionable.  Defendants conduct included, but was not limited to:  (1) claiming that the Tennant Bond was not insurance, when it was; (2) failing to inform Plaintiffs that the insurance provider assigned to them under the Tennant Bond Enrollment & Bond Acknowledgement would not contact Plaintiffs to determine whether any claim made by the apartment under that agreement was a valid claim, (3) failing to inform Plaintiffs that the insurance company that held Plaintiffs' surety insurance would not adhere to any duty of good faith to Plaintiffs, and (4) failing to inform Plaintiffs that their statutory protections afforded by New Mexico's security deposit laws would be affected. Defendants should understand that Insureco and ABIC of Florida have admitted (in New Jersey) that it is illegal for apartments who are under

3

contract with Insureco and ABIC of Florida to sell this insurance product in the manner that defendants sold this product to Plaintiffs. *See* Consent Order # E14-132, which is attached.

Damages will be appropriately granted under both of these claims. Plaintiffs do not believe that any reasonable fact finder could reasonably determine that Plaintiffs did not provide defendants with a Notice of Intent to Vacate the apartment on April 1, 2013, when that document was filled out by employees of the defendants and signed and dated by the Plaintiffs. Plaintiffs will reasonably show that the fraudulent charges assessed against them and reported to the insurance company were made in bad faith, and the product of the apartments dissatisfaction with Plaintiffs insistence that the apartment was substandard. Under the UPA, the defendants' fabrication of Plaintiffs move out date of June 16, 2013 and making a false insurance claim in order to collect on "unpaid" rent for the month of June was illegal. This claim violated UPA because it constituted a false or misleading statement made in connection with the lease of the apartment that tended to deceive everyone in the debt collection stream of commerce. Second, defendants will be hard pressed to overcome Insureco's and ABIC of Florida's admission that the Tennant Bond Enrollment & Bond Acknowledgement that defendants sold to Plaintiffs was an insurance product that was being sold illegally by apartment complexes like the ones defendants operate. As such, damages will be appropriately awarded to Plaintiffs under both of these UPA claims.

Until defendants unlawfully made a false claim for a debt that affected Plaintiffs credit score, Plaintiffs had never had a bad mark on their credit reports. The corresponding drop in their respective credit ratings from a FICO score of approximately 790 to about 665 cause Plaintiffs emotional distress, the loss of their security deposit ($100), and the loss of their ability to secure favorable credit rates due to the damage that this false report ultimately had on their credit rating. That drop, in turn, caused Plaintiffs to lose opportunities to save money by refinancing their automobiles at favorable rates, as well as other economic opportunities that demanded the use of credit. To correct their credit scores that dropped as a result of defendants unfair, deceptive or unconscionable trade practices, Plaintiffs were forced to hire an attorney and sue the national credit reporting agencies to correct their credit scores. Defendants' failure to mediate this claim in 2013, as Plaintiffs requested, forced Plaintiffs to sue the national credit reporting agencies to correct their credit scores.

4

As a result of defendants unwarranted and illegal conduct, Plaintiffs seek $30,000 in damages for their lost security deposit, and the emotional distress of having to correct their damaged credit score, as well as all of the attorneys fees and costs associated with this litigation.

### 2.    *Tortious Debt Collection*

Under the claim for tortious debt collection, defendants are liable to Plaintiffs for "improper conduct in knowingly and intentionally pursuing a person to force payment of a debt." *Montgomery Ward v. Larragoite*, 1970-NMSC-057, ¶ 6, 81 N.M. 383, 467 P.2d 399.  For all of the factual reasons discussed above, defendants conduct in fraudulently billing Plaintiffs for sixteen days of prorated June rent in 2013 when defendants were aware that Plaintiffs provided a proper Notice of Intent to Vacate on April 1, 2013, was improper conduct.  Plaintiffs would also seek the same damages discussed above under this cause of action.  Plaintiff are aware that this additional claim would not give rise to damages in addition to the remedies sought above.

### 3.    *Breach of Contract*

Under New Mexico law, "punitive damages may be recovered for breach of contract when the defendant's conduct has been sufficiently malicious, oppressive, fraudulent, or committed recklessly with a wanton disregard for the plaintiff's rights." *Bogle v. Summit Investment Co., LLC*, 2005-NMCA-024, ¶ 28, 137 N.M. 80107 P.3d 520.  In this case, not only was the apartment lease breached by defendants, but that breach was maliciously done.

Plaintiffs' apartment lease provides that the lease can be terminated.  According to the lease, "Resident must deliver a signed "VACATE NOTICE" at least sixty (60) days prior to move out."  The record in this case shows that the Plaintiffs did just that.  The Notice of Intent to Vacate dated April 1, 2013 was drafted by property manager Teri Shaffer, and dated in her handwriting, "4-1-13." That form indicated that the Plaintiffs move out inspection had to be completed by May 31, 2013, and was signed and dated by the Plaintiffs on April 1, 2013.  Plaintiffs completed their inspection move out on May 24, 2013.  Under New Mexico's Uniform Owner Resident Relations Act, a "person receives a notice of notification . . . where written notice to the owner is required, when it is mailed or otherwise delivered at

5

the place of business of the owner through which the rental agreement was made." NMSA 1978, § 47-8-13(C)(2).

There can be no dispute that the Notice of Intent to Vacate was delivered to the apartment management. That form was created by the defendants' property manager, Teri Shaffer, in her office and dated in her hand April 1, 2013. The Plaintiffs' also signed and dated the notice on April 1, 2013 on the lines right beside where Ms. Shaffer had drawn an "X" for their signature. That form had a move out inspection date listed for May 31, 2013, again written in Ms. Shaffer's hand. It is irrational for Defendants to contest that Plaintiffs did not "deliver" notice of their intent to move out to the "place of business of the owner through which the rental agreement was made or at any place held out by him as the place for the receipt of the communication" when the Notice form was actually drafted by defendants' employee on April 1, 2013 in the apartment manager's office.

The fact that defendants refuse to acknowledge what is obvious on the Notice of Intent to Vacate, and tried to talk Plaintiffs into staying at the apartment complex and delay when they *accepted* Plaintiffs' notice does not alter the fact that lawful notice was given to defendants on April 1, 2013 that Plaintiffs were moving out in 60 days. Defendants willful refusal to acknowledge the April 1, 2013 move out date amounts to "malicious, oppressive, fraudulent, or committed recklessly with a wanton disregard for the plaintiff's rights." *Bogle v. Summit Investment Co., LLC*, 2005-NMCA-024, ¶ 28, 137 N.M. 80107 P.3d 520. In addition to the $30,000 damages for the loss of their security deposit, emotional distress, and the loss of credit opportunities, Plaintiffs seek, in the form of a settlement award, an additional $30,000 in punitive damages.

### 4.   Violations of the Uniform Owner Resident Relations Act

Under UORRA, the apartment owner had a duty to maintain the premises in a safe and functional condition. NMSA 1978, § 47-8-20 (2)(4)&(6). Under this standard, the owners and mangers of the apartment had to "make repairs and do whatever is necessary to put and keep the premises in a safe condition."

Plaintiffs contend that their departure from the apartment was warranted under the UORRA due to the extensive problems that they had with their apartment. Plaintiffs were frugal, but their heating bills for the

small apartment exceeded $300/month in December of 2012, more than it had previously cost Plaintiffs to heat their home that was at least twice the size of this apartment. In addition,

1.  On September 25, 2012, Plaintiffs had to make a request for the management to fix the dryer in their apartment;
2.  On September 26, 2012, Plaintiffs had to make a request for mail box key replacement;
3.  On September 27, 2012, Plaintiffs had to make another request for mail box key repair;
4.  On October 21, 2012, Plaintiffs had to purchase a replacement filter for the furnace in their apartment;
5.  On October 22, 2012, Plaintiffs had to request that the washer and dryer be repaired;
6.  On October 26, 2012, Plaintiffs had to request window screen replacements;
7.  On January 5, 2013, Plaintiffs complained about the furnace not working properly, causing unreasonably high heating bills;
8.  On February 5, 2013, Plaintiffs complained again that the furnace did not appear to be functioning properly;
9.  On March 17, 2013, Plaintiffs had to call for a repair because the dishwasher fell out of its cabinet;
10.  On April 1, 2013, Plaintiffs had to request repairs to the dishwasher, the front door, and complained about the sewage smell in the kitchen and the master bathroom.
11.  On May 3, 2013, Plaintiffs had to again request repairs to the front door, the dishwasher, and pointed out to the management that the sewer smell in the bathroom was getting worse; complained about the excessive noise at the apartment; and, once again, complained about the lack of screens in the windows.

As discussed in the complaint, on one occasion sewage backed up into the sink in Plaintiffs' kitchen, overflowing into the kitchen floor. These persistent problems justified Plaintiffs decision to move out on April 1, 2013, so Plaintiffs and their newborn son could live in peace. Plaintiffs did not believe that the apartment complex adequately made repairs to keep the premises in a safe condition, especially concerning the sewage problems and noise. Therefore it was both reasonable and appropriate for them to vacate the premises. As the sewage problems in the apartment were never

adequately addressed, and the heating in the apartment remained exceedingly expensive, Plaintiffs seek to abate the rent for the month of April and May, 2013 by one-third of the monthly rate, as these problems were never rectified. *See* NMSA 1978, § 47-8-27.2(A)(1). Such an abatement would result in the refund of $629.33 to Plaintiffs for the rent they paid for April and May of 2013, and the abatement of one-hundred percent of any rent that defendants claim to be due after May 31, 2013, as Plaintiffs did not consider the apartment to be inhabitable, *see* NMSA 1978, § 47-8-27.2(A)(2), plus attorney's fees and costs under NMSA 1978, § 47-8-48(A).

Sincerely,

ROTHSTEIN, DONATELLI, HUGHES,
  DAHLSTROM, SCHOENBURG & BIENVENU, LLP

MARC M. LOWRY
500 4th Street, N.W., Suite 400
Albuquerque, New Mexico 87102
(505) 243-1443
mlowry@rothsteinlaw.com

*Attorney for Kenth and Laura Fallen*

8

**Notice of Intent to Vacate**
**Camino Real Apartments**
**3305 Calle Cuervo NW, Albuquerque, NM  87114**

Date: 4·1·13                                                     Apartment #: 518

Resident(s): Kenth Fallen & Laura Fallen

Plan to vacate Apartment # 518   on or before midnight the 31 day of May , 20 13 .

Reason for moving: unhappy / noisey neighbor

Lease expiration date: July 31, 2013

Lease Fulfilled: (Yes/No)  *If No complete the following fees:*

| | | |
|---|---|---|
| Lease Termination Fee*: | $ 994.— | [DUE IMMEDIATELY] |
| *(equal to 1 months rent, unless indicated in lease.)* | | |
| Concession Fee: | $ 0 | |
| Current Balance on Account: | $ 0 | |
| Prorate Rent for 31 days: | $ 1024.— | [DUE ON THE FIRST LATE AS OF THE 4TH] May |
| Prorate Month to Month Fee: | $ 0 | |
| Other: | $ 0 | |
| Refundable Deposit: | $ 100.— | |

*(Verify Lease & Resident Ledger)*

The undersigned Residents(s) of the dwelling unit described above hereby give notice of intent to move-out on or before the date noted. The undersigned Resident(s) are aware that the refund of security deposit(s) is subject to compliance with the terms and conditions of the Lease Agreement, including:

- **Forwarding address**: Written forwarding address provided to Owner's representative on or before move-out.
- **Key/Parking Permit return**: Return of all apartments, mail, amenity and all parking permits on or before move-out date.
  **\*(All apartment keys must be turned in on or by the move-out date.  Late keys will not be accepted)\***
- **Repairs**: Cleaning and repair of the premises other than conditions caused by normal wear and tear.

**Multiple Resident**: If multiple residents are on the lease, notice must be signed by all leaseholders. Security deposit refunds may be in the form of one draft check payable to multiple residents.**

**Failure to Move-Out**: Owner and new residents may rely on this move-out notice. Owner may clean, repair and relet the dwelling unit for occupancy on the day after the agreed move-out date. It is acknowledged that if any of the undersigned residents hold over and fail to move out on the agreed move-out date:

- There may be security deposit deductions relating to the holdover, as authorized in the lease; and
- Residents are subject to all contractual land statutory remedies for violation of the lease, including damages, attorney fees, and late payment charges, rent acceleration, cost of reletting, utility cut-off, and in the event of unauthorized holdover, liability for increased holdover rents and one month extension.

**Responsibility for Rent**: If the move-out date noted precedes the lease expiration date noted, or if written notice is less than 30 days before the move-out date, Resident is subject to all contractual and statutory remedies including rent acceleration and cost of reletting fees.

**Refund of Security or Pet Deposit**: If a Security or Pet Deposit is owed to you at move out your forwarding address is *required* for processing. The deposit will be processed and sent to you no later than 30 days after move-out date listed above. If we or the USPS do not have your forwarding address on file, your deposit will not be returned.

**Resident Initials:** _____ X LS. _____

Listed below are guidelines we use to assess charges to your apartment home at move out. These are guidelines only; more charges can be assessed if the degree of damage or lack of cleaning is severe. If you have any questions regarding the previous condition of your apartment, these need to be addressed prior to move out and should be documented on your Move-In/Move-Out Inspection form that was filled out at move in.

## MOVE-OUT CHARGES

1. Provided the resident fulfills the lease term and has lived in the apartment home in access of 3 years, there will be no charge to clean carpets. If there are excessive stains or pet damage those may be charged back to the resident. Agent shall assess no charges against the security deposit for normal wear and tear.

2. When resident moves and carpet or vinyl needs replacing the charge for the replacement will be determined on a pro-rated amount and the life term left of the carpet or vinyl. Life term of carpet is based on 6 years and an example follows [carpet installed date of 10/1/10 the cost was $985, resident resided for 2 years and so if the carpet needs to be replaced the equation would go thus [$986 divided by 6 multiplied by 4 years left = $656.68 due for replacement.]

|  | 1-BEDROOM | 2-BEDROOM | 3-BEDROOM |
|---|---|---|---|
| PAINTING | $130.00 | $150.00 | $160.00 |
| SHAMPOOING | $55.00 | $75.00 | $95.00 |
| TOUCH-UP PAINT | $40.00 | $65.00 | $80.00 |
| CLEANING | $120.00 | $150.00 | $175.00 [the cleaning charges below are for |

excessive cleaning needed. They can be added to the above charges if needed.]

Normal Charges: General cleaning of any kind will not be considered normal wear and tear. Listed below are specific minimum cleaning and/or replacement charges that will be applied against the security deposit. This sample list is to be used as a guideline only; charges are not limited to the following:

| CLEANING (minimum charge) |  | REPLACEMENTS (minimum charge) |  |
|---|---|---|---|
| Oven | 25.00 | Oven rack | 10.00 ea. |
| Stove | 10.00-25.00 | Keys (2-apt. + 1-mailbox) | 5.00 ea. |
| Kitchen/Bathroom Cabinets | 2.00-10.00 ea. | Amenity key | 50.00 ea. |
| Refrigerator | 25.00-50.00 | Crisper Tray | 50.00 ea. |
| Kitchen floor | 10.00-30.00 | Screen Door Repair/Replacement | 50.00 ea. |
| Kitchen Counter | 10.00 | Drip pans | 2.00 ea. |
| Light fixtures | 2.00 | Towel Bar | 5.00 ea. |
| Kitchen/Bathroom Sink | 10.00 | Interior door | 85.00 ea. |
| Dishwasher | 10.00 | Light globes | 10.00 ea. |
| Bathroom Counter | 5.00 | Entry door | 150.00 ea. |
| Patio/Storage | 20.00 | Broken/missing screens | 15.00 ea. |
| Bathroom Floor | 5.00-10.00 | Mini-blind replacement | 60.00-120.00 ea. |
| Commode | 20.00 | Broken/missing windows | 70.00 ea. |
| Shower/Bathtub | 20.00 | Vertical blind replacement | 100.00 ea. |
| Windows | 5.00 | Smoke alarm | 15.00 ea. |
| Mirrors | 5.00 | Crisper drawers | 30.00 ea. |
| Vacuum Carpet | 20.00 | Patching Holes | 10.00-45.00 ea. |
| Large Item Removal | 50.00 | Fire extinguisher | 25.00 ea. |
| Trash removal | 30.00 per bag | Sliding Closet Door Panel | 35.00 ea. |

## MOVE OUT INSPECTION

This inspection is to avoid surprise move out charges and to expedite refund process. Completing the Final Move-out Inspection with an associate is highly recommended. If no one is available or it is after hours all keys can be placed in the Drop Box located at the Office with proper identification of which apartment they belong to.

Move-Out Inspection Date: 5·31·13     Day: Friday     Time: 9am – 4:30

REQUIRED FORWARDING ADDRESS: X
Current Home #: X (505) 369-1569     Work #: X (505) 507-2698

Resident Signature(s): X _____     Date: X 4/1/13
X _____     Date: X 4-1-13
_____     Date: _____

Management Signature: _____     Date: _____

**This Notice to Vacate is not valid until all residents have signed and initialed where indicated.

Listed below are guidelines we use to assess charges to your apartment home at move out. These are guidelines only; more charges can be assessed if the degree of damage or lack of cleaning is severe. If you have any questions regarding the previous condition of your apartment, these need to be addressed prior to move out and should be documented on your Move-In/Move-Out Inspection form that was filled out at move in.

## MOVE-OUT CHARGES

1.      Provided the resident occupies the apartment for initial lease term, Agent shall assess, no charges against the security deposit for normal wear and tear of the following:

o   Painting of walls (one coat)

|                  | 1-BEDROOM | 2-BEDROOM | 3-BEDROOM |
|------------------|-----------|-----------|-----------|
| PAINTING         | $90.00    | $125.00   | $140.00   |
| SHAMPOOING       | $45.00    | $55.00    | $65.00    |
| TOUCH-UP PAINT   | $40.00    | $65.00    | $80.00    |
| CLEANING         | $79.00    | $89.00    | $99.00    |

**Normal Charges:** We do not consider general cleaning of any kind to be a condition of normal wear and tear. Listed below are specific minimum cleaning and/or replacement charges that will be applied against the security deposit. This sample list is to be used as a guideline only; charges are not limited to the following:

| CLEANING (minimum charge) | | REPLACEMENTS (minimum charge) | |
|---|---|---|---|
| Oven | 25.00 | Oven rack | 10.00 ea. |
| Stove | 10.00-25.00 | Keys (2-apt. + 1-mailbox) | 5.00 ea. |
| Kitchen/Bathroom Cabinets | 2.00-10.00 ea. | Amenity key | 50.00 ea. |
| Refrigerator | 25.00-50.00 | Crisper Tray | 50.00 ea. |
| Kitchen floor | 10.00-30.00 | Screen Door Repair/Replacement | 50.00 ea. |
| Kitchen Counter | 10.00 | Drip pans | 2.00 ea. |
| Light fixtures | 2.00 | Towel Bar | 5.00 ea. |
| Kitchen/Bathroom Sink | 10.00 | Interior door | 85.00 ea. |
| Dishwasher | 10.00 | Light globes | 10.00 ea. |
| Bathroom Counter | 5.00 | Entry door | 150.00 ea. |
| Patio/Storage | 20.00 | Broken/missing screens | 15.00 ea. |
| Bathroom Floor | 5.00-10.00 | Mini-blind replacement | 60.00-120.00 ea. |
| Commode | 20.00 | Broken/missing windows | 70.00 ea. |
| Shower/Bathtub | 20.00 | Vertical blind replacement | 100.00 ea. |
| Windows | 5.00 | Smoke alarm | 15.00 ea. |
| Mirrors | 5.00 | Crisper drawers | 30.00 ea. |
| Vacuum Carpet | 20.00 | Patching Holes | 10.00-45.00 ea. |
| Large Item Removal | 50.00 | Fire extinguisher | 25.00 ea. |
| Trash removal | 30.00 per bag | Sliding Closet Door Panel | 35.00 ea. |

*Vinyl is OK*

## MOVE OUT INSPECTION

This inspection is to avoid surprise move out charges and to expedite refund process. Completing the Final Move-out Inspection with an associate is highly recommended. If no one is available or it is after hours all keys can be placed in the Drop Box located at the Office with proper identification of which apartment they belong to.

Move-Out Inspection Date: __5/24/13__   Day: __7:50__   Time: __Fri.__

REQUIRED FORWARDING ADDRESS: _____
Current Home #: _____   Work #: _____

Resident Signature(s): _____   Date: _____
                        _____   Date: _____
                        _____   Date: _____

Management Signature: __Marvin Gutierrez__   Date: __5/24/13__

**This Notice to Vacate is not valid until all residents have signed and initialed where indicated.

 

ORDER # E14- 132

## STATE OF NEW JERSEY
## DEPARTMENT OF BANKING AND INSURANCE

IN THE MATTER OF:

| | | |
|---|---|---|
| Proceedings by the Commissioner of Banking | ) | |
| and Insurance, State of New Jersey, to fine | ) | CONSENT |
| Insureco Agency & Insurance Services Inc., | ) | ORDER |
| Ref. No. 8208825, David Patrick Madigan, | ) | |
| Ref. No., 0109124, American Bankers | ) | |
| Insurance Co. of Florida, Ref. No. 7610111, | ) | |
| and Assurant, Inc. | ) | |

TO:   **Insureco Agency & Insurance Services Inc.**      **David Patrick Madigan**
2677 N. Main St. #600                                          2677 N. Main St. #600
Santa Ana, CA 92705                                          Santa Ana, CA 92705

**American Bankers Insurance Co. of Florida**
11222 Quail Roost Drive
Miami, FL 33157

This matter, having been opened by the Commissioner of Banking and Insurance ("Commissioner"), State of New Jersey, upon information that Insureco Agency & Insurance Services Inc. ("Insureco"), currently licensed as a nonresident business entity insurance producer pursuant to N.J.S.A. 17:22A-34, David Patrick Madigan ("Madigan"), currently licensed as a nonresident individual insurance producer and Insureco's designated responsible licensed producer pursuant to N.J.S.A. 17:22A-32b(2), and American Bankers Insurance Company of Florida ("ABIC"),  admitted as an authorized insurer pursuant to N.J.S.A. 17:22B:17-11, have violated various provisions of the insurance laws of the State of New Jersey; and

WHEREAS, Assurant, Inc. ("Assurant"), is a Delaware corporation, that is an insurance holding company, Insureco and ABIC are subsidiaries of Assurant, and Assurant Specialty Property is a division of Assurant; and

WHEREAS, Insureco, Madigan, and ABIC, (collectively "Respondents") are subject to the provisions of New Jersey Insurance Producer Licensing Act of 2001, N.J.S.A. 17:22A-26 et seq.; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40a (2), an insurance producer shall not violate any insurance laws, or violate any regulation, subpoena or order of the Commissioner or of another state's insurance regulator; and

WHEREAS, pursuant to N.J.S.A. 17:22A-36, an insurance producer doing business under any name other than the producer's legal name shall notify the commissioner prior to using the assumed name; and

WHEREAS, pursuant to N.J.A.C. 11:17-2.7(b), no nonresident licensed producer shall conduct business under a name other than its legal or business name in the state where it maintains a resident license; and

WHEREAS, pursuant to N.J.A.C. 11:17-2.8 (a) and (e), licensees shall file with the Department of Banking and Insurance ("Department") a branch office registration form within 30 days before business is first conducted there and no branch office may engage in insurance related conduct unless at least one licensed individual insurance producer is present; and

WHEREAS, pursuant to N.J.A.C. 11:17A-1.6 (a), each place of business maintained by an insurance producer for the purpose of transacting the business of insurance shall be under the direct supervision of an insurance producer; and

WHEREAS, pursuant to <u>N.J.S.A.</u> 17:22A-40a (12), an insurance producer shall not knowingly accept insurance business from an unlicensed insurance producer; and

WHEREAS, pursuant to <u>N.J.S.A.</u> 17:22A-40a (17), an insurance producer shall not knowingly facilitate or assist another person in violating any insurance laws; and

WHEREAS, pursuant to <u>N.J.S.A.</u> 17:22A-29, no person shall sell, solicit or negotiate insurance in this State unless the person is licensed for that line of authority in accordance with this act; and

WHEREAS, pursuant to <u>N.J.A.C.</u> 11:17A-1.3 (a), (b), (c), and (d), no person shall act as an insurance producer, by soliciting, negotiating or selling insurance, or maintaining or operating any office in this State for the transaction of the business of an insurance producer, without first obtaining a license from the Commissioner granting authority for the kind of insurance transacted; and no licensed insurance producer shall permit or allow any unlicensed person to transact the business of an insurance producer; and

WHEREAS, pursuant to <u>N.J.S.A.</u> 17:22A-40a (5), an insurance producer shall not intentionally misrepresent the terms of an actual or proposed insurance contract, policy or application for insurance; and

WHEREAS, pursuant to <u>N.J.S.A.</u> 17:22A-40a (8), an insurance producer shall not use fraudulent, coercive, or dishonest practices, or demonstrate incompetence in the conduct of insurance business; and

IT APPEARING that between June 2011 through August 2014, Insureco operated under the trade name of SureDeposit without registering said name in the state where it maintains its resident license and did not notify the Department prior to using the assumed name in this state, in violation of <u>N.J.S.A.</u> 17:22A-40a (2), <u>N.J.S.A.</u> 17:22A-36, and <u>N.J.A.C.</u> 11:17-2.7 (b); and

IT FURTHER APPEARING that beginning in June 2011, Insureco was operating an unregistered branch office in this State that was not under the direct supervision of an insurance producer, in violation of N.J.S.A. 17:22A-40a (2), N.J.A.C. 11:17-2.8 (a) and (e), and N.J.A.C. 11:17A-1.6 (a); and

IT FURTHER APPEARING that beginning in June 2011, Respondents began to offer New Jersey residential rental tenants a "surety bond program" that is an alternative to paying a traditional security deposit to landlords; and

IT FURTHER APPEARING that in or around July 2014, the Department determined that the "surety bond program" offered by Respondents is a product regulated by the Department which requires a producer license to sell, solicit, or negotiate in this State; and that beginning in June 2011, Respondents permitted or allowed unlicensed persons to sell, solicit or negotiate the "surety bond program" in this state, in violation of N.J.S.A. 17:22A-40a (2), (12), and (17), N.J.S.A. 17:22A-29, and N.J.A.C. 11:17A-1.3 (a), (b), (c), and (d); and

IT FURTHER APPEARING that beginning in June 2011, Respondents provided New Jersey apartment communities offering the "surety bond program" with a "SureDeposit User's Guide" and a document entitled "Tenant Bond Enrollment and Bond Acknowledgment Form" ("Tenant Bond") to enroll additional New Jersey residential rental tenants, each of which was misleading in fact or by implication about the "surety bond program" and facilitated unlicensed insurance transactions, in violation of N.J.S.A. 17:22A-40a (2), (5), (8), (12), and (17), N.J.S.A. 17:22A-29, and N.J.A.C. 11:17A-1.3 (a), (b), (c), and (d); and

IT FURTHER APPEARING that in one instance the "surety bond program" offered by Respondents to New Jersey resident SB, by an unlicensed individual in or around February 2013, was misrepresented and SB did not receive adequate disclosure that: (1) SB remained liable to

the landlord for damages due to nonpayment of rent, breach of lease, or damages to the rental premises;  2) SB was obligated to reimburse Respondents for sums expended to pay the landlord's claim up to the bond amount;  3) SB could incur liabilities from claims that may exceed what the landlord could deduct legally from a traditional security deposits;  and 4) that the purchase of the surety bond product affected SB's statutory rights and protections afforded under the New Jersey Security Deposit laws, in violation of <u>N.J.S.A.</u> 17:22A-40a(2), (5), (8), (12), and (17), <u>N.J.S.A.</u> 17:22A-29, and <u>N.J.A.C.</u> 11:17A-1.3 (a), (b), (c), and (d); and

IT FURTHER APPEARING that Respondents:

1)  Have admitted responsibility for the aforementioned violations; and

2)  Have cooperated with the investigation conducted by the Department; and

3)  Have declared that these acts were unintentional; and

4)  Have agreed to modify the  operation of the SureDeposit program as to comply with New Jersey law; and

IT FURTHER APPEARING that the New Jersey Department of Banking and Insurance records indicate that the personal and business addresses of Respondent Madigan are in California; and

IT FURTHER APPEARING that Respondent Madigan asserts that he had no personal involvement in the aforementioned violations; and

IT FURTHER APPEARING, that cause does exist under <u>N.J.S.A.</u> 17:22A-40a and <u>N.J.S.A.</u> 17:22A-45c, to impose a fine; and

IT FURTHER APPEARING, that Respondents have waived their right to a hearing on the aforementioned violations and have consented to being jointly and severally liable for the payment of a fine in the amount of $85,000.00; and

IT FURTHER APPEARING, that this matter should be resolved upon the consent of the parties without resort to a formal hearing on the aforementioned violations, and further good cause appearing; and

NOW, THEREFORE, IT IS on this _12th_ day of _November_, 2014

ORDERED AND AGREED, that Respondents pay a fine in the amount of $85,000.00 to the Department; and

IT IS FURTHER ORDERED AND AGREED, that said fine shall be paid by certified check, cashier's check or money order made payable to the State of New Jersey, General Treasury, with a fine payment of $85,000.00 due and payable immediately upon execution of this Consent Order by Respondents; and

IT IS FURTHER ORDERED AND AGREED, that the signed Consent Order together with the fine payment of $85,000.00 shall be remitted to:

> New Jersey Department of Banking and Insurance
> ATTN: Virgil Dowtin, Chief of Investigations
> 9th Floor – Enforcement Unit
> P.O. Box 329
> Trenton, New Jersey 08625

IT IS FURTHER ORDERED AND AGREED, that Respondents shall provide the Department within 30 days of the date of execution of the Consent Order with satisfactory proof that the Tenant Bond used to enroll New Jersey residents in the "surety bond program" has been modified to comply with all aspects of New Jersey insurance laws and regulations; and

IT IS FURTHER ORDERED AND AGREED, that Respondents shall provide the Department with satisfactory proof that the "User Guide" issued to New Jersey apartment communities offering the "surety bond program" has been modified to comply with all aspects of New Jersey insurance laws and regulations; and



IT IS FURTHER ORDERED AND AGREED, that Respondents shall provide the Department with satisfactory proof that the notice issued to New Jersey consumers enrolling in the "surety bond program"  has been modified to comply with all aspects of New Jersey insurance laws and regulations; and

IT IS FURTHER ORDERED AND AGREED, that Respondents shall provide the Department with satisfactory proof that the marketing material issued to New Jersey consumers interested in and/or enrolling in the "surety bond program"  and New Jersey apartment communities offering the "surety bond program"  has been modified to comply with all aspects of New Jersey insurance laws and regulations; and

IT IS FURTHER ORDERED AND AGREED, that Respondents shall provide the Department with satisfactory proof that all New Jersey apartment communities offering the "surety bond program" have been notified that they must comply with all aspects of New Jersey insurance laws and regulations and the proper procedures to effectuate compliance; and

IT IS FURTHER ORDERED AND AGREED, that Respondents shall take all reasonable steps requested by the Commissioner for the implementation of these actions, including submitting documents requested pursuant to this order to the Department for approval prior to use and/or issuance; and

IT IS FURTHER ORDERED AND AGREED, that any subsequent documents and/or marketing material implemented and/or amended that is issued to New Jersey consumers interested in and/or enrolling in the "surety bond program" and New Jersey apartment communities offering the "surety bond program" will comply with all aspects of New Jersey insurance laws and regulations; and



IT IS FURTHER ORDERED AND AGREED, that in the event full payment of the fine is not made in accordance with this Order, the Commissioner may exercise any and all remedies available by law, including but not limited to recovery of any unpaid amounts in summary proceedings, in accordance with the penalty enforcement law N.J.S.A. 2A:58-10 et seq.; and

IT IS FURTHER ORDERED AND AGREED, that the provisions of this Consent Order represent a final agency decision and constitute a final resolution of the violations contained herein; and

IT IS FURTHER ORDERED AND AGREED, that Respondents shall cease and desist from engaging in the conduct that gave rise to this Consent Order and hereafter, shall comply in all respects with the New Jersey insurance laws and regulations.

Peter L. Hartt
Acting Director of Insurance

Consented to as to
Form, Entry, and Content

**Insureco Agency & Insurance Services Inc.**

DAVE MADIUM.
(Print Name and Title)

Date: 11-3-14

**American Bankers Insurance Co. of Florida**

RUSSELL G. KIRSCH, SVP F.S.R.P.
(Print Name and Title)

Date: 11-04-14

**David Patrick Madigan**

Date: 11-3-14