

Dorato v. Smith et. al. 14cv00365 JB/GBW
Frances Carpenter
to:
K'Aun_Wild
09/15/2016 11:22 AM
Cc:
"'Griffin, Stephanie M.'", "'Susan C. Syring'"
Hide Details
From: "Frances Carpenter" <frances@francescrockettlaw.com>
To: <K'Aun_Wild@nmcourt.fed.us>
Cc: "'Griffin, Stephanie M.'" <SGriffin@cabq.gov>, "'Susan C. Syring'"
<susan@francescrockettlaw.com>

5 Attachments

         

Questionaire-police shooting.docx   Joyner Report.pdf   Joyner Testimony List.pdf   Defendants' Rule 26 Expert Disclosures.pdf



CHARLES JOYNER Fee Schedule.pdf

K'Aun,

Attached is the expert report and disclosures from Defendants' expert Charles Joyner. I informed the Court that I would be emailing that by today. I also could not recall if you asked us to send you what we did as far as the special juror questionnaires in our other cases. In an overabundance of caution, I have attached the one we did in the Ellis case. I have not redacted any information from the Ellis questionnaire. Please let me know if you have any issues opening the documents or if you have any questions. Thank you.

Frances Crockett Carpenter

click below to report this message as spam
for K'Aun_Wild@nmcourt.fed.us
report this as spam

**PRELIMINARY REPORT**

**Tillison v. Smith, et al.**

**City of Albuquerque**

**Date of Incident: 03/19/2012**


SUBMITTED TO:  Stephanie M. Griffin,

Deputy City Attorney

City of Albuquerque Legal Department

Litigation Division

P.O. Box 2248

Albuquerque, New Mexico 87103


PERTAINING TO: Albuquerque Police Department,

Case Number: CIV 14-365 JB-GBW


PREPARED BY:   Charles R. Joyner

Survival Sciences, LLC

P.O. Box 571073

Houston, Texas 77257

(310)962-9122

**TABLE OF CONTENTS**

Topic                                            Page

Title Page                                         1

Table of Contents                                  2

Documents Reviewed                                 3

Factual Overview of the Case                       7

Additional Facts of the Case                       8

Discussion of Use of Force                        10

Opinions                                          12

Response to Report by Melvin Tucker               16

Qualifications                                    20

**DOCUMENTS REVIEWED:**

At the request of Deputy City Attorney Stephanie Griffin, I have reviewed the following documents:

1.  Tillison Autopsy Report, dated 04/05/2012,

2.  DOJ Findings Letter, dated 04/10/2014,

3.  Multiple Crime Scene and Evidence photos,

4.  Plaintiff's Report of Melvin Tucker, dated 10/21/2015,

5.  Plaintiff's Report of Melvin Tucker, dated 05/28/2014,

6.  Plaintiff's Report of Christopher Stewart, dated 06/03/2014,

7.  Memorandum Opinion and Amended Order, No. CIV 14-0365 JB/GBW, filed 05/26/2015,

8.  Plaintiff's Response - Exhibit A, 911 call,

9.  Plaintiff's Response - Exhibit B, Interview of Officer Smith, 03/20/2012,

10. Plaintiff's Response - Exhibit D, Interview of Officer Smith, 03/26/2012,

11. Plaintiff's Response - Exhibit E, APD Procedural Order 2-55, Pursuit by Motor Vehicle,

12. Plaintiff's Unopposed Amended Response, No. CIV 14-0365, filed 07/09/2014,

13. Affidavit of Officer Martin Smith, occurring on 05/12/2014,

14. Detailed History of Police Call #P120790534, 04/09/2012,

15. Detailed History of Police Call #P120730078, 04/09/2012,

16. APD Dispatch Recording Transcript, dated 04/21/2014,

17. APD Uniform Incident Report, Case #120023046, 03/13/2012,

18.   Affidavit of Detective Michael Kleinfeld, occurring on 05/08/2014,

19.   Affidavit of Officer David Weidner, occurring on 04/28/2014,

20.   Motion for Summary Judgment, CIV 14-365 JB-GBW, filed on 05/12/2014,

21.   Defendant's Reply, CIV 14-365 JB-GBW, filed on 08/20/2014,

22.   Joint Status Report, CIV 14-365 JB-GBW, filed on 07/02/2015,

23.   Defendant's Amended Answer, CIV 14-365 JB-GBW, filed on 04/21/2015,

24.   First Amended Complaint, CIV 14-365 JB-GBW, filed on 04/08/2015,

25.   Criminal Investigation Bureau Case Report, #AP12-0025037,

26.   Criminalistics and Field Investigator Reports, Case No. 12-025037,

27.   Homicide Canvas Sheets, Case No. 12-025037,

28.   Investigative Supplemental Reports, Case No. 12-025037,

29.   Miscellaneous Documents, Case No. 12-025037,

30.   New Mexico State Police Investigations Bureau, dated 03/19/2012, subject: Daniel Tillison,

31.   Tillison Original Offense Report, APD Case No. 12-0025037,

32.   Field Services Supplemental Report, APD Case No. 12-0025037,

33.   Transcript of 911 call, Operator 2432, 0:55 in length, date of transcript certification, 04/14/2014,

34.   Transcript of 911 call, Operator 3121, 1:54 in length, date of transcript certification, 04/14/2014,

35.    Transcript of Dispatch Recording, date of transcript certification, 04/17/2014,

36.    Transcript of interview of Amanda Gutierrez on 03/19/2012,

37.    Transcript of interview of Eric Selina on date unknown, date of transcript certification, 04/17/2014,

38.    Transcript of interview of Gary Hill on date unknown, date of transcript certification, 04/17/2014,

39.    Transcript of interview of Jessica Barnett on 03/19/2012,

40.    Transcript of interview of Kerry VanAmburg on 03/20/2012,

41.    Transcript of interview of Marie Selina on 03/19/2012,

42.    Transcript of interview of Markie Ortiz on 03/19/2012,

43.    Transcript of interview of Mary Jobe on 03/19/2012,

44.    Transcript of interview of Steven VanAmberg on 03/23/2012,

45.    Transcript of interview of Officer Mark Smith on 03/20/2012.

46.    Use of Force Policy created by IACP, with effective date of February 2006,

47.    Review of Use of Force in the Albuquerque Police Department, prepared by PERF, dated 06/23/2011,

48.    Copy of FBI 2010 Statistics on Law Enforcement Officers Killed and Assaulted, dated 10/24/2011,

49.    U.S. DOJ "Questions and Answers: The Americans with Disabilities Act and Hiring Police Officers," marked as Appendix H,

50.    City Of Albuquerque Interoffice Memorandum from Lt. Mason to Deputy Chief Calloway, dated 04/03/2007, marked as Appendix I,

51.   Employment History form, marked as Appendix J,

52.   Certificate of Service indicating service on 04/05/2016,
      submitted by Frances Carpenter,

53.   Exhibit A-1, Economic Analysis regarding loss of earning
      capacity prepared by William Patterson, dated 09/24/2015,

54.   Exhibit A-2, Economic Analysis regarding psychological
      therapy prepared by William Patterson, dated 04/04/2016,

55.   Exhibit A-3, CV of William Patterson,

56.   Exhibit A-4, Table of "Expectation of Life and Expected
      Deaths by Race, Sex, and Age: 2008,"

57.   Exhibit B-1, psychological report by Samuel Roll,

58.   Exhibit B-2, CV of Samuel Roll,

59.   Exhibit B-3, Fee Structure of Samuel Roll,

60.   Exhibit B-4, Recent Cases of Samuel Roll,

61.   Exhibit C-1, Plaintiff's Report of Christopher Stewart,
      to include updated animations, dated 01/20/2016,

62.   Exhibit C-2, CV of Christopher Stewart,

63.   Exhibit C-3, Testimony provided by Christopher Stewart,

64.   Exhibit C-4, Fee Schedule of Forensic Engineering
      Technologies,

65.   Exhibit D-1, Plaintiff's Report by Melvin Tucker, dated
      01/11/2016,

66.   Exhibit D-2, CV of Melvin Tucker,

67.   Exhibit D-3, Deposition and trial testimony by Melvin
      Tucker,

68.   Exhibit D-4, Material Reviewed by Melvin Tucker,

69.   Exhibit D-5, Facts Assumed by Melvin Tucker,

70.   Exhibit D-6, Melvin Tucker's Fees and Expense Policy,

71.   Training Records for Officer Smith,

72.   Biennium Training Video regarding Biased Policing,

73.   Biennium Training Lesson Plans on multiple topics for
      2011, 2012, 2013, 2014,

74.   Crisis Management Training materials (Lesson Plan
      Modules 10.1, 10.2, 10.3, and 10.4),

75.   Domestic Violence "Cheat Sheet,"

76.   H-93 Training, Lesson Plans for Multiple Topics by the
      New Mexico Department of Safety Law Enforcement Academy,
      Train the Trainers, and

77.   Use of Force Training Lesson Plans on multiple topics to
      include Officer Safety Techniques and Tactics, Edged
      Weapons, Firearms, TASER, and Less Lethal Munitions.


**FACTUAL OVERVIEW OF THE CASE**

On March 19, 2012, Officer Smith responded to an APD
dispatch regarding a person selling possibly stolen stereo
equipment out of the back of a black Mitsubishi Montero SUV.
Officer Smith was dispatched to the area of Texas and Marquette.
After arriving in the area of 8201 Marquette, Officer Smith
reported he observed a black Mitsubishi Montero with New Mexico
license plate 568PTX and he would be making contact with the
driver.  The Mitsubishi had been reported stolen and there was
no report that it had been recovered.  This location was
described by Officer Smith as being a high-crime area.

Officer Smith pulled behind the Montero SUV to block it in
the parking space.  Officer Smith stated he saw the driver
moving around inside the vehicle, to include Mr. Tillison
reaching around the interior of the vehicle.  Officer Smith
ordered the driver, Daniel Tillison, to show his hands and to
put his hands outside the open driver's side window.  Mr.
Tillison failed to obey these commands.  Mr. Tillison attempted
to open the driver's side door, but Officer Smith thwarted this
attempt by pushing the door closed.  Mr. Tillison then drove the
SUV in reverse, slamming the SUV into Officer Smith's patrol car

and pushing it back approximately four feet.  Officer Smith
initially responded to the movement of the vehicle by moving
away from the vehicle's path.

Officer Smith fired his handgun at the driver's side rear
tire in an attempt to disable the vehicle.  Mr. Tillison drove
the SUV forward, striking a wall, and then reversed his
direction and struck a Dodge pickup truck, moving it
approximately 8.5 feet.  Officer Smith reported that Mr.
Tillison brought his right arm across his body and over his
extended left arm, and pointed a dark object at Officer Smith.
Believing Mr. Tillison's actions and the dark object were
consistent with a handgun, Officer Smith responded by firing one
shot into Mr. Tillison.

Officer Smith and Officer George Trujillo provide first aid
to Mr. Tillison until they were relieved by emergency medical
personnel.


**ADDITIONAL FACTS OF THE CASE**

A 911 call was placed by Steven VanAmberg at approximately
12:15 a.m. on 03/13/2012, reporting his black Mitsubishi Montero
SUV had been stolen while he was at work.  Mr. VanAmberg had
last seen his vehicle at approximately 3:30 pm on 03/12/2012 as
he parked it to go into work.  He discovered it missing as he
got off of work at approximately midnight.  Mr. VanAmberg's
stolen SUV was later determined to be the same vehicle occupied
by Mr. Tillison when Mr. Tillison was approached by Officer
Smith.

Witness Gary Hill stated he was on the phone with Mr.
Tillison when the shooting occurred.  Mr. Hill said he heard the
officer command Mr. Tillison to put his hands in the air and to
put his hands out the window.

Per witness Eric Selina, the black SUV driven by Mr.
Tillison rammed the police car.  After that, he said Officer
Smith fired his weapon.  It is unclear if Mr. Selina saw the
shot or heard the shot.

Witness Marie Selina said she saw the black SUV strike a wall in front of it and then strike a car as it backed up.

Per witness Markie Ortiz, the police officer (Smith) appeared to be talking to the driver of the vehicle (Tillison) when Officer Smith suddenly pulled his handgun and pointed it at the vehicle.  Per Ms. Ortiz, Mr. Tillison tried to escape by driving forward over the parking curb and then Mr. Tillison reversed and "tried to run him (Officer Smith) over."  She repeated that Mr. Tillison almost ran over Officer Smith.  Ms. Ortiz also stated that Officer Smith had backed away from the moving vehicle driven by Mr. Tillison.

Per Officer Smith, Mr. Tillison was moving around the inside of his vehicle as Officer Smith approached.  Officer Smith identified himself as an APD officer and ordered Mr. Tillison to put his hands outside the car window.  Instead, Mr. Tillison continued to move around in the vehicle, looked back at Officer Smith, and then reached down and reached behind the driver's seat.  Officer Smith continued to give commands.  Mr. Tillison attempted to open the driver's side door, but Officer Smith was able to push the door closed.  Per Officer Smith, Mr. Tillison continued to reach around in the vehicle and then reversed the SUV into Officer Smith's patrol car.  Mr. Tillison then drove forward in Officer Smith's direction.  At some point, Officer Smith responded by firing one round into the rear driver's side tire of the stolen SUV driven by Mr. Tillison. Officer Smith stated that Mr. Tillison then pointed a dark object at Officer Smith and Officer Smith, believing the object to be a handgun, fired one round through the open SUV window, striking Mr. Tillison.

Per the engineering report prepared by Mr. Stewart, Mr. Tillison drove his Mitsubishi SUV in reverse, striking Officer Smith's patrol car and pushing it rearward approximately 4 feet. In response, Officer Smith moved to the "northwest quadrant of the second parking space from the west" of the parking lot away from the direction of the stolen SUV driven by Mr. Tillison. Mr. Tillison reversed direction, now driving the SUV toward Officer Smith and with enough speed to jump the wheel stop and sidewalk, impacting a wall.  Mr. Tillison once again changed

9

direction, placing the SUV in reverse and striking a Dodge pickup with enough force to move it approximately 8.5 feet.

One inaccuracy in the engineering report videos is they depict Officer Smith standing stationary approximately the distance of the width of one parking space away from the moving SUV as Mr. Tillison drove the SUV first backward into the patrol car, forward into the wall, and then again rearward striking the vehicle on the passenger side of the SUV. As evident from Officer Smith's and witness' statements, Officer Smith was initially in very close proximity (within touching distance) of the SUV as he prevented Mr. Tillison from opening the driver's side door. Officer Smith moved away from the SUV as it began moving and likely continued to move in response to the changes in the SUV's direction.

## DISCUSSION OF USE OF FORCE

Officers are typically taught that allegations of excessive force are examined by the courts under the Fourth Amendment prohibition of unreasonable seizures. Officers are taught the tenets of the U.S. Supreme Court decisions in *Tennessee v. Garner*, 471 U.S. 1 (1985) and in *Graham v. Connor*, 490 U.S. 386, 394 (1989). Many police academies are moving away from teaching a traditional continuum use of force model and instead rely on teaching the law as it applies to use of force. For example, officers are taught that when an officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or others, it is not unreasonable to prevent escape by using deadly force. Officers are further taught that it is appropriate for a police officer to use deadly force if the suspect threatens the officer with a weapon. Officers are trained to respond to the threat of violence, but there must be objective factors justifying the use of force in responding to the threat. Police officers have the right, and responsibility, to arrest those who they have probable cause committed a crime, particularly one in which the safety of others is threatened.

As officers are taught per *Graham v. Connor*, an officer is not to be judged with 20-20 hindsight, but rather by a

reasonable officer on the scene during events that are often
tense, uncertain, and rapidly evolving.  Many officers are
taught a three-prong test established by *Graham v. Connor*, to
determine the reasonableness of a use of force event.
Generally, officers learn these three factors are:

1. What is the nature of the offense?  What brought the
   officer and the suspect together in this incident?
2. Does the suspect pose an immediate threat to the officer or
   someone else?
3. Is the suspect trying to flee or evade arrest? Is the
   suspect actively resisting?

In this situation, the nature of the original offense was a
suspicious vehicle, or possibly selling stolen items from a
vehicle.  At the time of the encounter, Officer Smith had reason
to believe the vehicle was possibly stolen, but this wasn't
confirmed until after the incident.

In examining the second prong of *Graham v. Connor,* the
primary question is whether Mr. Tillison posed a threat to the
officer or someone else.  As stated by Officer Smith and
supported by witness statements and the engineering report
prepared by Mr. Stewart, Mr. Tillison was driving in a dangerous
fashion.  After Officer Smith originally moved away from the SUV
driven by Mr. Tillison as Mr. Tillison drove in reverse, Mr.
Tillison then changed direction and drove forward now moving
toward the location where Officer Smith previously stood.  In
viewing the totality of the circumstances, Mr. Tillison refused
to obey Officer Smith's lawful commands, reached into areas of a
vehicle that could contain a weapon, drove in a fashion as to
endanger the life of Officer Smith and other possible
pedestrians, and then displayed a dark object in a fashion
consistent with wielding a handgun.  The totality of these
actions would lead a reasonable officer to believe his/her life
was in danger of death or serious bodily injury.

As to the third prong of *Graham v. Connor:* Was Mr. Tillison
attempting to flee or evade arrest?  The obvious answer is yes.

The reasonableness of the use of deadly force may also be
reviewed considering the factors of ability, opportunity, and
jeopardy.  Ability means the subject has the ability to kill or

11

seriously injure another.  Opportunity means that the situation is such the subject would be able to use his ability against another person.  Jeopardy means the subject's words or action would cause another person to reasonably believe the subject intends to kill or injure.

In this case, Mr. Tillison used a stolen 4,500 pound vehicle as a weapon (ability), drove in a dangerous and reckless manner while continuously failing to obey commands (opportunity), and clearly presented a threat to Officer Smith as Officer Smith and witness Markie Ortiz stated that Mr. Tillison attempted to run over Officer Smith (jeopardy).

**OPINIONS**

The use of deadly force by Officer Smith was clearly reasonable and appropriate.

The courts have consistently determined that officers may shoot at the driver of a vehicle when the driver is using the vehicle as a weapon and endangering the life of the officer or others.  The officer is placed in the unenviable position of selecting one dangerous alternative or another.  Most officers have received legal instruction on the U.S Supreme Court decision of *Scott v. Harris.*  In *Scott v. Harris,* the Supreme Court ruled that an officer did not violate the 4th Amendment by ramming the car of a fugitive who "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the other officers involved in the chase."

In this case, Officer Smith's actions possibly saved his life, as well as the life of any others in the area or in Mr. Tillison's path in his desperate attempt to escape.  It is unlikely that if Mr. Tillison were successful in forcibly ramming other vehicles out of his way, that he would then drive away in a safe, lawful manner.  It is more likely that he would continue to drive dangerously and erratically, placing every one in his path at risk.  Mr. Tillison's dangerous, unlawful actions posed a threat to public safety.  A reasonable officer would

conclude Mr. Tillison was intent on continuing his flight and would pose a deadly threat to others on the road.

In cannot logically be argued that Mr. Tillison's actions in the parking lot did not pose a deadly threat to Officer Smith.  Mr. Tillison recklessly drove the SUV forward and backward, slamming into a pickup truck with enough force to move the vehicle 8.5 feet. If Mr. Tillison had struck Officer Smith with this same amount of force, it undoubtedly would have caused death or serious bodily injury.  If it had been someone's spouse or child standing near the SUV driven by Mr. Tillison, I'm certain there would be outrage at Mr. Tillison for placing them in obvious danger by his dangerous and erratic driving.  We should be no less outraged when the person placed in harm's way is a police officer.

Mr. Tillison's dangerous attempt to flee in the SUV was justification for the use of deadly force.  In addition, Mr. Tillison's actions in which he brought his right hand across his body while holding a dark object would cause a reasonable officer to believe that Mr. Tillison was pointing a handgun at the officer.  In the totality of the circumstances, Officer Smith is confronted with a driver who repeatedly failed to obey lawful commands, was observed reaching into areas of a vehicle which could contain a weapon, desperately tried to escape by ramming vehicles while Officer Smith's avenues of escape were limited by other vehicles and a wall, and then Mr. Tillison reached across his body pointing a dark object at Officer Smith in a fashion consistent with pointing a handgun.  It is reasonable for an officer to conclude that the driver was attempting to shoot the officer.  We will never know Mr. Tillison's intentions for simulating having a weapon and pointing it at Officer Smith.  Perhaps he was hoping to frighten Officer Smith to make his escape easier.  Perhaps Mr. Tillison was under the influence drugs (as suggested by Ms. Jobe) causing him to act erratically and illogically.  In this case, Mr. Tillison immediately threatened Officer Smith by both his dangerous attempts to flee by striking vehicles, and by simulating having a weapon and pointing it at Officer Smith.

To better understand the threat faced by officers when facing a weapon, it is beneficial to examine the OODA Loop

13

concept, first developed by military strategist Colonel John Boyd.  The OODA Loop is frequently used to examine the decision-making and action-taking process in a critical incident.  The first step is Observing – seeing the event unfold.  Second is Orienting – interpreting what is occurring and determining the threat.  Next is Deciding – determining a course of action and the best response to a threat.  Last is Acting – taking the action to, hopefully, respond successfully.  Typically, an officer facing an armed assailant is at a distinct disadvantage. The suspect has already cycled through the first three stages and is beginning the fourth stage (Acting) while the officer, at best, is beginning stage one (Observing).

In an article entitled "To Shoot or Not to Shoot: Response and Interpretation of Response to Armed Assailants," written by Matthew Sharps and Adam Hess, and appearing in *The Forensic Examiner* (12/22/2008), it was argued that an officer's decision to shoot must be made swiftly.  In less than a second, an officer must evaluate the suspect's motions, where a weapon is aimed, the presence of other people, whether others are in the officer's field of fire, and other potential sources of danger to the officer and others.  The authors advised that "even under ideal conditions of lighting, exposure time, freedom from contextual distraction, and relatively brief retention intervals, pistol identifications were on average less than 50% correct."

In numerous studies by Force Science and law enforcement agencies, which I've replicated, an officer will take at least 0.75 – 1.0 seconds to fire a shot from a low-ready position.  A suspect, with a handgun already pointed at the officer, could easily fire 4-5 rounds prior to the officer firing one round. This is why the time limit confronting the officer is of critical importance when examining the actions of a police officer.  When Mr. Tillison simulated pointing a weapon at Officer Smith, Officer Smith had less than a second to respond. Even then, Officer Smith was dangerously behind on the OODA Loop.

In a test conducted by Force Science and documented in The Law Enforcement Executive Forum, Volume 13, No. 1, March 2013, officers were videotaped conducting traffic stops with role

14

players armed with training Simunition (paintball) weapons.  Dr. Lewinski reported, "With few exceptions, he (the role player) shot every single one (the officers participating in the study) before they could move and he continued to shoot them as they continued to move."

When I was on SWAT, we trained in blocking and jamming suspect vehicles as well at the "Precision Immobilization Technique" (PIT) maneuver.  We quickly learned that a patrol car positioned behind a suspect's vehicle may be a psychological barrier, but it is not a physical barrier.  We were taught that a blocking vehicle must weigh two to three times more than the suspect's vehicle to serve as a physical barrier.  In the March 2006 issue of *American Police Beat,* "Shooting at Cars," it was determined that a suspect ramming a police vehicle can drive it backwards a foot if the vehicles were initially two feet apart, and will drive the patrol vehicle back 11 feet if the two vehicles were initially 20 feet apart.

Witness Mary Jobe said she talked to Mr. Tillison on the phone on the day of the incident.  Per Ms. Jobe, Mr. Tillison said he was sick because he was using heroin and she knew Mr. Tillison to be a heroin user "since he was a little boy."  Ms. Jobe stated that Mr. Tillison "just runs the streets and hustles to get money to get well."  Ms. Jobe said Mr. Tillison sold drugs, specifically methamphetamines and heroin, and sometimes crack cocaine.  Although this was unknown to Officer Smith, it is relevant in that it may explain Mr. Tillison's illogical and dangerous behavior.

According to a study by the International Association of Police (IACP) initially researched in 2001, 53% of the males involved in a use of force incident with police were under the influence of alcohol or drugs.  Officers are taught that people under the influence of alcohol or drugs are less likely to react logically and, therefore, can be even more dangerous.

In the Engineering Report prepared by Mr. Christopher Stewart, Mr. Tillison was driving a 2005 Mitsubishi Montero, Officer Smith was driving a Ford Police Cruiser (struck), and the vehicles present/struck include a 2004 Ford Taurus (struck), 2008 Dodge pickup truck (struck), and a 2005 Pontiac Vibe.  As Mr. Tillison drove forward and backward, Officer Smith moved

away from the SUV driven by Mr. Tillison.  Mr. Tillison pushed
the Ford approximately 4.0 feet, and pushed the Dodge
approximately 8.5 feet.

More specifically, Mr. Tillison drove in reverse as Officer
Smith was commanding Mr. Tillison to place his hands outside the
car window.  Mr. Tillison struck Officer Smith's patrol car,
pushing it back about 4.0 feet.  As Officer Smith moved away
from Mr. Tillison, Mr. Tillison drove his SUV forward with
enough speed to jump the parking lot wheel stop, cross a
sidewalk, and impact a wall.  At some point, Officer Smith fired
one round into the driver's side rear tire of the stolen SUV
driven by Mr. Tillison.  Mr. Tillison then put the SUV in
reverse and slammed into the Dodge pickup truck, pushing it
approximately 8.5 feet.  In the report, Mr. Stewart opines
Officer Smith fired through the driver's window as Mr. Tillison
was driving in reverse.

In the crime scene photo, Mr. Tillison's phone was
described as a Samsung cellular phone, black with a metallic,
silver face, approximately 4 ¼ inches by 2 inches closed, and 4
¼ inches by 3 inches open.  This closely approximates the color
and dimensions of a handgun.


**RESPONSE TO REPORT BY MELVIN TUCKER**

Mr. Tucker opines that Officer Smith's assessment of the
threat was unreasonable.  As mentioned above, it appears as if
the U.S. Supreme Court would disagree with Mr. Tucker.  As
stated in *Scott v. Harris,* and *Plumhoff v. Rickard,* a suspect
behaving as Mr. Tillison is a definite threat to officers and
the public.

Mr. Tucker opines Officer Smith's use of deadly force was
contrary to established law enforcement training and standards.
I disagree.  I have conducted tactical training for thousands of
FBI agents, police officers, and military personnel.  In a
situation similar to the one faced by Officer Smith, I would
teach officers to respond with deadly force when faced with a
suspect ramming cars in your vicinity as you are on foot and the
suspect displays an object in a threatening manner consistent

with a handgun.  Of the police trainers I know throughout the
country, all would have supported deadly force in this case.
Officer Smith responded in a tactically sound and professional
manner to protect the public and himself.

No rational argument can be made that the situation was not
life threatening.

Mr. Tucker contradicts himself in his report.  At one point
he suggests an officer should not approach a vehicle they
consider high risk until back-up has arrived, indicating this
situation was high risk, and faulting Officer Smith for doing
so.  Mr. Tucker then chastises Officer Smith for his actions
stating the call was simply a person who may be selling stolen
goods from his car.

Mr. Tucker references the IACP Model Policy that prohibits
officers from shooting at moving vehicles unless they were being
threatened by deadly force by means other than the vehicle.  The
IACP does not establish law nor does it dictate policy for
departments; it can only make recommendations.  This suggestion
is contrary to current law and also ignores a situation in which
the officer is unable to move to safety.  In this case, Officer
Smith was surrounded by other vehicles and a wall.  There was no
clear path to safety.  Officer Smith initially tried to move to
safety by moving away from Mr. Tillison.  However, Mr. Tillison
changed his direction and then drove in the direction of Officer
Smith.  Mr. Tillison's erratic, dangerous driving put Officer
Smith at risk wherever he fled.  As evidenced in the Engineering
Report, Mr. Tillison was driving aggressively enough to move a
2008 Dodge Pickup (weighing approximately 4,500 to 6,500 pounds)
over 8 feet.  Standing next to or behind one of the vehicles in
the parking lot would not have been a safe option for Officer
Smith.  Perhaps the only safe option for Officer Smith was the
one he chose, to fire upon the deadly Mr. Tillison.  Finally,
Officer Smith reasonably assumed he was being threatened by
deadly force other than the vehicle based on Mr. Tillison's
suspicious actions in the car and simulating pointing a handgun
at Officer Smith.

Mr. Tucker states research has shown handguns are
ineffective in disabling vehicles.  This is true.  However,
Officer Smith's intention wasn't to disable the vehicle.

17

Officer Smith's intention was to stop Mr. Tillison's deadly actions.  Shooting at the driver of a vehicle is an effective means of stopping the threat posed to the officer and public safety.

Mr. Tucker argues that should the driver be killed, the vehicle would "almost certainly proceed out of control and could be a serious threat to the officer and others in the area." First, this is contrary to numerous court decisions.  Second, in this situation, Mr. Tillison was initially boxed in and was making a desperate attempt to escape by ramming vehicles. Therefore, Officer Smith's action stopped Mr. Tillison from driving his vehicle into public which would have created a threat to others.

Mr. Tucker writes that there is "virtually no risk of harm to an officer from a suspect in a vehicle."  This is untrue, disingenuous, and contrary to what is taught to law enforcement officers.  Per the Officer Down Memorial Page, there were eight officer deaths in 2015 caused by "vehicular assaults," or suspects using their vehicles as a weapon.  These eight dead officers are in addition to the large number of officers killed by vehicles in accidents, pursuits, or when officers are unintentionally struck by another driver.  Obviously, vehicles pose a grave threat to officers and officers are keenly aware of this threat.  In the PERF Report referenced by Mr. Tucker (Appendix F), page 12, it documented that in 5% of incidents leading Albuquerque Police Officers to use deadly force, suspects used motor vehicles as weapons against the officers.

Mr. Tucker opines the nature of the call did not indicate the driver was armed and dangerous.  This is true; the nature of the call does not indicate Mr. Tillison was armed and dangerous. However, Mr. Tillison's actions upon being contacted by Officer Smith clearly did indicate he was dangerous.  When Mr. Tillison ignored Officer Smith's commands and searched through the car in an apparent attempt to locate something, it is reasonable to assume he was looking for a weapon.  Mr. Tillison driving the 2005 Mitsubishi Montero SUV backward and forward was an obvious deadly threat, as the SUV is now an over 4,500 pound weapon. Finally, Mr. Tillison pulling out an object similar in

18

appearance to a handgun and pointing it at Officer Smith is a
dangerous threat.

Mr. Tucker also suggests Officer Smith could have removed
himself from potential harm by stepping out of the way of the
moving vehicle.  This is also disingenuous.  First, officers
have no legal duty to retreat.  In fact, society pays them to do
just the opposite.  In this case, however, Officer Smith did
move away from Mr. Tillison as Mr. Tillison began his reckless
attempt to escape.  Looking at the crime scene photos, there is
no clear path to safety for Officer Smith.  I'm confident
Officer Smith didn't expect Mr. Tillison to repeatedly drive
backward and forward.  Each change in direction of Mr.
Tillison's vehicle posed a new threat to Officer Smith.  Officer
Smith had a limited area in which to maneuver.  Even if he were
able to get behind another vehicle so that it was a barrier
between Officer Smith and Mr. Tillison, this would offer no
safety.  Mr. Tillison was colliding with cars that could cause
them to become dangerous projectiles.  Mr. Tucker's statements
also ignore the threat posed by Mr. Tillison when Mr. Tillison
displayed an object resembling a weapon and pointed at Officer
Smith in a weapon-like fashion.

Finally, Mr. Tucker faults Officer Smith for assuming the
object was a weapon and states it is more likely the object was
a cell phone since "247 million Americans (88%) own cell
phones."  This is a ridiculous statement.  Using this logic, all
objects are cell phones and none are handguns.  Actually, a
higher percentage of Americans probably own sunglasses, so,
using the logic proposed by Mr. Tucker, officers should assume
any dark object, wielded in a manner consistent with a handgun,
is a pair of sunglasses.  That is, until the officer is shot and
killed from what the officer assumed to be a cell phone or
sunglasses.  Per the FBI's Law Enforcement Officers Killed and
Assaulted annual report, 2,266 police officers were assaulted by
firearms in 2013.  Based on Mr. Tucker's logic, officers in
these 2,266 incidents would be committing an error of judgment
believing the suspect had a weapon and should have instead
assumed the suspect was holding a cell phone.  And many of those
officers would now be dead.

**QUALIFICATIONS**

Chuck Joyner
President, Survival Sciences, LLC
cjoyner@SurvivalSciences.com
(310)962-9122

Chuck Joyner served in the CIA from 1983-1987, and was a FBI Special Agent from 1987 until his retirement in 2011.  He has extensive experience in use of force training and consultations.  Chuck has lectured internationally and throughout the U.S. on myriad law enforcement topics.

PUBLICATIONS

*Advanced Concepts in Defensive Tactics; A Survival Guide for Law Enforcement*, published in 2010 by CRC Press, Taylor & Francis.

"A Modern, Simple, No-Cost Solution to Ensure Reasonable Use of Force," published in the IACP *Great Ideas* issue of their periodical, *The Police Chief*, September 2015.

Frequent contributor to law enforcement publications to include the *FBI Law Enforcement Bulletin*, PoliceOne.com, and *The Tactical Edge*.

CERTIFICATIONS

Certified in force science analysis by the Force Science Institute, Ltd.

Certified by the FBI as a Master Police Instructor, General Police Instructor, Firearms Instructor, Defensive Tactics Instructor, Chemical Agents Instructor, Fitness Instructor, and Tactical Instructor.

Certified by TASER International as a TASER instructor.

Certified by Armament Systems and Procedures (ASP) as an ASP baton instructor.

Inducted into the martial arts Masters' Hall of Fame as Instructor of the Year in 2006.

MEMBERSHIPS

National Tactical Officers Association (NTOA)
International Association of Chiefs of Police (IACP)
FBI National Academy
FBI Retired Agents Association
International Law Enforcement Trainers and Educators Association (ILEETA)

## EXPERIENCE

Testified in federal and state courts.

Creator of the Dynamic Resistance-Response Model (DRM); a modern use of force model first presented in the *FBI Law Enforcement Bulletin*, September 2007.

Career focus on training and criminal investigations.

Provided instruction on all aspects of use of force to thousands of FBI agents, law enforcement officers, and military personnel.

Principal Firearms Instructor, Principal Defensive Tactics Instructor, and Principal Tactical Instructor for the FBI Los Angeles Field Office.

Served as the lead/certifying instructor in providing firearms, defensive tactics, and chemical agents instruction to certify officers as instructors for their agencies (train the trainers).

Created training curricula, authored lesson plans, and prepared written and practical examinations of proficiency.

FBI Regional SWAT Team operator (entry team, sniper, and grenadier) and SWAT Team Commander.

Managed FBI critical incident programs to include SWAT, Evidence Response Teams (Crime Scene Investigations), Special Agent Bomb Technicians, Weapons of Mass Destruction, Crisis Management, Hazardous Materials Response Teams, and Special Events.

Managed multi-agency critical incidents, planned and coordinated protection details of U.S. government officials, led high-risk tactical operations, and coordinated the FBI response to special events.

Created and managed two unique programs for the FBI. Met with executive level foreign government officials, researched applicable U.S. and foreign laws, and established program policies and training guidelines.

FBI Regional SWAT Team Commander.

FBI Regional SWAT Team Operator (entry team, sniper, and grenadier).

## EDUCATION

M.A., Organizational-Industrial Psychology, University of West Florida, 1982

B.A., Psychology, University of West Florida, 1981

B.A., Biology/Pre-professional, University of West Florida, 1981

**LIST OF CASES IN WHICH CHARLES JOYNER HAS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION DURING THE PREVIOUS 4 YEARS**

03/21/2016
Wood v. Wright, et al
Houston, TX
Deposition
Attorney: Stephanie Griffin
Testified on behalf of the city

11/11/2015
Harris County v. Behler, et al.
Houston, TX
Criminal
Attorney: Julian Ramirez
Testified on behalf of the county against charged police officers

12/01/2014
Treavor Eimers v. City of Key West
Key West, FL
Civil
Attorney: Michael Burke
Testified on behalf of the City of Key West

07/23/2014
Monroe County Grand Jury
Key West, FL
State Grand Jury
Attorney: Mark Wilson
Testified at request of the state in favor of the police officers

07/14-18/2014
U.S v. Daniel Sutterfield
Harrison, AR
Criminal
Attorney: Bruce Eddy
Testified on behalf of defendant

06/11-13/2013
Free Speech Coalition v. The Honorable Eric H. Holder
Philadelphia, PA
Civil
Attorney: Kathryn Wyer
Testified on behalf of U.S. government


07/12/2010
U.S v. Michael Dodd
Pre-trial Hearing
Los Angeles, CA
Criminal
Attorney: Patricia Donahue
Testified on behalf of U.S. government


Very little of my work since retirement has required testimony since usually
the matters are settled via administrative action.  I primarily provide
consultations to attorneys and Chiefs.  My opinions in those matters have
been fairly evenly split between decision for and against the officers
involved.

## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

VERONICA DORATO, as PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH CLAIM OF DANIEL TILLISON,
deceased

      Plaintiffs,

v.                                                    1:14-CV-00365 JB-GBW

OFFICER MARTIN SMITH
in his official and individual capacities,
JOHN/JANE DOE SUPERVISOR
 in his/her official and individual capacities,
and CITY OF ALBUQUERQUE,

      Defendants.

### DEFENDANTS' RULE 26  EXPERT DISCLOSURES

      **COME NOW**, Martin Smith and City of Albuquerque (hereinafter

"Defendants"), by and through their attorney Deputy City Attorney Stephanie M. Griffin,

and hereby submit their Expert Disclosures pursuant to Fed. R. Civ. P. Rule 26(a)(2):

      Charles R. Joyner
      Survival Sciences, LLC
      P.O. Box 571073
      Houston, Texas 77257
      (310) 962 - 9122

Mr. Joyner's Rule 26(a)(2)(B) report is attached.

Respectfully submitted,

**CITY OF ALBUQUERQUE**
Jessica M. Hernandez, City Attorney


/s/ Stephanie M. Griffin
Deputy City Attorneys
P. O. Box 2248
Albuquerque, NM 87102
(505) 768-4500

*Attorneys for Defendants*

## CHARLES JOYNER'S FEE SCHEDULE

My fee for consultation is $300 per hour.  This fee covers all consultation time, including any phone calls and/or reports that I make.  My fee for court appearances or deposition is $400 per hour, with a half-day minimum of $1,600.  All fees are the responsibility of the party issuing the subpoena or requesting my appearance.

In addition to my general consultation or appearance fees, I charge for travel time, including the time involved in travel to a different city.  This includes all time involved in getting to and from airports, time spent at airports, and time flying.  It does not include time I might spend working on matters for other clients, working on other business matters, or sleeping, but, in general, I charge a minimum of 10 hours for any day in which I am out of the office traveling and working on your case (including weekends).  Travel-related time is charged at a $150/hour rate.

My retainer fee is one thousand, two hundred dollars, representing 4 hours of my work ($300 x 4 = $1,200), which will be applied to the final billing.