# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

KENTH FALLEN and
LAURA FALLEN,

     Plaintiffs,

vs.                                                                    No. CIV 15-0146 JB/SCY

GREP SOUTHWEST, LLC; SCI CAMINO
REAL FUND, LLC, d/b/a CAMINO REAL
APARTMENTS; NATIONAL CREDIT
SYSTEMS, INC.; INSURECO AGENCY &
INSURANCE SERVICES, INC. d/b/a
SUREDEPOSIT; EQUIFAX INFORMATION
SERVICES, LLC; EXPERIAN
INFORMATION SOLUTIONS, INC. and
TRANSUNION, LLC.,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Attorneys' Fees,

filed March 16, 2016 (Doc. 104)("Motion").  The Court held a hearing on September 13, 2016.

The primary issues are: (i) whether the Court should award the Plaintiffs, Kenth and Laura

Fallen, reasonable attorneys' fees against Defendant GREP Southwest, LLC, and Defendant SCI

Camino Real Fund, LLC d/b/a Camino Real Apartments ("Camino Real"); and (ii) whether the

Court should award the Fallens reasonable attorneys' fees against Defendant National Credit

Systems, Inc. ("National Credit").  The Court will grant in part and deny in part the Motion.  The

Court will not award the Fallens all the attorneys' fees that they request.  The Court will,

however, award the Fallens: (i) $17,427.28 in reasonable attorneys' fees against GREP

Southwest; (ii) $17,427.28 in reasonable attorneys' fees against Camino Real; and (iii) $8,803.47

in reasonable attorneys' fees against National Credit.

**FACTUAL BACKGROUND**

The Court takes its recitation of the facts from the Plaintiffs' Second Amended Complaint for Damages and Declaratory and Injunctive Relief, filed September 22, 2015 (Doc. 48)("Second Amended Complaint").  The Plaintiffs, Kenth and Laura Fallen, are residents of Albuquerque, New Mexico.  See Second Amended Complaint ¶ 1, at 2.  On September 19, 2012, the Fallens entered into an agreement to rent an apartment at the Camino Real Apartments in Albuquerque, New Mexico, for a period of ten months and ten days, beginning September 21, 2012, and ending July 31, 2013.  See Second Amended Complaint ¶ 12, at 4.  The Fallens entered this rental agreement with Camino Real, which owns the Camino Real Apartments, and GREP Southwest, which manages the apartments.  See Second Amended Complaint ¶ 12, at 4.  Under the agreement's terms, the Fallens had the right to terminate the agreement with sixty days written notice.  See Second Amended Complaint ¶ 12, at 4.  The apartment had sewer problems and was uninhabitable: sewage had overflowed from the kitchen sink, spilling over the countertop and onto the floor.  See Second Amended Complaint ¶¶ 17-23, at 4-5.  Hence, on April 1, 2013, the Fallens gave the Camino Real manager, Teri Shaffer, notice of their intent to vacate the apartment.  See Second Amended Complaint ¶¶ 25-30, at 5.  On that day, Shaffer completed a "Notice of Intent to Vacate" form, designating May 31, 2013, as the move-out date, and the Fallens initialed the form.  Second Amended Complaint ¶¶ 27-30, at 5.  Later, on April 16, 2013, Shaffer completed another "Notice of Intent to Vacate" form, but this time without the Fallens' knowledge or cooperation.  Second Amended Complaint ¶¶ 47-52, at 7-8.  This form altered the Fallens' move-out date to June 16, 2013, and purported to obligate the Fallens for sixteen days of pro-rated rent for the month of June 2013.  See Second Amended Complaint ¶¶ 47-50, at 7-8.

The Fallens vacated the apartment on May 24, 2013, and paid May's rent in full.  See Second Amended Complaint ¶¶ 54-55, at 8.  On June 19, 2013, Camino Real and GREP Southwest issued the Fallens a move-out statement, which billed the Fallens for $412.00 in unpaid rent for the period of June 1, 2013, to June 16, 2013.  See Second Amended Complaint ¶ 59, at 9.  This bill was based upon the April 16, 2013, "Notice of Intent to Vacate" form, which Shaffer completed without the Fallens' knowledge or cooperation.   Second Amended Complaint ¶ 60, at 9.  The Fallens refused to pay the $412.00 bill.  See Second Amended Complaint ¶ 62, at 9.

On August 13, 2013, Camino Real and GREP Southwest opened a claim with Defendant Assurant Payment Services, Inc. d/b/a Assurant Solutions d/b/a SureDeposit ("SureDeposit"), a debt collector.  See Second Amended Complaint ¶¶ 5, 64, at 2, 9.  SureDeposit then assigned the debt to National Credit, a national debt collection agency.  See Second Amended Complaint ¶¶ 4, 65, at 2, 9.  National Credit contacted the Fallens and pursued collection of the $412.00 debt.  See Second Amended Complaint ¶¶ 66-79, at 9-11.  The Fallens contacted Camino Real, GREP Southwest, and National Credit, making them aware that it did not owe the $412.00 debt, because the April 6, 2013, "Notice of Intent to Vacate" form was operative, and the April 16, 2013, form was fraudulent.  See Second Amended Complaint ¶¶ 81-85, at 11.  Nevertheless, National Credit reported the debt to three national credit agencies -- Equifax Information Services, LLC, Experian Information Solutions Inc., and TransUnion LLC -- detrimentally impacting the Fallens' credit scores.  See Second Amended Complaint ¶¶ 93-98, at 12-13.  The Fallens, through counsel, sought to remedy the injury by contacting the three credit agencies, but they refused to adjust the Fallens' credit scores.  See Second Amended Complaint ¶¶ 99-155, at 13-21.

**PROCEDURAL BACKGROUND**

On February 19, 2015, the Fallens, injured and deeply frustrated, filed suit in federal court. See Complaint for Damages and Declaratory and Injunctive Relief at 1, filed February 19, 2015 (Doc. 1)("Complaint").  In the Second Amended Complaint, the Fallens assert: (i) a claim against National Credit for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x, see Second Amended Complaint ¶¶ 156-161, 189-202 at 21-22, 25-26; (ii) a claim against National Credit and SureDeposit for violations of the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p, Second Amended Complaint ¶¶ 162-166, at 22; (iii) a claim against GREP Southwest, Camino Real, SureDeposit, Equifax Information Services, LLC, Experian Information Solutions Inc., and TransUnion LLC for violations of the New Mexico Unfair Practices Act ("UPA"), N.M. Stat. Ann. §§ 57-12-1 to 57-12-26, Second Amended Complaint ¶¶ 167-71, at 22-23; (iv) a tortious-debt-collection claim against GREP Southwest, Camino Real, and SureDeposit, see Second Amended Complaint ¶¶ 172-76, at 23; (v) a breach-of-contract claim against GREP Southwest and Camino Real, Second Amended Complaint ¶¶ 177-82, at 23-24; (vi) a claim against GREP Southwest and Camino Real for violations of the New Mexico Uniform Owner-Resident Relations Act ("UORRA"), N.M. Stat. Ann. §§ 47-8-1 to 47-8-52, Second Amended Complaint ¶¶ 183-88, at 24-25; and (vii) a claim against Equifax Information Services, LLC, Experian Information Solutions Inc., and TransUnion LLC for violations of the FCRA, 15 U.S.C. §§ 1681-1681x, see Second Amended Complaint ¶¶ 189-202 at 25-26.

On October 22, 2015, National Credit made an offer of judgment in the amount of $4,001.00, plus reasonable attorneys' fees and costs.  See Defendant National Credit Systems, Inc.'s Response to Plaintiffs' Motion for Attorney's Fees at 1, filed April 18, 2016 (Doc.

112)("National Credit Response"); National Credit Systems, Inc.'s Offer of Judgment at 1-2 (dated October 22, 2015), filed September 13, 2016 (Doc. 126)("National Credit Offer of Judgment"). The Fallens rejected this offer. See National Credit Response at 1. The litigation continued. See National Credit Response at 1.

On January 13, 2016, the Honorable Steven Yarbrough, United States Magistrate Judge for the United States District Court for the District of New Mexico, held a settlement conference at which the Fallens reached a settlement agreement with Camino Real, GREP Southwest, and National Credit on all issues except attorneys' fees. See Order at 1, filed January 15, 2016 (Doc. 90)("Settlement Order").[1]   GREP Southwest and Camino Real agreed to pay the Fallens $2,000.00 to settle the Fallens' claims against them.   See Transcript of Rule 16 Settlement Conference at 3:8-10, taken January 13, 2016 (Doc. 129)("Settlement Conference Tr.")(Court). National Credit agreed to pay $1,000.00 to settle the Fallens' claims against it.  See Settlement Conference Tr. at 10:20-22 (Court).

At the settlement conference, the Fallens and Camino Real, GREP Southwest, and National Credit agreed that the Court shall decide the issue of reasonable attorneys' fees.  See Settlement Order at 1.  In addition, the Fallens and National Credit agreed to cap any attorneys' fee award at a maximum of $16,500.00.  See National Credit Response at 2, 4.  Unlike National Credit, however, GREP Southwest and Camino Real and the Fallens did not reach an agreement

---

[1]After the settlement conference, the Fallens noticed voluntary dismissals of the credit-agency Defendants Equifax Information Services, LLC, Experian Information Solutions Inc., and TransUnion LLC.   See Stipulation of Voluntary Dismissal, filed January 21, 2016 (Doc. 91)("TransUnion Dismissal"); Stipulation of Voluntary Dismissal, filed February 5, 2016 (Doc. 96)("Experian Dismissal"); Stipulation of Voluntary Dismissal, filed March 4, 2016 (Doc. 101)("Equifax Dismissal").  Further, on May 2, 2016, the Fallens noticed a voluntary dismissal of SureDeposit.   See Stipulation of Voluntary Dismissal of Insureco Agency & Insurance Services, Inc. and Notice of Withdrawal of Motion to Intervene, filed May 2, 2016 (Doc. 115)("SureDeposit Dismissal").

regarding a maximum attorney-fee award.  <u>See</u> Response to Plaintiffs' Motion for Attorney's Fees at 2, filed April 8, 2016 (Doc. 108)("Camino Real Response").  The Fallens and GREP Southwest and Camino Real agreed that the Court's determination regarding attorneys' fees would be "binding," such that neither side would appeal the Court's decision.  <u>See</u> Settlement Conference Tr. at 4:16-5:20 (Lowry, Vance, Court).  Magistrate Judge Yarbrough instructed the parties to discuss the issue of attorneys' fees and directed the Fallens' counsel to file a motion with the Court if the parties were unable to resolve the amount of reasonable attorneys' fees.  <u>See</u> Order at 1.

1.      **The Motion.**

The Fallens filed their Motion on March 16, 2016.  <u>See</u> Motion at 16.  The Fallens move for attorneys' fees against GREP Southwest, Camino Real, and National Credit.  <u>See</u> Motion at 1.  This litigation has not developed far beyond the pleadings, and the Fallens explain that "much of the attorney time devoted to [GREP Southwest, Camino Real, and National Credit] was accrued before the Complaint was even filed."  Motion at 4.  The Fallens also state that

> much time was spent by Plaintiffs' counsel in making multiple attempts to forestall [National Credit] from rubber-stamping a fraudulent debt, and then, when that proved futile, in writing multiple, methodically-detailed letters to the [credit reporting agencies] debunking the validity of the so-called debt with exhibits showing that GREP Southwest and Camino Real relied on a fraudulent 'Notice of Intent to Vacate' form, never signed by Plaintiffs and created without their participation, in devising and reporting the debt.

Motion at 4 (alterations added).  The Fallens consequently seek a fee award against National Credit in the amount of $16,500.00 and a fee award in the amount of $41,324.06 from GREP Southwest and Camino Real collectively.[2]  The Fallens confirm that they and National Credit

---

[2]In the Motion, the Fallens state that "Camino Real and GREP Southwest are separate entities, who were subject to the same claims, are jointly represented by the same counsel, and whose liability was inextricably intertwined for purposes of the instant case."  Motion at 1 n.1.

"negotiated a cap limiting [National Credit's] exposure to $16,500 in fees," but state that GREP Southwest and Camino Real are not subject to "any such cap."  Motion at 1.

The Fallens argue, as a threshold matter, that the only issue before the Court is the amount of their attorneys' fees through the January 13, 2016, settlement conference.  See Motion at 6.  The Fallens state that they are entitled to attorneys' fees, noting that the claims that they asserted against GREP Southwest, Camino Real, and National Credit allow for an award of attorneys' fees to the prevailing party.  See Motion at 5.  The Fallens note that they asserted New Mexico UPA and UORRA claims against GREP Southwest and Camino Real, and that the UPA and URORRA include fee-shifting provisions.  See Motion at 5 (citing N.M. Stat. Ann. §§ 47-8-48(A) and 57-12-10(C)).  The Fallens also note that they settled the FDCPA and FCRA claims against National Credit and that each federal statute includes a costs-and-fee-shifting provision.  See Motion at 5-6 (citing 15 U.S.C. §§ 1692k(a)(3) and 1681s-2b).  The Fallens concede that they are pursuing neither costs nor fees accrued after the January 13, 2016, settlement conference.  See Motion at 6.

Turning to their argument regarding the fee amount, the Fallens state that, because they seek fees under fee-shifting statutes, the Court should determine their fee request "'by calculating the so-called lodestar amount of a fee.'"  Motion at 6 (quoting Robinson v. City of Edmond, 160 F.3d 1275, 1281 (10th Cir. 1998)).  The Fallens also maintain that "fee-shifting statutes provide for the recovery of out-of-pocket expenses" as part of reasonable attorneys' fees, so long as the expenses are normally charged to fee-paying clients and are not part of office overhead already incorporated into the attorneys' billing rates.  Motion at 7 (citing Ramos v. Lamm, 713 F.2d 546, 549 (10th Cir. 1983)).  The Fallens further state that a reasonable fee

---

The Fallens' counsel, therefore, billed for time related to "GREP Southwest/Camino Real." Motion at 2 n.1.

award includes "applicable gross receipts tax," because "[i]t is customary for gross receipts tax to be added to any fee for attorneys' services rendered, whether on an hourly fee basis or a contingency fee basis." Motion at 7 (citing Ramah Navajo Chapter v. Babbit, 50 F. Supp. 2d 1091, 1109 (D.N.M. 1999)(Hansen, J.)).  Consequently, the Fallens explain that, under a lodestar calculation, the amount of reasonable attorneys' fees and costs includes the hours reasonably expended, multiplied by reasonable hourly rates, plus gross receipt taxes, plus out of pocket expenses.  See Motion at 7.

The Fallens calculate their lodestar amount for this entire case at $151,650.48.  See Motion at 13.  This sum includes the time billed and devoted to the claims against all seven Defendants in this case.  See Motion at 12.  This sum is based on the hours that the Fallens' attorneys, paralegals, law clerks, and assistants worked, multiplied by their respective rates, plus a 7.1875% gross receipts tax on the total fee amount.  See Motion at 13.

The Fallens stress that the Court should award their requested fees against National Credit in the amount of $16,500.00, because the requested amount represents a "[s]ubstantial [d]iscount" from their actual fees and costs under a lodestar calculation.  Motion at 13.  The Fallens advert to the actual share of fees attributable to National Credit up through the January 16, 2016, settlement conference, which they calculate to be $17,874.94, including the gross receipts tax adjustment.  See Motion at 13-14.  The Fallens argue that the Court should not award an amount less than the $16,500.00 fee cap that they negotiated with National Credit, because the cap is less than that portion of their lodestar amount which is attributable to National Credit.  See Motion at 14.

Next, the Fallens argue that the Court should not award less than their requested $41,324.06 fee against GREP Southwest and Camino Real collectively, because "those

Defendants were the original wrongdoers in this case . . . ."  Motion at 14.  The Fallens argue that their claims against GREP Southwest and Camino Real figured prominently in their pre-filing contacts with other Defendants, and in their research and drafting.  See Motion at 14. The Fallens additionally emphasize that they do not seek their costs or any fees incurred after the January 13, 2016, settlement conference.  See Motion at 14.

Last, the Fallens argue that "the fact that the requested fees exceed monetary recovery is not a valid basis for reduction of the fees," because they seek fees "in a consumer protection lawsuit under a fee-shifting statute . . . ."  Motion at 15 (internal citations omitted).  The Fallens assert, therefore, that a proportionality analysis does not apply to the determination of a reasonable fee award.  See Motion at 15.  The Fallens point to City of Riverside v. Rivera, 477 U.S. 561 (1986), in which the Supreme Court of the United States of America stated that "[a] rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts." Motion at 15 (citing City of Riverside v. Rivera, 477 U.S. at 578).  Accordingly, the Fallens request the Court to award "fees against National Credit in the amount of $16,500 and an award of $41,324.06 from GREP Southwest/Camino Real."  Motion at 15.

The Fallens attach to their motion two exhibits which demonstrate how they calculate a $41,324.06 fee award from GREP Southwest and Camino Real collectively.  See Time Common to All Defendants at 1-75, filed March 16, 2016 (Doc. 104-3)("Common Time"); Time Attributable to Defendants GREP Southwest, LLC And SCI Camino Real Fund, LLC d/b/a Camino Real Apartments at 1-75, filed March 16, 2016 (Doc. 104-5)("Camino Real Time"). The Fallens attribute $28,058.76 of time to GREP Southwest and Camino Real collectively and two-sevenths of the $36,730.08 of time common to all the Defendants -- i.e., $ 10,494.30 -- for a

sum of $38,553.06.  See Camino Real Time at 75.  This sum, plus the gross receipt tax of $2,771.00, equals the fee that they seek from GREP Southwest and Camino Real collectively -- i.e., $41,324.06.  See Motion at 2.

**2.     GREP Southwest and Camino Real's Response.**

GREP Southwest and Camino Real responded to the Motion on April 8, 2016.  See Camino Real Response at 16.  GREP Southwest and Camino Real begin by relating, in their view, a basic fact about this litigation: the Fallens' suit is a nuisance, and GREP Southwest and Camino Real settled the Fallens' claims at a small fraction of the demand to avoid the costs of litigation.  See Camino Real Response at 1-5.  GREP Southwest and Camino Real state that the case's central issue is whether the Fallens delivered their written notice of termination on April 1, 2013, or April 16, 2013.  See Camino Real Response at 2.  GREP Southwest and Camino Real aver that this is an issue that state small-claims courts frequently resolve, often without attorneys. See Camino Real Response at 2.  GREP Southwest and Camino Real rehearse that the case's limited procedural history includes only a complaint, an answer, a joint status report, and a settlement conference.  See Camino Real Response at 2.  Before the settlement conference, GREP Southwest and Camino Real offered $1,500.00 to settle the Fallens' claims, after the Fallens made a demand of $60,629.33, reduced from a global demand of $175,000.00.  See Camino Real Response at 2, 5.  At the settlement conference, the GREP Southwest and Camino Real settled the Fallens' claims for $2,000.00.  See Camino Real Response at 2.

GREP Southwest and Camino Real make three basic arguments that the Fallens' counsel are not entitled to the amount of attorneys' fees they seek.  See Camino Real Response at 6-15. First, GREP Southwest and Camino Real argue that the Fallens are not prevailing parties.  See Camino Real Response at 6-7.  GREP Southwest and Camino Real state that "a plaintiff who

receives only nominal damages is not a prevailing party entitled to attorneys fees." Camino Real Response at 6-7 (citing Farrar v. Hobby, 506 U.S. 103 (1992)). They press that the Court "should determine that the settlement involved here does not merit an award of attorney fees," because "[s]ettling a case for $2,000 after demands of $175,000 and $60,629.33 cannot be considered an indication of having prevailed in any significant way." Camino Real Response at 7.

Second, GREP Southwest and Camino Real argue that the fees the Fallens seek are unreasonable. See Camino Real Response at 8. GREP Southwest and Camino Real state that whether "a resident provided notice to terminate a lease on a particular day," resulting in a $412.00 dispute, is not a complex question of landlord-tenant law. Camino Real Response at 8. GREP Southwest and Camino Real then allege that the market will bear a maximum of $240.00 per hour for legal work related to residential rental property. See Camino Real Response at 8. GREP Southwest and Camino Real concede that the Fallens' counsel, Marc Lowry, might be worth "every penny" of his hourly fee in a criminal case, but assert that, in light of his "stated lack of experience in landlord-tenant or consumer law," the fees he seeks in this case are unreasonable. Camino Real Response at 8. GREP Southwest and Camino Real argue that "the Plaintiffs' rates should be multiplied by 0.64 to reduce them to a reasonable range." Camino Real Response at 9.

Third, GREP Southwest and Camino Real argue that the vast majority of the time that the Fallens' counsel billed did not advance the Fallens' claims against GREP Southwest and Camino Real. See Camino Real Response at 9-15. Accordingly, GREP Southwest and Camino Real also take issue with how the Fallens' counsel arrive at their requested fee. See Camino Real Response at 9-15. GREP Southwest and Camino Real take aim at the time "allegedly

attributable to [GREP Southwest and] Camino Real, which, in Camino Real Time, the Fallens calculate to be $28,058.76." See Camino Real Response at 9-13. GREP Southwest and Camino Real state that the Fallens have the burden to establish that billed hours are reasonable and necessary, and they argue the Fallens cannot carry that burden. See Camino Real Response at 9. GREP Southwest and Camino Real assert that "the time and records of counsel do not support the award of compensation for the vast majority of the efforts for which Plaintiffs seek compensation." Camino Real Response at 10. Further, GREP Southwest and Camino Real challenge the "mistaken idea that Camino Real is responsible for everything that happened," Camino Real Response at 11, and therefore argue that the pre-litigation billing of the Fallens' counsel attributed to Camino Real is arbitrary and unreasonable, see Camino Real Response at 10-11. On this point, GREP Southwest and Camino Real assert:

> If the costs of dealing with credit bureaus were asserted against Camino Real, it should have been asserted as a special damage, and it should have been pled specifically, itemized in the initial disclosures and considered as such in settlement negotiations with full knowledge of what was being claimed. [But a]ll items of general and special damage were settled when the parties accepted a settlement of $2,000 for Plaintiffs' other than the attorney fees in this action.

Camino Real Response at 11. GREP Southwest and Camino Real press that the Fallens do not assert an FDCPA claim against them, and thus contend that any billed time addressed to credit bureaus "should be excluded . . . in its entirety." Camino Real Response at 11. GREP Southwest and Camino Real also argue that it is unreasonable to bill time for "contract interpretation," which really amounts to nothing more than training a law student summer intern. Camino Real Response at 11-12. Relatedly, GREP Southwest and Camino Real press that the Fallens' counsel overstaffed the case, maintaining that they "should not be charged twice and three times for services on this minimal claim." Camino Real Response at 12. GREP Southwest and Camino Real suggest that Camino Real Time contains "128 entries of block billing with

arbitrary allocations after the fact," and complain that numerous instances of block billing render it "very difficult to subtract unnecessary hours and come to a result." Camino Real Response at 13. See Camino Real Time at 1-75. GREP Southwest and Camino Real assert that, under controlling case law, "the Court will need to make a determination of just what is reasonable time to spend on a case worth $2,000, from which counsel has also received compensation from 5 other parties." Camino Real Response at 13 (citing Jane L. v. Bangerter, 61 F.3d 1505, 1511 (10th Cir. 1995)).

Further, GREP Southwest and Camino Real take issue with how the Fallens' counsel calculate the time which they attribute as common to all the Defendants. See Camino Real Response at 13-14. GREP Southwest and Camino Real contend:

> As part of the documentation for the fees requested, Plaintiffs have submitted [Common Time], which takes the time common to all Defendants multiplied by the requested (albeit excessive) rates and divided by 7. Dividing by 7 and multiplying that amount by two, as Plaintiffs do on the last page of [Camino Real Time], makes no sense at all. The fact that Camino Real are technically two parties does not add a thing to the effort in conducting a case with them. . . .

Camino Real Response at 14. Setting aside quibbles about overstaffing and duplicate billing, GREP Southwest and Camino Real also suggest an estimate of what, in their view, would be a reasonable fee award:

> A more appropriate divisor would be 6. Division of the amounts claimed against all parties by 6 results in a total of $6,121.68 attributable to each Defendant represented separately. . . . When the rates are multiplied by 64% to bring them to a reasonable rate such as that of defense counsel, the total fee for these efforts is $3,917.87. . . . Assuming any attorney fees are due at all, these fees are in the ball park.

Camino Real Response at 13-14. See id. at 9 (asserting that "the Plaintiffs' rates should be multiplied by 0.64 to reduce them to a reasonable range" commensurate with what the market will bear for residential lease work).

Next, GREP Southwest and Camino Real propose that the Court, instead of "[w]ading through 128 block entries in [Camino Real Time] . . . and deleting unnecessary research and pervasive double teaming," should divide the amount that the Fallens attribute to GREP Southwest and Camino Real by 6, "leav[ing] a charge at Plaintiffs' requested rate of $4,676.46" and, then, apply a 64% multiplier to adjust the rate. Camino Real Response at 14. According to GREP Southwest and Camino Real, this sum amounts to $2,992.93, which, in addition to the $3,917.87 sum that GREP Southwest and Camino Real calculate as the reasonable fees of the Fallens' counsel common to all the Defendants, apportioned to GREP Southwest and Camino Real, totals to $6,910.80. See Camino Real Response at 14.

GREP Southwest and Camino Real argue that this methodology reflects a more sound starting point to calculate a reasonable fee in this case, contending that, "[i]f Plaintiffs are entitled to any fees at all, a fee of a little more than three times the no-fault settlement makes sense." Camino Real Response at 14. GREP Southwest and Camino Real then argue:

> Given the small amount in question, lack of success on the merits, the simple nature of the claims against Camino Real, the stage of litigation when settled and the lack of any overarching public purpose served by this action, the loadstar should reduce this amount [i.e., $6,910.80] rather than increase it.

Camino Real Response at 15. GREP Southwest and Camino Real conclude that "[a] nuisance settlement should not justify attorney fees to a prevailing party," but contend that, if the Court awards attorneys' fees, "a calculation between $0 and $6,910.80 as set out above, is appropriate." Camino Real Response at 15.

### 3.    __National Credit Response__.

National Credit responded to the Motion on April 18, 2016. See National Credit Response at 14. National Credit acknowledges that both the FDCPA and the FCRA allow a prevailing party to recover costs and reasonable attorneys' fees. National Credit Response at 4

(citing 15 U.S.C. § 1692k(a)(3); 15 U.S.C. §§ 1681n & 1681o).  National Credit asserts that "the amounts allegedly spent by Plaintiffs to secure the nominal recovery obtained from National Credit are far from reasonable."  National Credit Response at 1.  National Credit makes two main arguments that the $16,500.00 fee award that the Fallens seek against National Credit is unreasonable.  See National Credit Response at 5-13.

First, National Credit relies on rule 68 of the Federal Rules of Civil Procedure to argue that, because the Fallens rejected an offer of judgment and then failed to obtain a more-favorable settlement, the Court should not award the Fallens attorneys' fees incurred after National Credit made its offer of judgment.  See National Credit Response at 5-8.  National Credit alleges that it served an offer of judgment shortly after filing its answer to the Fallens' Second Amended Complaint.  See National Credit Response at 5; Defendant National Credit Systems, Inc.'s Answer to Second Amended Complaint, filed September 23, 2015 (Doc. 50)("National Credit's Answer"); National Credit Offer of Judgment at 1-2.  According to National Credit, "[s]uch answer was filed because Plaintiffs refused to provide National Credit or its undersigned counsel with a settlement demand despite being asked to do so multiple times after the suit was filed." National Credit Response at 5.  National Credit emphasizes that, on October 22, 2015, it made, under rule 68, an offer of judgment in the amount of $4000.01, plus reasonable attorneys' fees and costs.  See National Credit Response at 1; National Credit Offer of Judgment at 1-2. National Credit argues that the Fallens should not be able to collect any fees incurred after National Credit's October 22, 2015, offer of judgment, because "the failure to accept a Rule 68 Offer cuts-off a plaintiff's ability to recover post-offer fees under a fee-shifting statute when attorney's fees are considered costs."  Response at 5 (citing Marek v. Chesny, 473 U.S. 1, 11-12 (1985)).  National Credit further states that, "[a]lthough the FDCPA and FCRA do not define

costs to include attorney's fees, the same reasoning [in rule 68] applies."   Response at 5-6 (alterations added)(citing <u>French v. Corporate Receivables, Inc.</u>, 489 F.3d 402, 404 (1st Cir. 2007); <u>Lee v. Thomas & Thomas</u>, 109 F.3d 302, 305-07 (6th Cir. 1997)).   National Credit presses that the Fallens, after rejecting the offer of judgment, "failed to improve their position in any meaningful way, wasting both the Court and National Credit's resources in the process." National Credit Response at 7.   Accordingly, National Credit concludes that the Fallens cannot recover fees incurred after National Credit's offer of judgment.   <u>See</u> National Credit Response at 8 (citing <u>Haworth v. State of Nevada</u>, 56 F.3d 1048 (9th Cir. 1995)).

National Credit additionally argues that, "[i]f Rule 68 does not cut off a plaintiff's rights to fees, a defendant has no way to rid itself of litigation aside from completely capitulating to [an] unreasonable settlement demand."   National Credit Response at 7 (alteration added). National Credit further asserts that "[t]he fact that FDCPA and FCRA are consumer protection statutes makes no difference" to its rule 68 argument, and adverts to <u>Marek v. Chesny</u>, 473 U.S. at 10-11, for the proposition that "the polic[ies] behind Rule 68[,] including the desire to encourage settlement and conserve judicial resources applied equally to civil rights statutes." National Credit Response at 7 (alterations added)(internal quotation marks omitted).

National Credit then argues that, because the Fallens cannot recover fees incurred after National Credit's October 22, 2015, offer of judgment, the Fallens at most incurred eight hours of fees before the offer of judgment which are fairly attributable to National Credit.   <u>See</u> National Credit Response at 8.  National Credit asserts that the Fallens' attorneys' billing records "demonstrate that with the exception of time spent drafting the complaint and appearing at the initial conference -- tasks which pertain to all defendants -- the amount of time incurred handling specific tasks to National Credit . . . prior to service of the [offer of judgment] was at most 5

hours."  National Credit Response at 8.  National Credit further asserts that, "[i]nclusive of time spent preparing the pleadings (and apportioned amongst the other defendants), Plaintiffs reasonably incurred no more than 8 hours of time with regard to the claims against National Credit through October 22, 2015 . . . ."  National Credit Response at 8.  National Credit concludes, therefore, that "eight (8) hours should be the maximum [amount] of time that plaintiffs can claim in this case."  National Credit Response at 8.

National Credit's second main argument is that the Fallens' claimed lodestar amount is unreasonable and excessive with respect to both the Fallens' attorneys' hourly rate and the number of billed hours.  See National Credit Response at 9-14.  National Credit states that "[t]he court determines an attorney's reasonable hourly rate by looking to the 'prevailing market rate in the relevant community' for 'similar services by lawyers of reasonably comparable skill, experience and reputation.'"  National Credit Response at 9 (emphasis in Response)(quoting Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc., 295 F.3d 1065, 1078 (10th Cir. 2002)).  National Credit also states that the burden is on the Fallens to establish that the requested fee is reasonable and appropriate.  See National Credit Response at 9 (citing Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)).  National Credit argues that the Fallens cannot carry that burden.  See National Credit Response at 9-14.

National Credit challenges the basis for the hourly rates of the Fallens' counsel.  See National Credit Response at 9-11.  National Credit asserts that the Fallens' counsel -- Mr. Lowry and Alicia Lopez -- "fail to identify how their respective hourly rates were arrived at and completely fail to present any evidence whatsoever that such rates are reasonable market rate[s] for this type of case."  National Credit Response at 10 (alteration added).  Further, National Credit alleges that the Fallens' counsel did not establish experience with cases involving FDCPA

or FCRA claims.  See National Credit Response at 10.  National Credit then challenges the relevance of the affidavits of Bradford Berge of Santa Fe, New Mexico and Joseph Goldberg of Albuquerque, New Mexico, which Fallens' counsel filed in support of their hourly rate.  See National Credit Response at 10.  See also Affidavit of Bradford C. Berge ¶¶ 1-4, at 11-12, filed March 16, 2016 (Doc 104-1)("Berge Aff."); Affidavit of Joseph Goldberg ¶¶ 1-4, at 13-17, filed March 16, 2016 (Doc 104-1)("Goldberg Aff.").  National Credit argues that the Berge Aff. and the Goldberg Aff. are inapposite and "do not establish the market hourly rate for similar services performed by attorneys of comparable skill," because they were submitted in different cases and do not speak to the standard hourly rate for New Mexico attorneys handling analogous consumer finance cases.  National Credit Response at 10 (citing Berge Affidavit ¶¶ 1-4, at 11-12; Goldberg Affidavit ¶¶ 1-4, at 13-17).[3]

National Credit next targets the number of hours that the Fallens' counsel billed.  See National Credit Response at 11-14.  National Credit states that the district court should "'exclude from [the] initial fee calculation hours that were not reasonable expended."  National Credit Response at 11 (alteration in Response)(quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983))(internal quotation marks omitted).  National Credit states that the Court may exclude from the Fallens' initial fee calculation "duplication of work by counsel, impermissible block billing, grossly inflated time entries, vague time entries, and impermissible billing for clerical tasks . . . ."  National Credit Response at 11 (citing Hensley v. Eckerhart, 461 U.S. at 434).  National Credit alleges that the time records of the Fallens' attorneys include all of these deficiencies, see National Credit Response at 12-13, and further challenges the time records of

---

[3]Both the Berge Aff. and the Goldberg Aff. were prepared for and submitted in Chavez v. Chavez, No. CV 13-1047 JAP-SCY.  See Chavez v. Chavez, No. CV 13-1047 JAP-SCY (Doc. 113-4)(Affidavit of Bradford C. Berge); id. (Doc. 113-4)(Affidavit of Joseph Goldberg).

the Fallens' counsel as "a mess," National Credit Response at 12.  National Credit argues that the Court should "reduce the amount awarded to Plaintiff as a matter of course," because "[i]t is neither the Court, nor the National Credit's job to sift through Plaintiffs' exhibits to make sense of Plaintiffs' Fee Petition."  National Credit Response at 12.  National Credit particularly objects to the block billing of the Fallens' counsel, arguing that they are "per se objectionable in the fee petition context."  National Credit Response at 13.  National Credit presses that the Court should disregard the block-billing entries of the Fallens' counsel, because "there is no way for National Credit or this Court to determine with any level of accuracy how much time was reasonably spent on each task and attributable to [National Credit]."  National Credit Response at 13 (alteration added).  National Credit further presses that the Court need not undertake a line-item veto of the time entries of the Fallens' counsel and may instead "exclude excessive and unreasonable hours . . . by making an across-the-board reduction the amount of hours."  National Credit Response at 14 (citations omitted).  Pulling together its rule 68 offer-of-judgment argument and its challenges to the hourly rates, billed hours, and imprecise time entries of the Fallens' counsel, National Credit concludes that the Court should award "no more than $2000.00 in fees and costs from National Credit representing eight (8) hours of compensable attorney time at a blended rate of no more than $250 per hour."  National Credit Response at 14.

   4.     **The Reply**.

   The Fallens' counsel replied to both the Camino Real Response and the National Credit Response on May 17, 2016.  See Joint Reply to Defendants' Responses to Plaintiffs' Motion for Attorneys' Fees at 21, filed May 17, 2016 (Doc. 119)("Reply").  The Fallens concede nothing, stating that "not a single one of Defendants' arguments can stand up to scrutiny . . . ."  Reply at 1.  Accordingly, they maintain that the Court should grant the Motion and award $16,500.00

from National Credit and $41,324.06 from GREP Southwest [and] Camino Real."  Reply at 1.

First, the Fallens maintain that they prevailed in a complex case, stating that it was not a simple dispute, but rather "combined seven federal-and state-law causes of action against seven different corporate Defendants, and raised enough evidence of misconduct . . . to form the basis of at least two potential class-action lawsuits."  Reply at 2.  The Fallens also restate that the damages award to a plaintiff in a consumer credit action does not impose a ceiling on an attorneys' fee award and the law does not require that the attorneys' fee award be proportional to the plaintiff's recovery.  See Reply at 2-3 (citing Purtle v. Eldridge Auto Sales, Inc., 91 F.3d 797 (6th Cir. 1996); Graham v. Vengroff, Williams & Assocs., Inc., No. CIV 02-369, 2004 U.S. Dist. LEXIS 31029, at *11 (D.N.M. Oct. 4, 2004)(Vazquez, J.); Jones v. General Motors Corp., 1998-NMCA-020, ¶ 24, 954 P.2d 1104, 1109).

Second, the Fallens contest the Defendants' allegations that the Fallens, motivated to increase their attorneys' fees, thwarted the Defendants' expeditious efforts to settle.  See Reply at 3-5.  Rather, the Fallens allege that the Defendants evaded the Fallens' attempts to settle.  See Reply at 3-4.  The Fallens state that they "made six separate attempts to reach GREP Southwest and Camino Real" through their counsel in June and July 2014 to discuss settlement.  Reply at 4 (citing Camino Real Time at 3-5).  The Fallens further allege that "Camino Real and GREP Southwest were not meaningful participants in any settlement conversations with the other Defendants," having failed to appear at the October 27, 2015, status conference and to timely answer the Second Amended Complaint, and having "nearly defaulted" by filing an Answer at the eleventh hour.  Reply at 4.  The Fallens argue that GREP Southwest's and Camino Real's conduct "more than justified [the Fallens'] decision not to aggressively pursue a settlement with them . . . ."  Reply at 4-5 (alteration added).  Turning to National Credit, the Fallens state that

they "felt it was fruitless to attempt to negotiate with National Credit until it retained legal counsel," because the Fallens had a unproductive conservation with National Credit's Vice President of Operations, Ron Sapp.  Reply at 5.  Once National Credit obtained counsel, the Fallens explain, the Fallens issued a global settlement demand to all Defendants for $175,000.00, inclusive of all fees and costs.  See Reply at 4-5.

Third, the Fallens argue that National Credit waived its argument that the Fallens may not recover attorneys' fees that the Fallens incurred after National Credit's rule 68 offer of judgment. See Reply at 6-8.  The Fallens state that National Credit waived this argument "when it agreed that the Court should determine a reasonable fee award for Plaintiffs' counsel -- with the maximum fee award limited to $16,500, as the only provision."  Reply at 6 (internal citation omitted).  The Fallens explain that, during settlement negotiations, National Credit did not insist that the Fallens could not recover attorneys' fees which they incurred after National Credit's October 22, 2015, offer of judgment.  See Reply at 6-7.  "Having negotiated away its Offer of Judgment," the Fallens press, "National Credit may not resurrect it now."  Reply at 6.

The Fallens then argue that, even if National Credit did not waive its rule 68 argument, rule 68 "does not preclude Plaintiffs from collecting reasonable attorneys' fees incurred after the Offer was made."  Reply at 7.  The Fallens quote the part of rule 68 that provides, "'[i]f the judgment that offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made.'"  Reply at 7 (alteration added)(quoting Fed. R. Civ. P. 68(d)).  The Fallens then argue that the FDCPA, 15 U.S.C. § 1692k(a)(3), distinguishes between "costs" and actual "attorneys' fees."  Reply at 7 (citing 15 U.S.C. § 1692k(a)(3)).  Accordingly, the Fallens conclude that, "because the FDCPA distinguishes between costs and attorneys' fees, [the Fallens'] fee recovery should not be cut off as of the date

[National Credit's] Offer was tendered."  Reply at 8 (alterations added).

Fourth, the Fallens assert that the Defendants' challenges to the Fallens' lodestar calculation lack merit.  See Reply at 8-20.    The Fallens maintain that their attorneys' hourly rates are reasonable, stating that "[q]uality of performance is to be considered."  Reply at 8-9 (alteration in original)(quoting Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 663 F. Supp. 1360, 1453 (D. Kan. 1987)(Kelly, J.)).  The Fallens also argue that a reduction of their hourly rates would disincentivize skilled lawyers from devoting attorney time to consumer-protection cases brought under fee-shifting statutes.  See Reply at 8-9 (citing Barber v. T.D. Williamson, 254 F.3d 1223, 1231 (10th Cir. 2001); Graham v. Vengroff, Williams & Assocs., Inc., No. 2004 U.S. Dist. LEXIS 31029, at *11)).

The Fallens also defend the number of hours that their attorneys devoted to this case.  See Reply at 9-20.  They "maintain that their bills were fairly and thoughtfully apportioned," and that, upon review, the Court will recognize "the effort put into the prosecution of this case by Plaintiffs' counsel."  Reply at 10.  In support of their arguments, the Fallens attach to their Reply "an unredacted copy of all their time records generated in this case . . . ."  Reply at 11 (citing Detail Fee Transaction File List at 1-40, filed May 17, 2016 (Doc. 119-10)("Detail Fee List").  The Fallens also deny that they engaged in vague block billing, maintaining that they "kept detailed, contemporaneous billing entries."  Reply at 11.

Furthermore, the Fallens challenge GREP Southwest's and Camino Real's argument that those two Defendants should be treated as a single Defendant for the purpose of calculating an attorney's fee award.  See Reply at 12-14.  The Fallens advert to the Second Amended Complaint, reciting the separate actions that GREP Southwest and Camino Real took, and which gave rise to the Fallens' claims.  See Reply at 13 (citing Second Amended Complaint ¶¶ 2-3, 14-

64, at 2, 4-9).  Moreover, the Fallens state that GREP Southwest's and Camino Real's attorney, Claud Vance, maintained that GREP Southwest and Camino Real are separate parties.  <u>See</u> Reply at 13 (citing Camino Real's Response at 10).  The Fallens conclude that GREP Southwest and Camino Real "are still separate Defendants and are each responsible for a separate share of Plaintiffs' attorneys' fees."  Reply at 14.  The Fallens also challenge GREP Southwest's and Camino Real's special damages argument, and the Fallens maintain that they did not need to plead their fees as special damages to recover the fees as the prevailing party.  <u>See</u> Reply at 15.

The Fallens next contest the Defendants' argument that the Fallens' attorneys overbilled in this case.  <u>See</u> Reply at 17-20.  The Fallens portray their view of their attorneys' work:

> Having thus agreed to undertake the representation, Plaintiffs' counsel then proceeded to act as good litigation firms will do -- thoroughly reviewing the relevant facts and law; exhausting Plaintiffs' administrative remedies (by way of submitting multiple detailed letters, with supporting documents, to each of the three national credit bureaus and [National Credit]) as a necessary precursor to filing federal suit; attempting in vain to interest Camino Real and GREP Southwest in correcting their report to the credit bureaus before suit needed to be filed; filing a Complaint and amending it extensively upon obtaining additional information about the parties; preparing the Joint Status Report; issuing a global settlement demand to all Defendants setting forth the bases of multiple class-action lawsuits that could be pursued against them based on their conduct in the instant case; and then achieving settlement with all seven Defendants and a full vindication of their clients' rights without resorting to further litigation.

Reply at 18 (alteration added)(footnote omitted).  The Fallens argue that their preparatory work regarding two potential class actions against the Defendants "almost certainly affected the readiness with which Defendants moved to settle."  Reply at 8 (internal citation omitted).  This preparatory work and the settlement it prompted, the Fallens argue, "could not have been obtained by a landlord-tenant attorney before one of the judges in Metropolitan Court."  Reply at 18 (internal quotation marks and citations omitted).  The Fallens also defend their use of a law student summer associate as a cost-saving device, because the summer associate billed less than

half of an associate's normal rate.  See Reply at 19.  In conclusion, the Fallens maintain that the Court should award attorneys' fees in the amount of $16,500.00 from National Credit, and in the amount of $41,324.06 from GREP Southwest and Camino Real collectively.  See Reply at 20.

### 5.    The Hearing.

On September 13, 2016, the Court held a hearing on the Motion.  See Transcript at 1:1-2, taken September 13, 2016 (Court)("Tr.").[4]  The Court began by providing its view of the case. See Tr. at 2:4-3:14 (Court).  The Court stated that the Fallens are prevailing parties and that the settlement which they reached exceeded a nominal amount.  See Tr. at 2:12-16 (Court).  The Court stated its view that "the plaintiffs are entitled to their attorneys' fees."  Tr. at 2:17-18 (Court).  The Court also stated that the hourly rates which the Fallens' counsel proposed "are appropriate."  Tr. at 2:25 (Court).  The Court therefore stated that it did not find "a lot of problems with the claim against the GREP Southwest Defendants."   Tr. at 3:1-2 (Court). Turning to National Credit, the Court provided its view that the Fallens' counsel should not "get anything after a settlement offer was made."  Tr. at 3:5-6 (Court).  The Court then invited argument from the Fallens.  See Tr. at 3:12-13 (Court).

The Fallens began by noting that the fee award has a statutory basis.  See Tr. at 3:20-22 (Lowry).  The Fallens then reiterated that they are prevailing parties, and that "this really wasn't a simple you know run-of-the-mill case as the Defendants have alleged."  Tr. at 4:6-8 (Lowry). The Fallens explained that they discovered that Camino Real had sold a tenant bond to the Fallens, and, hence, Camino Real had sold an insurance product without being registered with the New Mexico Department of Insurance.  See Tr. at 4:9-25 (Lowry).  The Fallens then explained:

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

> I just wanted to highlight that to the Court because one of the things that I think drove both attorneys' fees and costs in this case with respect to GREP Southwest [and] Camino Real was the fact that they were engaging in this other conduct that the complaint as drafted and pending didn't capture but the parties all knew that the plaintiffs were going to amend these complaints if the case didn't settle. . . . And I think the defendants wisely decided to settle this case at that time just to prevent those future filings.

Tr. at 5:5-22 (Lowry).

The Court then inquired into the basis for the fees.  See Tr. at 5:23-24 (Court).  The Fallens responded that the UPA, N.M. Stat. Ann. §§ 57-12-1 to 57-12-26, supplies the basis.  See Tr. at 5:25-6:8 (Lowry).  The Fallens further stated that the attorney-fee award also has a contractual basis, because "[National Credit, GREP Southwest,] Camino Real [and the Fallens] reached a contractual agreement whereby [National Credit, GREP Southwest and Camino Real] would pay the plaintiffs a sum certain, plus reasonable attorneys' fees."  Tr. at 6:25-7:2 (Lowry).

The Fallens then addressed National Credit's argument that the Fallens cannot recover attorneys' fees which they incurred after National Credit's October 22, 2015, offer of judgment.  See Tr. at 7:6-10:8 (Lowry).  The Fallens stated that, during discovery, they learned that National Credit had not conducted "a fair reinvestigation of the debt that [the Fallens] claim[ed] was fraudulent," thus exposing National Credit to punitive damages.  Tr. at 8:17-18 (Lowry).  The Fallens represented that they could not arrive at an agreement with National Credit about a reasonable fee and that National Credit's offer of judgment did not "capture the potential for [a] punitive damage award[]."  Tr. at 8:23-24 (Lowry).  The Fallens then explained that the difference in the settlement award that they ultimately received from National Credit -- namely, $2,000.00 exclusive of attorneys' fees -- and the $4,000.01 offer of judgment, which included costs and fees, owed almost entirely to a disagreement about reasonable attorneys' fees.  See Tr. at 9:15-21 (Lowry)("[T]he reason . . . it looks like what the plaintiffs actually go was lower than

the offer judgment . . . [was that the dispute over] attorneys' fees . . . actually foreclosed acceptance of the offer of judgment in the first place."). The Fallens also explained that, because the national credit agencies agreed to modify their credit scores, they were satisfied by the results of the settlement conference, and thus were willing to settle for reasonable sums and appropriate attorneys' fees. See Tr. at 10:1-8 (Lowry). The Fallens further stated that, at the settlement conference, the parties agreed that the Court's decision regarding an attorney fee award would be binding and "there wouldn't be the potential for any party to appeal the decision of this Court." Tr. at 10:14-15 (Lowry).

The Fallens concluded their argument by reiterating their view of the complexity of the case, which was headed toward a class action, but for the Fallens' desire to settle. The Fallens explained:

> I would point out as well, Your Honor, and I think we pointed this out [in] the brief that this case is far from a simple straightforward case. It involved seven Defendants, [and] the possibility of class action suits. You know, we have a class action attorney in the firm. But again we deferred to plaintiffs and the plaintiffs elected to proceed on their own than mushroom this into a larger case. But what I would suggest, though, is that all the decisions in this, and the decisions to investigate the claims and proceed were reasonable under the circumstances. This was much, this case was much more than a simple termination of a lease dispute with the property management and the property owner in this matter.

Tr. at 11:9-25 (Lowry).

The Court then invited argument from the Defendants. See Tr. at 12:5 (Court). GREP Southwest and Camino Real began by indicating their view that the basis for attorneys' fees is the New Mexico UORRA, N.M. Stat. Ann. §§ 47-8-1 to 47-8-52. See Tr. at 12:12-14 (Vance); id. at 13:16-22 (Vance). GREP Southwest and Camino Real emphasized that the Fallens alleged no federal claim against them. See Tr. at 14:2-3 (Vance). GREP Southwest and Camino Real then argued that the Fallens want to extract a disproportionately large fee award from them based

upon the tenant bond theory, which sounds in the actions of SureDeposit, not in any of GREP Southwest's and Camino Real's action.  See Tr. at 14:7-11 (Vance).  GREP Southwest and Camino Real alleged that it is a mischaracterization to say that they sell SureDeposit's tenant bond products.  See Tr. at 14:11-13 (Vance).  Rather, GREP Southwest and Camino Real alleged that they accept a SureDeposit tenant bond in lieu of a security deposit.  See Tr. at 14:13-14 (Vance).

GREP Southwest and Camino Real turned to their objections to the amount of the fee award that the Fallens seek, noting that they received the requested fee award after the settlement.  See Tr. at 14:24-15:7 (Vance).  GREP Southwest and Camino Real explained:

> We understood that we were settling for the payment of attorney fees set by the Court for this case for prosecuting this litigation.  When we get the billing, we find stuff going back two years before this case that only applies to other people, to the credit bureaus.  So that does not seem like it's either our responsibility under the law, or our responsibility under what we understood we were settling.

Tr. at 14:24-15:7 (Vance).  GREP Southwest and Camino Real then restated their argument that they should not be responsible to pay two-sevenths of time that was common to all the Defendants, because "that allocation would have been done long after the fact."  Tr. at 15:15-16 (Vance).  GREP Southwest and Camino Real argued that the Court should reduce the requested fee award, because the Fallens' claims against them travelled only under the New Mexico UORRA, N.M. Stat. Ann. §§ 47-8-1 to 47-8-52, and further alleged that the cost of prosecuting those claims "is just a whole lot less than $41,000 . . . ."  Tr. at 15:21-16:3 (Vance).  GREP Southwest and Camino Real then proposed an award of $10,000.00, because that is roughly the amount that they paid their attorney to defend the claims against them.  See Tr. at 16:4-5 (Vance).

The Court inquired how it should approach the block billing entries of the Fallens'

counsel.  See Tr. at 16:7-10 (Court).  GREP Southwest and Camino Real pointed to the approach it argued in its papers, and additionally stated that the Court should ignore the billing entries relating entirely to the credit agencies and debt collection theories, because GREP Southwest and Camino Real "never pursued a credit claim against the Fallens . . . ."  See Tr. at 16:21-22 (Vance); id. at 17:7-10 (Vance).  GREP Southwest and Camino Real then pressed their view that the Fallens are seeking proximate cause damages and, not attorneys' fees.  See Tr. at 17:18-18:8 (Vance).  GREP Southwest and Camino Real argued that the Fallens' attorneys billed time that did not result in a case against any Defendant.  See Tr. at 8:25-19:2 (Vance).  GREP Southwest and Camino Real additionally argued that, "with a settlement of $2,000.00 on a claim of $60,000.00, the attorney fees can't be based on a presumption that we're horrible people and we caused everything."  Tr. at 19:6-10 (Vance).

The Court then invited argument from National Credit.  See Tr. at 19:19 (Court). National Credit began its presentation by stating that the Court confronts the issue whether the Fallens' requested fee amount of $16,500.00 is reasonable, and not whether the Fallens' counsel acted unprofessionally or unethically.  See Tr. at 20:8-10 (Olson).  The Court inquired which claims the Fallens and National Credit had settled.  See Tr. at 21:20-21 (Court).  National Credit responded that it had settled both the FDCPA claim and the FCRA claim.  See Tr. at 21:22-22:12 (Olson).

National Credit pivoted to its principal argument that, under rule 68, the Court should not award the Fallens any attorneys' fees incurred after National Credit made the October 22, 2015, offer of judgment.  See Tr. at 21:10-19 (Olson); id. at 23:2-4 (Olson).  National Credit clarified that its offer of judgment "was never actually attached and made a part of the record," but added that the Fallens never disputed the offer's content.  See Tr. at 21:5-6 (Olson).  The Court

observed that National Credit had filed its offer of judgment on the day of the hearing.  See Tr. at

21:1 (Court); National Credit Offer of Judgment at 1-2.  National Credit asserted that the Fallens'

counsel had incurred $3,700.64 in fees "as of the October 22, 2015, offer."  Tr. at 23:20-21

(Olson).  Returning to its argument, National Credit then alluded to the settlement conference

and its agreement with the Fallens that the Fallens cap their requested attorneys' fees attributable

to National Credit at $16,500.00.  See Tr. at 24:2-10 (Olson).

National Credit next challenged the Fallens' contention that National Credit had waived

its rule 68 argument.  See Tr. at 24:11-25:4 (Olson).  National Credit argued:

> But this notion that somehow we -- we being NCS -- negotiated away or waived
> their right to argue that the Rule 68 offer was served many months earlier and
> stands as an impediment to recovery of fees, I don't think that's supported in the
> record I'm not aware of any case anywhere in this country that stands for the
> notion that to the extent you negotiate a settlement that somehow that is not part
> of [the] court's analysis . . . .

Tr. at 24:11-19 (Olson).  National Credit pressed that the attorneys' fees that the Fallens incurred

after National Credit's offer of judgment were "wasteful and not productive as [they] relate[] to

[National Credit]," because the Fallens settled their claims against National Credit for less than

the October 22, 2015, offer of judgment.  Tr. at 25:3-4 (Olson).  National Credit argued that "the

entire purpose behind the rule [68] is to ensure that parties do not waste the resources of clients,

do not waste the resources of the courts, [and] to ensure that we don't incentivize what the

Supreme Court has dubbed 'wasteful litigation.'"  Tr. at 25:9-14 (Olson).

National Credit then clarified the bearing of its rule 68 argument, stating that, "while it is

not a per se bar, it has to be part of the Court's analysis as to whether or not it was reasonable to

continue . . . ."  Tr. at 25:23-25 (Olson).  See Tr. at 26:10-13 (Olson)("[T]he only recovery that

would be cut off by virtue of the express language of the rule would be costs.  We know fees are

different than costs.").  With that stipulation in place, National Credit restated its rule 68

argument that any fees that the Fallens' counsel incurred after National Credit's October 22, 2015, offer of judgment are unreasonable, because those fees did not result in a more favorable result for the Fallens.  See Tr. at 26:18-27:3 (Olson); id. at 27:8-16 (Olson).  National Credit expressed that "it was a wise move to serve the Rule 68 offer," stating that it was "not only a make whole offer but a reasonable offer as it relates to the resolution of the claims against [National Credit] only."  Tr. at 28:4-6 (Olson).  National Credit then requested that the Court

> exercise its discretion [and] look at these fees and costs, and essentially follow courts . . . that have concluded rightfully so that continuing to litigate a case long into the night, long into the year and recovering a fraction of what you could have recovered sooner is not an exercise that the federal court should be involved in and encouraging.

Tr. at 28:23-29:6 (Olson).

The Court gave the Fallens the last word.  See Tr. at 29:11-12 (Court).  The Fallens alleged that they were not "trying to waste resources."  Tr. at 29:15 (Lowry).  The Fallens explained that, "[a]t the time the offer of judgment was tendered, [they] were in active discovery" and that discovery led them to believe that National Credit might be liable for punitive damages.  Tr. at 29:16-22 (Lowry).  The Fallens reiterated their view that "the real actor" was "the apartment building owner and the management complex" -- i.e., GREF Southwest and Camino Real.  Tr. at 30:1-2 (Lowry).

The Court asked the Fallens whether they could have "recovered all the damages, whoever committed the actual act or bad act or harm, from the apartment complex with those two claims that you brought."  Tr. at 30:6-10 (Court).  The Fallens responded affirmatively, and proposed that they could have shown that GREF Southwest's and Camino Real's conduct "were the proximate cause of the entirety of the events."  Tr. at 30:12-13 (Court).  The Court inquired whether that was the case presented against GREF Southwest and Camino Real at the settlement

conference.  See Tr. at 30:16-19 (Court).  The Fallens indicated that it was the same presented, see Tr. at 30:20 (Lowry), and proceeded to challenge GREF Southwest's and Camino Real's argument that GREF Southwest and Camino Real did not sell tenant bonds, see Tr. at 30:24-31:14 (Lowry).  The Fallens alleged:

> [W]hat the evidence would show is that Bernadette Maestas the signatory down here as a witness is actually an employee of the apartment management company or the apartment owner, and that they are the ones that present potential tenants with this agreement, and, in fact, for lack of a better term, sell it to potential tenants.  That makes them part and parcel of this agreement. . . .  The product was marketed and solicited by employees of these particular defendants.

Tr. at 31:3-14 (Lowry).

The Fallens also "agreed" with their depiction of National Credit's concession "that there is nothing in Rule 68 that prevents the award of attorneys' fees . . . ."  Tr. at 31:16-18 (Lowry).  Addressing National Credit's rule 68 argument, the Fallens asked the Court to "step back" and see that they "weren't in this action to churn up attorneys' fees unnecessarily, to stoke some kind of award."  Tr. at 31:19-22 (Lowry).  Rather, the Fallens assert that they "were aggressively and actively investigating and litigating claims of real tangible consumer fraud," and stated that "every defendant involved in this case settled with [them]."  Tr. at 31:22-25 (Lowry).  The Fallens then stated their conclusion that this case should never have been filed in federal court, because each Defendant "had the ability to do the right thing very early on."  Tr. at 33:7 (Lowry).

The Court then asked National Credit whether the $3,700.64 figure, which National Credit calculated as the fees that the Fallens incurred before National Credit tendered the offer of judgment, included gross receipts taxes or simply reflected the attorneys' fee amount.  See Tr. at 33:13-15 (Court).  National Credit responded that the figure did not include the gross receipts tax.  See Tr. at 33:16 (Olson).  National Credit then explained how it arrived at the $3,700.64

calculation: "Your honor, essentially what we did was we took [National Credit Time], and exceptionally added up the time that plaintiffs contend was attributable to NCS through October, it may have been October 25.  The offer was served on October 22.  We added that up . . . ."  Tr. at 33:17-22 (Olson).  See Time Attributable to Defendant National Credit Systems, Inc. at 1-75, filed March 16, 2016 (Doc. 104-4)("National Credit Time").  The Court then asked National Credit if it had any other objections and inquired whether National Credit's argument is "almost exclusively that there should be a cutoff."  Tr. at 34:9-10 (Court).  National Credit responded that it had other arguments, but "if the Court were to award that amount through the date of the offer, we would be prepared to take that amount as the order of the Court without further reduction for the other objections . . . ."  Tr. at 34:16-20 (Olson).

The Court again gave the Fallens the last word.  Tr. at 34:21-22 (Court).  The Fallens objected that the basis for National Credit's calculation -- i.e., National Credit Time at 1-75 -- does not include "the common time that was attributable to all the Defendants as outlined in [Common Time]."  Tr. at 35:6-7 (Lowry).  See Common Time at 1-75.  Adverting to Common Time, the Fallens represented that the common time attributable to National Credit is in the amount of $5,247.15.  See 35:7-11 (Lowry).

The Court thanked the parties for their presentations.  See Tr. at 37:11-12 (Court).  The Court also provided its view of a reasonable attorneys' fee award.  See Tr. at 35:12-36:25 (Court).  Regarding the fee award against GREP Southwest and Camino Real, the Court indicated that it would review the Fallens' request, but stated that the award likely would tack more closely to the Fallens' requested amount than the award that GREP Southwest and Camino Real have proposed.  See Tr. at 35:14-20 (Court).  The Court gave its inclination that, with respect to GREP Southwest and Camino Real, "the plaintiffs are proposing reasonable bills."  Tr.

at 36:2 (Court).

Turning to National Credit, the Court stated its inclined method would be to use "the offer of judgment as a cutoff point and use that to find anything beyond that should not be a reasonable claim." Tr. at 36:9-11 (Court). The Court added that it would likely adjust the calculation to include gross receipts taxes. See Tr. at 36:11-12 (Court). The Court concluded that the award against National Credit would tend closer to the amount National Credit had proposed than to the negotiated cap of $16,500.00. See Tr. at 36:12-15 (Court).

## LAW REGARDING THE AWARD OF ATTORNEY'S FEES

### 1.    The American Rule and Its Exceptions.

"As a general rule, trial courts are without authority to award attorney's fees unless the right exists by contract or statute." Paramount Pictures Corp. v. Thompson Theaters, Inc., 621 F.2d 1088, 1091 (10th Cir. 1980). New Mexico follows the "American Rule" with respect to attorney's fees.[5]   Craft v. Sunwest Bank of Albuquerque, 84 F. Supp. 2d 1226, 1238-39 (D.N.M. 1999)(Black, J.); Monsanto v. Monsanto, 1995-NMCA-048, ¶ 7, 894 P.2d 1034, 1036-37. "The American Rule is shorthand for the general rule that in the absence of legislation providing otherwise, litigants must pay their own attorney's fees." Christiansburg Garment Co.

---

[5]The Court's reference to the "American Rule" reflects the sharp contrast between the award of attorney's fees in the United States' legal system and the award of attorney's fees in other legal systems, which automatically shift fees to the losing party. Neal H. Klausner, The Dynamics of Rule 11: Preventing Frivolous Litigation by Demanding Professional Responsibility, 61 N.Y.U. L. Rev. 300, 303-04 (1986)("The United States is the only common law jurisdiction in which legal expenses, including attorneys' fees, are not automatically shifted to the losing party."); Middle Mountain Land and Produce Inc. v. Sound Commodities, 307 F.3d 1220, 1225 (9th Cir. 2002)("Unlike the British legal system rule, in which the winner automatically gets attorneys' fees, the rule in American courts, commonly known as the American Rule, looks with disdain upon awarding attorneys' fees unless an independent basis exists for the award.")(citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257-59 (1975)). See Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., 188 F. Supp. 3d 1097, 1142 (D.N.M. 2016)(Browning, J.).

v. Equal Emp't Opportunity Comm'n, 434 U.S. 412, 415 (1978). See Garcia v. Jeantette, 2004-NMCA-004, ¶ 16, 82 P.3d 947, 951 ("[G]enerally, a party may recover attorney fees only when authorized by statute, court rule, or an agreement expressly providing for their recovery." (citing Monsanto v. Monsanto, 1995-NMCA-048, ¶ 7, 894 P.2d at 1037)); Craft v. Sunwest Bank of Albuquerque, 84 F. Supp. 2d at 1238-39 ("In the absence of statutory authority to the contrary, parties pay their own attorney's fees."); Credit Inst. v. Veterinary Nutrition Corp., 2003-NMCA-010, ¶ 38, 62 P.3d 339, 347 ("As a general rule, litigants are responsible for their own attorney fees absent statutory authority or some other authority such as a contract allowing such fees.")(quoting Springer Group, Inc. v. Wittelsohn, 1999-NMCA-120, ¶ 23, 988 P.2d 1260, 1266)). The American Rule admits of exceptions, however, which include: (i) statutory basis; (ii) enforceable contract; (iii) willful violation of court order; (iv) bad-faith action; and (v) litigation creating common fund for the benefit of others. See E. Armata, Inc. v. Platinum Funding Corp., 887 F. Supp. 590, 594 (S.D.N.Y. 1995)(Patterson, J.)(citing Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. at 257-59). See also Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., 188 F. Supp. 3d 1097, 1142–43 (D.N.M. 2016)(Browning, J.)

Congress has legislated exceptions to the American Rule for prevailing plaintiffs in actions to enforce federal rights. See, e.g., 42 U.S.C. § 1988(b); 29 U.S.C. § 216(b); 17 U.S.C. § 505; 28 U.S.C. § 3905(a). See generally Marek v. Chesny, 473 U.S. at 44-45 app. (Brennan, J., dissenting)(providing "a summary of the statutes enacted by Congress authorizing courts to award attorney's fees"). Other statutes make an exception to the American Rule for suits brought in bad faith, brought for purposes of harassment, or known to be meritless. See 28 U.S.C. § 1875(d)(2); 15 U.S.C. § 1693m(f). See also Crespin v. City of Espanola, No. CIV 11-0913 JB/KBM, 2013 WL 2284958, at *8 (D.N.M. May 10, 2013)(Browning, J.). Furthermore, the

Supreme Court of the United States of America has made clear that courts have the inherent

power to award attorney's fees, in contravention of the American Rule, under circumstances that

the Supreme Court has clearly delineated.  See Chambers v. NASCO, Inc., 501 U.S. 32, 45-46

(1991).  In Chambers v. NASCO, the Supreme Court explained:

> [T]he less severe sanction of an assessment of attorney's fees is undoubtedly
> within a court's inherent power as well. . . .  Indeed, [t]here are ample grounds for
> recognizing . . . that in narrowly defined circumstances federal courts have
> inherent power to assess attorney's fees against counsel, even though the so-called
> "American Rule" prohibits fee shifting in most cases.  As we explained in
> [Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 259 (1975)],
> these exceptions fall into three categories.  The first, known as the "common fund
> exception," derives not from a court's power to control litigants, but from its
> historic equity jurisdiction, and allows a court to award attorney's fees to a party
> whose litigation efforts directly benefit others.  Second, a court may assess
> attorney's fees as a sanction for the willful disobedience of a court order.  Thus, a
> court's discretion to determine [t]he degree of punishment for contempt permits
> the court to impose as part of the fine attorney's fees representing the entire cost
> of the litigation.  Third, and most relevant here, a court may assess attorney's fees
> when a party has acted in bad faith, vexatiously, wantonly, or for oppressive
> reasons.  In this regard, if a court finds that fraud has been practiced upon it, or
> that the very temple of justice has been defiled, it may assess attorney's fees
> against the responsible party, as it may when a party shows bad faith by delaying
> or disrupting the litigation or by hampering enforcement of a court order[.]  The
> imposition of sanctions in this instance transcends a court's equitable power
> concerning relations between the parties and reaches a court's inherent power to
> police itself, thus serving the dual purpose of vindicat[ing] judicial authority
> without resort to the more drastic sanctions available for contempt of court and
> mak[ing] the prevailing party whole for expenses caused by his opponent's
> obstinacy.

Chambers v. NASCO, Inc., 501 U.S. 32, 45–46 (first, third, and fifth alterations added)(internal

quotation marks and citations omitted).

New Mexico has also traditionally followed "the American Rule by which each litigant is

ordinarily responsible for its own attorney's fees."  Carrillo v. Compusys, Inc., 2002-NMCA-

099, ¶ 10, 54 P.3d 551, 554 (citing Am. Civil Liberties Union of N.M. v. City of Albuquerque,

1999-NMSC-044, ¶ 26, 992 P.2d 866, 875).  "However, it is well settled that the legislature may

override the American Rule by enacting a fee-shifting statute." Carrillo v. Compusys, Inc., 2002-NMCA-099, ¶ 10, 54 P.3d at 554 (citing Alber v. Nolle, 1982-NMCA-085, ¶ 50, 645 P.2d 456, 458). New Mexico has legislated several exceptions to the American Rule for prevailing plaintiffs in actions to enforce certain statutorily created rights, see, e.g., N.M. Stat. Ann. §§ 14-2-12(D), 39-2-1, 47-8-48(A), 48-2-14, 57-12-10(C), 52-1-54(F), & 70-10-6, and "New Mexico courts define the prevailing plaintiff as the party who wins the lawsuit," Knight v. Snap-On Tools Corp., 3 F.3d 1398, 1403 (10th Cir. 1993)(internal citation omitted). See South v. Lucero, 1979-NMCA-046, ¶ 41, 595 P.2d 768, 774 ("'To the prevailing party' means the party who wins the lawsuit.")(internal quotation marks and citation omitted); 20 C.J.S. Costs § 9 ("While to be a 'prevailing party,' a party must obtain at least some relief on the merits, the determination is based upon success upon the merits, not upon damages."). Further, the Supreme Court of New Mexico has recognized that New Mexico courts have the inherent power to override the American rule, without statutory authority, under certain circumstances. See State ex rel. N.M. State Highway & Transp. Dep't v. Baca, 1995-NMSC-033, ¶ 12, 896 P.2d 1148, 1152 (citing Chambers v. NASCO, Inc., 501 U.S. at 45-46).[6]

## 2. **The Calculation of an Attorney's Fee Award Under Federal Fee-Shifting Statutes.**

Congress has enacted many statutes under which a prevailing party may recover "a reasonable attorney's fee." See, e.g., 42 U.S.C. § 1988; Perdue v. Kenny A. ex rel. Winn, 599

---

[6]The Supreme Court of New Mexico stated that "[a] court may award attorney's fees in order to vindicate its judicial authority and compensate the prevailing party for expenses incurred as a result of frivolous or vexatious litigation." State ex rel. N.M. State Highway & Transp. Dep't v. Baca, 1995-NMSC-033, ¶ 12, 896 P.2d at 1152. "In awarding fees under the bad-faith exception," however, "a court cannot sanction conduct occurring before another tribunal unless that conduct is in direct defiance of the sanctioning court's authority." State ex rel. N.M. State Highway & Transp. Dep't v. Baca, 1995-NMSC-033, ¶ 13, 896 P.2d at 1152.

U.S. 542, 550 n. 3 (2010)("Virtually identical language appears in many of the federal fee-shifting statutes."); Marek v. Chesny, 473 U.S. at 44-45 app. (Brennan, J., dissenting)(providing "a summary of the statutes enacted by Congress authorizing courts to award attorney's fees"). "[T]he task of identifying an appropriate methodology for determining a 'reasonable' fee was left for the courts." Perdue v. Kenny A. ex rel. Winn, 599 U.S. at 550.

In Perdue v. Kenny A. ex rel. Winn, 599 U.S. at 550, the Supreme Court related the development of alternative methodological approaches to the determination of a reasonable fee:

> One possible method was set out in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (5th Cir. 1974), which listed 12 factors that a court should consider in determining a reasonable fee. This method, however, "gave very little actual guidance to district courts. Setting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results." Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 563 (1986). . . . An alternative, the lodestar approach, was pioneered by the Third Circuit in Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (1973), appeal after remand, 540 F.2d 102 (1976), and "achieved dominance in the federal courts" after our decision in Hensley v. Eckerhart, 461 U.S. 424 (1983). Gisbrecht v. Barnhart, 535 U.S. 789, 801 (2002). "Since that time, '[t]he "lodestar" figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence.'" Ibid. (quoting City of Burlington v. Dague, 505 U.S. 557, 562 (1992)).

Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 550-51.

The "lodestar" is a calculation based on "the number of hours worked multiplied by the prevailing hourly rates . . . ." Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 546. In Perdue v. Kenny A. ex rel. Winn, the Supreme Court announced several rules regarding the administration of the lodestar method to determine a reasonable fee. First, "in accordance with our understanding of the aim of fee-shifting statutes, the lodestar looks to 'the prevailing market rates in the relevant community.'" Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 551 (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984)). Second, "a 'reasonable' fee is a fee that is

- 37 -

sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 552 (citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. at 565 ("[I]f plaintiffs . . . find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied."); Blum v. Stenson, 465 U.S. at 897 ("[A] reasonable attorney's fee is one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys.")(ellipses, brackets, and internal quotation marks omitted)). Third, "the lodestar method yields a fee that is presumptively sufficient to achieve this objective." Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 552 (citations omitted). Last, "'the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee . . . .'" Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 553 (quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. at 566). The Supreme Court's case law "construing what is a 'reasonable' fee applies uniformly to all" of the "federal fee-shifting statutes . . . ." City of Burlington v. Dague, 505 U.S. at 562 (citing Flight Attendants v. Zipes, 491 U.S. 754, 758 n.2 (1989)).

Despite the lodestar's blinding light, some courts have discerned another methodology appropriate to common-fund cases, emanating from a footnote in Blum v. Stenson, 465 U.S. 900 n.16. There, the Supreme Court said: "Unlike the calculation of attorney's fees under the 'common fund' doctrine, where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation." Blum v. Stenson, 465 U.S. 900 n.16.[7] "Many courts have addressed

---

[7]Regarding the Blum v. Stenson footnote, the United States Court of Appeals for the Tenth Circuit has stated that courts have

the propriety of utilizing the percentage of the fund instead of the lodestar in calculating attorneys' fees in common fund cases." Gottlieb v. Barry, 43 F.3d at 482 (citing Florin v. Nationsbank of Georgia, N.A., 34 F.3d 560 (7th Cir. 1994); In re Washington Pub. Power Supply Sys. Litig., 19 F.3d 1291, 1295-96 (9th Cir. 1994); Rawlings v. Prudential-Bache Properties, Inc., 9 F.3d 513, 515-17 (6th Cir. 1993); Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1265-71 (D.C. Cir. 1993); Camden I Condominium Ass'n v. Dunkle, 946 F.2d 768, 771-74 (11th Cir. 1991)). Courts have applauded the use of the percentage-of-recovery method "in cases involving a common fund, because it rewards counsel for success and penalizes counsel for waste or failure." Serrano v. Sterling Testing Sys., Inc., 711 F. Supp. 2d 402, 418 (E.D. Pa. 2010)(Pratter, J.)(citing In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 821 (3d Cir. 1995)). In this vein, the Tenth Circuit has implied a preference for the percentage-of-the-fund method in common fund cases. See Gottlieb v. Barry, 43 F.3d at 483 (10th Cir. 1994)(citing Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 853 (10th Cir.1993)). Apart from common fund cases, however, the "lodestar" remains "the guiding light of [the Supreme Court's] fee-shifting jurisprudence." Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 551 (quoting City of Burlington v. Dague, 505 U.S. at 562). See Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d 1188, 1207 (D.N.M. 2011)(Browning, J.)("In

---

relied upon the Supreme Court's dicta in Blum v. Stenson, 465 U.S. 886 (1984), in which the Court distinguished common fund from statutory fee-shifting cases, stating, "[u]nlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under [the fee-shifting statute in question] reflects the amount of attorney time reasonably expended on the litigation." Id. 465 U.S. at 900 n. 16. This dicta has given comfort to those courts which prefer percentage of the fund in common fund cases.

Gottlieb v. Barry, 43 F.3d 474, 483 n.5 (10th Cir. 1994).

determining appropriate attorneys' fees, courts generally begin by calculating the lodestar . . . .")(citations omitted).

      **3.**     <u>**Nominal Damages and Their Effect on the Court's Award of Attorney's Fees.**</u>

Nominal damages are "[a] trifling sum awarded when a legal injury is suffered but there is no substantial loss or injury to be compensated." Black's Law Dictionary 447 (9th ed. 2009). Thus, a judge or jury may award nominal damages where a plaintiff has suffered a legal injury, but has not shown the extent of the loss or damage suffered, or if "the plaintiff establishes a breach of contract or a tort of the kind that is said to be 'actionable per se' but fails to establish a loss caused by the wrong."  Black's Law Dictionary, <u>supra</u>, 447 (citing C. McCormick, <u>Handbook on the Law of Damages</u> § 20, at 85 (1935); S. Waddams, <u>The Law of Damages</u> 477-78 (3d ed. 1997)).

In <u>Farrar v. Hobby</u>, the Supreme Court held that "a plaintiff who wins nominal damages is a prevailing party under § 1988." 506 U.S. at 112.  <u>See</u> <u>Koopman v. Water District No. 1</u>, 41 F.3d 1417, 1420 (10th Cir. 1994)("It is clear that under <u>Farrar v. Hobby</u>, [the plaintiff] is a prevailing party because he was awarded nominal damages.").  "Although the 'technical' nature of a nominal damages award or any other judgment does not affect the prevailing party inquiry, it does bear on the propriety of fees awarded under Section 1988." <u>Farrar v. Hobby</u>, 506 U.S. at 114.  "[I]n some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all." <u>Farrar v. Hobby</u>, 506 U.S. at 115.  The most important factor in determining the reasonableness of an attorney's fees award is the degree of success obtained. <u>See</u> <u>Farrar v. Hobby</u>, 506 U.S. at 115.  In a civil rights action for compensatory and punitive damages, an award of only nominal damages highlights the plaintiff's failure to prove actual injury or any basis for awarding punitive damages.  <u>See</u> <u>Farrar v. Hobby</u>, 506 U.S. at 115.

"When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all."  Farrar v. Hobby, 506 U.S. at 115.

Justice Clarence Thomas wrote the majority opinion, in Farrar v. Hobby, in which Chief Justice William Rehnquist and Justices Sandra Day O'Connor, Antonin Scalia, and Anthony Kennedy joined.  Justice O'Connor noted that she joined the majority's opinion, concurred in the judgment, and wrote separately to explain more fully why it was appropriate to deny fees in the case. See Farrar v. Hobby, 506 U.S. at 116 (O'Connor, J., concurring).   Justice O'Connor recognized that the plaintiff met the "minimum condition for prevailing party status," but made clear that fees must still be reasonable. Farrar v. Hobby, 506 U.S. at 117 (O'Connor, J., concurring).  In her concurrence, Justice O'Connor noted that the "relevant indicia of success" in nominal damages cases are: (i) the difference between the judgment recovered and the recovery sought; (ii) the significance of the legal issue on which the plaintiff prevailed; and (iii) the public purpose of the litigation.  Farrar v. Hobby, 506 U.S. at 121-22 (O'Connor, J., concurring).

In Phelps v. Hamilton, the Tenth Circuit adopted Justice Sandra Day O'Connor's three-part analysis from her concurring opinion in Farrar v. Hobby for determining whether a party achieved enough success to be entitled to an award of attorney's fees. See 120 F.3d 1126, 1131-32 (10th Cir. 1997).  Since Farrar v. Hobby, the Tenth Circuit has repeatedly awarded attorney's fees to plaintiffs who recover nominal damages.  See Brandau v. Kansas, 168 F.3d 1179, 1183 (10th Cir. 1999)("[W]hat is controlling [in determining entitlement to a fee award] is Plaintiff's vindication of her civil rights and of important rights of coworkers, even if she sought only a modest amount of damages."); Phelps v. Hamilton, 120 F.3d at 1131 ("The general rule under § 1988 is that the prevailing party 'should ordinarily recover an attorney's fee unless special

circumstances would render such an award unjust.'"); Koopman v. Water Dist. No. 1, 41 F.3d 1417, 1421 (10th Cir. 1994)(reversing denial of attorney's fees where the plaintiff was awarded $1.00 in nominal damages).  See also Sanchez v. Matta, No. 03-0296, 2005 WL 2313621, at *4 (D.N.M. July 29, 2005)(Browning, J.)("Indeed this Court could not locate any decisions in which the Tenth Circuit has reversed a district court for awarding fees when there was an award of nominal damages.").  Furthermore, this Court has noted that "[the Tenth] [C]ircuit has recognized that the 'district court's discretion to deny fees to a prevailing party is quite narrow.'" Sanchez v. Matta, 2005 WL 2313621 at *5 (citing Phelps v. Hamilton, 120 F.3d at 1131)).

The Tenth Circuit has also affirmed a district court decision finding that a plaintiff who recovers a nominal award is a prevailing party entitled to an award of attorney's fees.  See, e.g., Nephew v. City of Aurora, 830 F.2d 1547, 1550-51 (10th Cir. 1987)(en banc).  In Nephew v. City of Aurora, the jury awarded the plaintiffs nominal damages of $1.00.  See 830 F.2d at 1550-51.  The Tenth Circuit, sitting en banc, concluded: "Because the district court found that the most important aspect of the judgment was the vindication of plaintiffs' civil rights and its message to the police department, we cannot conclude that the trial court's award [of attorneys' fees] was an abuse of discretion." Nephew v. City of Aurora, 830 F.2d at 1550-51.  See Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL 2383667, at *15-16 (D.N.M. June 13, 2012)(Browning, J.).

## LAW REGARDING OFFERS OF JUDGMENT AND ATTORNEY'S FEES

Rule 68 of the Federal Rules of Civil Procedure provides in pertinent part:

At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. . . .  If the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made.

Fed. R. Civ. P. 68.  "The purpose of Rule 68 is to encourage the settlement of litigation."  Delta

Air Lines, Inc. v. Aug., 450 U.S. 346, 352 (1981)(citing Fed. R. Civ. P. 68 advisory committee

notes; 12 C. Wright & A. Miller, Federal Practice and Procedure § 3001, at 56 (1973); 7 J.

Moore & J. Lucas, Moore's Federal Practice ¶ 68.02, at 68-4 (1979).  The Supreme Court has

explained:

> In all litigation, the adverse consequences of potential defeat provide both parties
> with an incentive to settle in advance of trial.  Rule 68 provides an additional
> inducement to settle in those cases in which there is a strong probability that the
> plaintiff will obtain a judgment but the amount of recovery is uncertain.  Because
> prevailing plaintiffs presumptively will obtain costs under Rule 54(d), Rule 68
> imposes a special burden on the plaintiff to whom a formal settlement offer is
> made.  If a plaintiff rejects a Rule 68 settlement offer, he will lose some of the
> benefits of victory if his recovery is less than the offer.  Because costs are usually
> assessed against the losing party, liability for costs is a normal incident of defeat.
> Therefore, a nonsettling plaintiff does not run the risk of suffering additional
> burdens that do not ordinarily attend a defeat, and Rule 68 would provide little, if
> any, additional incentive if it were applied when the plaintiff loses.

Delta Air Lines, Inc. v. Aug., 450 U.S. at 352 (citations omitted).  "Under this scheme, the

defendant can protect itself from the costs associated with protracted litigation by making a

formal offer of judgment. If the final judgment is less than the settlement offer, the otherwise

'prevailing' plaintiff is precluded from recovering his post-offer costs."  Knight v. Snap-On

Tools Corp., 3 F.3d 1398, 1404 (10th Cir. 1993)(citing O'Brien v. City of Greers Ferry, 873 F.2d

1115, 1118 (8th Cir. 1989)).

"Federal Rule of Civil Procedure 68 . . . shifts to the plaintiff all 'costs' incurred

subsequent to an offer of judgment not exceeded by the ultimate recovery at trial."  Marek v.

Chesny, 473 U.S. at 4 (quoting Fed. R. Civ. P. 68).  "'Costs' typically are defined by reference to

28 U.S.C. § 1920 and include things such as filing fees and court reporter fees."  Knight v. Snap-

On Tools Corp., 3 F.3d at 1404 (footnote omitted).  In Marek v. Chesny, however, the Supreme

Court made clear that the substantive law that creates the cause of action on which the plaintiff files suit defines "costs" under rule 68.  See 473 U.S. at 9.

In Marek v. Chesny, the Supreme Court confronted the question "whether attorney's fees incurred subsequent to an offer of settlement under Federal Rule of Civil Procedure 68 must be paid to the defendant . . . when the plaintiff recovers a judgment less than the offer."  473 U.S. at 3.  The Supreme Court was called to decide whether "costs" under rule 68 included attorney's fees awardable under a fee-shifting provision, specifically 42 U.S.C. § 1988.  Fed. R. Civ. P. 68(d).  See 473 U.S. at 5.  In adjudicating this question, the Supreme Court reasoned:

> [T]he term 'costs' in Rule 68 was intended to refer to all costs properly awardable under the relevant substantive statute or other authority.  In other words, all costs properly awardable in an action are to be considered within the scope of Rule 68 'costs.'  Thus, absent congressional expressions to the contrary, where the underlying statute defines 'costs' to include attorney's fees, we are satisfied such fees are to be included as costs for purposes of Rule 68.

Marek v. Chesny, 473 U.S. at 9.  The Supreme Court concluded that, because Congress expressly included "a reasonable attorney's fee as part of the costs" available to a plaintiff in a § 1983 suit, 42 U.S.C. § 1988(b), "such fees are subject to the cost-shifting provision of Rule 68," Marek v. Chesny, 473 U.S. at 9.  Accordingly, the Supreme Court held that the defendants were not liable for attorney's fees that the plaintiff incurred after the defendants made their rule 68 offer of judgment.  See Marek v. Chesny, 473 U.S. at 12.

From Marek v. Chesny, the Tenth Circuit derived a general rule "that 'the costs which are subject to the cost-shifting provisions of Rule 68 are those enumerated in 28 U.S.C. § 1920, unless the substantive law applicable to the particular cause of action expands the general § 1920 definition."  Knight v. Snap-On Tools Corp., 3 F.3d at 1404 (quoting Parkes v. Hall, 906 F.2d 658, 660 (11th Cir. 1990)).  In other words, Marek v. Chesny provides a method for courts to determine whether a defendant who makes an offer of judgment is liable for those attorney's fees

of the plaintiff that are incurred after the defendant's offer of judgment when the plaintiff prevails on an action that is subject to a fee-shifting provision. See Marek v. Chesny, 473 U.S. at 9. To determine liability for those after-incurred fees, courts must determine whether the statute that creates the cause of action and the fee-shifting mechanism "defines 'costs' to include attorney's fees . . . ." Marek v. Chesny, 473 U.S. at 9. Compare Marek v. Chesny, 473 U.S. at 9 (holding that, because § 1988(b) defines "a reasonable attorney's fee as part of the costs" available to a plaintiff in a § 1983 suit, "such fees are subject to the cost-shifting provision of Rule 68"), with Oates v. Oates, 866 F.2d 203, 206-07 (6th Cir. 1989)(fee-shifting provision of federal wiretapping statute, 18 U.S.C. § 2520, which provides for the award of "a reasonable attorneys' fee and other litigation costs reasonably incurred," does not define attorneys' fees as costs for purposes of rule 68).

Consistent with this rule, the Tenth Circuit and other Courts of Appeal have provided guidance that, "'in a diversity action, the court looks to the substantive law which creates the cause of action . . . to determine if costs include attorneys' fees.'" Knight v. Snap-On Tools Corp., 3 F.3d at 1404-5 (alteration in original)(quoting Tanker Mgmt., Inc. v. Brunson, 918 F.2d 1524, 1527 (11th Cir. 1990), and citing Zackaroff v. Koch Transfer Co., 862 F.2d 1263, 1265 (6th Cir. 1988)). For example, the Tenth employed this rule in Knight v. Snap-On Tools Corp. See 3 F.3d at 1399-1406. In that case, the plaintiff, Knight, prevailed on a New Mexico unfair-trade-practices claim filed against the defendant, Snap-On Tools. See Knight v. Snap-On Tools Corp., 3 F.3d at 1399-1406. The New Mexico Unfair Practices Act ("UPA"), N.M. Stat. Ann. §§ 57-12-1 to 57-12-26, contains a fee-shifting provision, see N.M. Stat. Ann. § 57-12-1, and the Tenth Circuit held that Knight was entitled to "attorneys' fees and costs to the plaintiff because he was a prevailing party," Knight v. Snap-On Tools Corp., 3 F.3d at 1403. The Tenth Circuit

then considered Snap-On Tools' argument that, because Knight recovered less at trial than Snap-On Tools' previously tendered offer of judgment, under rule 68, Knight had to pay the costs and attorney's fees incurred after the offer.  See Knight v. Snap-On Tools Corp., 3 F.3d at 1404.  The Tenth Circuit concluded that the calculation of Knight's costs which were incurred after Snap-On Tools made an offer of judgment excluded attorney's fees, because the UPA, N.M. Stat. Ann. §§ 57-12-1 to 57-12-26, does not define costs to include attorney attorneys' fees, see Knight v. Snap-On Tools Corp., 3 F.3d at 1404-5.  Accordingly, the Tenth Circuit held that Knight was not permitted to recover his post-offer costs, but was permitted to recover his post-offer attorneys' fees.  See Knight v. Snap-On Tools Corp., 3 F.3d at 1405-06.  See also Sanchez v. Matta, No. 03-0296, 2005 WL 2313621, at *8-9.

## ANALYSIS

The Court concludes that, under the UPA's and UORRA's fee-shifting provisions, the Fallens are entitled to reasonable attorneys' fees against GREP Southwest and Camino Real in the amount of $17,427.28 against each respectively.  The Court also concludes that, under the FDCPA's and FCRA's fee-shifting provisions, the Fallens are entitled to reasonable attorneys' fees against National Credit in the amount of $8,803.47.

## I.    THE COURT AWARDS THE FALLENS REASONABLE ATTORNEYS' FEES AGAINST GREP SOUTHWEST AND CAMINO REAL.

The Fallens are entitled to an award of reasonable attorneys' fees against GREP Southwest and Camino Real, because the Fallens are the prevailing parties on their claims against those Defendants.   The Court calculates the reasonable fees of the Fallens' attorneys using a lodestar analysis.  The Court will not make a downward adjustment to the lodestar amount.

A.     **THE FALLENS ARE ENTITLED TO AN AWARD OF REASONABLE ATTORNEYS' FEES AGAINST GREP SOUTHWEST AND CAMINO REAL.**

The Fallens are prevailing parties in this matter, and, therefore, are entitled to reasonable attorneys' fees against GREP Southwest and Camino Real.  The Fallens filed an UPA claim and an UORRA claim against GREP Southwest and Camino Real, see Second Amended Complaint ¶¶ 167-71, at 22-23; id. ¶¶ 183-88, at 24-25, and each of those statutes includes a fee-shifting provision, N.M. Stat. Ann. §§ 47-8-48(A) & 57-12-10(C).   UORRA's fee-shifting provision provides:

> If suit is brought by any party to the rental agreement to enforce the terms and conditions of the rental agreement or to enforce any provisions of the Uniform Owner-Resident Relations Act, the prevailing party shall be entitled to reasonable attorneys' fees and court costs to be assessed by the court.

N.M. Stat. Ann. § 47-8-48(A).  Similarly, the UPA's fee-shifting provision states that "[t]he court shall award attorney fees and costs to the party complaining of an unfair or deceptive trade practice or unconscionable trade practice if the party prevails."  N.M. Stat. Ann. § 57-12-10(C).  The Court of Appeals of New Mexico has interpreted "prevailing party" in UORRA's fee-shifting provision, N.M. Stat. Ann. § 47-8-48(A), as "'[t]he party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention.'"  Hedicke v. Gunville, 2003-NMCA-032, ¶ 26, 62 P.3d 1217, 1224 (alteration original)(quoting Black's Law Dictionary 1188 (6th ed. 1990)).[8]  The Hedicke v. Gunville court added that "[t]his definition suggests . . . that at

---

[8]The Court considers New Mexico Court of Appeals' opinions with the understanding that the Court "certainly may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision."  Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(alterations added)(noting that where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is

to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).

The Supreme Court of the United States of America has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law. . . . The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.   In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)(citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

the end of the entire action, the prevailing party is the party who wins on the merits or on the main issue of the case." Hedicke v. Gunville, 2003-NMCA-032, ¶ 26, 62 P.3d at 1224-25.[9]

The Fallens successfully prosecuted their UPA and UORRA claims against GREP Southwest and Camino Real, because GREP Southwest and Camino Real agreed to pay the Fallens $2,000.00 to settle those claims. See Settlement Conference Tr. at 3:8-10 (Court). Cf. Farrar, 506 U.S. at 111 ("[T]o qualify as a prevailing party, a . . . plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement.")(alterations added)(citations omitted). Accordingly, the Fallens, as prevailing parties under the UPA and the UORRA, are "entitled to reasonable attorneys' fees and court costs to be assessed by the court." N.M. Stat. Ann. § 47-8-48(A). See N.M. Stat. Ann. § 57-12-10(C).

## B. LODESTAR ANALYSIS REGARDING FEES ATTRIBUTABLE TO GREP SOUTHWEST AND CAMINO REAL.

The Court turns to the calculation of a reasonable attorneys' fee award against GREP Southwest and Camino Real. Because the Fallens asserted only New Mexico state claims

---

[9]Regarding the interpretation of "prevailing party" in rule 1-054(D)(1) of the New Mexico Rules of Civil Procedure for the District Courts, the Court of Appeals of New Mexico has also stated:

A prevailing party is defined as the party who wins the lawsuit -- that is, a plaintiff who recovers a judgment or a defendant who avoids an adverse judgment. We have also defined the prevailing party as [t]he party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention. Finally, we have reiterated that the prevailing party is the party that wins on the main issue of the case.

Mayeux v. Winder, 2006-NMCA-028, ¶ 41, 131 P.3d 85, 96 (alteration original)(internal quotation marks and citations omitted).

against GREP Southwest and Camino Real, and prevailed on those claims, the predominant question concerning the Court's award of attorneys' fees is whether under the UPA and the UORRA the Fallens' requested fees are "reasonable." Atherton v. Gopin, 2012-NMCA-023, ¶ 6, 272 P.3d 700, 701 ("Although the UPA imposes no limitations on attorney fees, the fees requested must be reasonable."). See 10 Moore's Federal Practice § 54.171[5], at 54-378 (3d ed. 2016)("[A] plaintiff prevailing on pendant state claims may rely on a state fee-shifting provision.").

When adjudicating a fee request under the UPA's fee-shifting provision, the Court of Appeals of New Mexico has stated that "[o]ne way of arriving at a reasonable fee is the 'lodestar' method . . . ." Atherton v. Gopin, 2012-NMCA-023, ¶ 7, 272 P.3d at 701. "In this method, the court determines a fee that approximates a reasonable hourly rate multiplied by the number of hours reasonably incurred in the representation." Atherton v. Gopin, 2012-NMCA-023, ¶ 7, 272 P.3d at 701 (internal citation omitted). Cf. Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1249 ("'To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate.'")(quoting Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995)). The same standard applies to fees for services that non-lawyers, such as law clerks and paralegals, provide. See Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1249 (citing Ramos v. Lamm, 713 F.2d at 552). The resulting lodestar "value serves as a starting point for the calculation of a reasonable fee." Atherton v. Gopin, 2012-NMCA-023, ¶ 7, 272 P.3d at 701 (citation omitted). "The lodestar method is 'ordinarily used in statutory fee-shifting cases because it provides adequate fees to attorneys who undertake litigation that is socially beneficial.'" Atherton v. Gopin, 2012-NMCA-023, ¶ 7, 272 P.3d at 701 (quoting In re

N.M. Indirect Purchasers Microsoft Corp., 2007-NMCA-007, ¶ 76, 149 P.3d 976, 1004).  The

Fallens, as fee applicants, bear the burden "'of establishing entitlement to an award and

documenting the appropriate hours expended and hourly rates.'"  Case v. Unified Sch. Dist. No.

233, Johnson Cty., Kan., 157 F.3d at 1249 (citing Mares v. Credit Bureau of Raton, 801 F.2d

1197, 1201 (10th Cir. 1986)).  See In re N.M. Indirect Purchasers Microsoft Corp., 2007-

NMCA-007, ¶ 76,  149 P.3d 976, 1004 ("The attorney bears the burden of proving that his legal

services provided a benefit to the client.").

### 1.      The Fallens' Attorneys Seek Reasonable Rates.

The Court first reviews the hourly rates of the Fallens' counsel to determine whether they

are reasonable.  When reviewing the reasonableness of the rates of the Fallens' attorneys, the

Court considers "the fee customarily charged in the locality for similar legal services."  Atherton

v. Gopin, 2012-NMCA-023, ¶ 6, 272 P.3d at 701-02 (internal quotation marks and citation

omitted).  Cf. Blum v. Stenson, 465 U.S. at 895 ("The statute and legislative history establish

that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates

in the relevant community . . . .")(alterations in original)).  Further, the Court notes that the Tenth

Circuit has consistently instructed that "'[t]he first step in setting a rate of compensation for the

hours reasonably expended is to determine what lawyers of comparable skill and experience

practicing in the area in which the litigation occurs would charge for their time.'"  Case v.

Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1256 (quoting Ramos v. Lamm, 713

F.2d at 555).   See also In re Continental Ill. Sec. Litig., 962 F.2d 566, 568, 572 (7th

Cir. 1992)(Posner, J.)("The object in awarding a reasonable attorney's fee . . . is to simulate the

market where a direct market determination is infeasible.").

The Court considers the evidence and arguments the parties introduced regarding their rates.  See Affidavit of Marc. M. Lowry (executed March 16, 2016), filed March 16, 2016 (Doc. 104-1)("Lowry Aff."); Affidavit of Alicia C. Lopez (executed March 2016), filed March 16, 2016 (Doc. 104-1)("Lopez Aff.").  See also Camino Real Response at 8 (discussing the local market for legal work related to residential rental property).  The Court notes that Mr. Lowry charges $375.00 per hour for his services and that Ms. Lopez charges $225.00 per hour for her services.  See Motion at 13; Lowry Aff. ¶ 22, at 8.  The Court also notes that, according to GREP Southwest and Camino Real, the maximum that the local market will bear for attorney services concerning the landlord-tenant relationship and residential rental property is $240 per hour.  See Camino Real Response at 8.

As the Court indicated at the hearing, the Court finds Mr. Lowry's and Ms. Lopez's rates to be reasonable in the local market, because this case does not pertain only to the landlord-tenant relationship or to residential retail property, but rather involves federal and state consumer protection claims asserted against not only owners and managers of residential rental property, but also national debt collection agencies and credit bureaus.  See Tr. at 36:2 (Court).  Striving to attain a complete view of the case's complexity, the Court credits the Fallens' argument that this case was likely headed toward a class action, but for the Fallens' willingness to reach a settlement.  See Tr. at 11:9-25 (Lowry).  Reviewing its past fee opinions, the Court notes that Mr. Lowry's rate approaches the upper end of what the local market would currently bear for the hourly rate of a very experienced partner engaged in complex, multi-party commercial litigation. See Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL 2383667, at *21 (D.N.M. June 13, 2012)(Browning, J.)(concluding that  (i) $235.00 per hour for partners; (ii) $200.00 per hour for senior associates; (iii) $150.00 per hour for other associates; and (iv) $75.00 per hour for

paralegals to be reasonable rates); Avendano v. Smith, No. 11-0556, 2011 WL 5822733, at *2 (D.N.M. Nov. 3, 2011)(Browning, J.)(finding rates of $180.00 per hour reasonable); Mountain Highlands, LLC v. Hendricks, No. 08-0239, 2010 WL 1631856, at *9-10 (D.N.M. Apr. 2, 2010)(Browning, J.)(approving an hourly rate of $170.00 to $210.00 per hour as reasonable for commercial litigation); Allahverdi v. Regents of Univ. of N.M., No. 05-0277, 2006 WL 1304874, at *2 (D.N.M. Apr. 25, 2006)(Browning, J.)(finding hourly rate of $225.00 reasonable in a public-employment dispute); Kelley v. City of Albuquerque, No. 03-0507, 2005 WL 3663515, at *15-17 (D.N.M. Oct. 24, 2005)(Browning, J.)(finding $250.00 per hour to be a reasonable rate in an employment dispute).  Nevertheless, the Court credits Mr. Lowry's "skill and experience" as a commercial litigator, Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1256, and the Court also takes seriously the statutorily-created incentives necessary to motivate attorneys of Mr. Lowry's skill to prosecute "'socially beneficial'" consumer protection claims, Atherton v. Gopin, 2012-NMCA-023, ¶ 7, 272 P.3d at 701 (quoting In re N.M. Indirect Purchasers Microsoft Corp., 2007-NMCA-007, ¶ 76, 149 P.3d at 1004).  The Court concludes, therefore, that the rates that Mr. Lowry charged, in addition to the rates that other Rothstein Donatelli lawyers, paralegals, and staff charged, to be reasonable and commensurate with the case's complexity, as well as the statutory purpose that the UPA's and UORRA's respective fee-shifting provisions reflect.

### 2.  The Fallens' Attorneys Reasonably Allocated $34,854.56 in Time to Prosecute the Fallens' Claims Against GREP Southwest and Camino Real.

The Court proceeds to the next step in its lodestar analysis -- i.e., to determine the number of hours that the Fallens' attorneys reasonably spent in prosecuting their claims against GREP Southwest and Camino Real.  See Atherton v. Gopin, 2012-NMCA-023, ¶ 7, 272 P.3d at

702 ("In this method, the court determines a fee that approximates a reasonable hourly rate multiplied by the number of hours reasonably incurred in the representation."). Accord Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250 (providing guidance regarding the analysis of the reasonable time component of the lodestar calculation). "The first step in calculating the lodestar by determining the number of hours reasonably spent by counsel for the party seeking fees." Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250 (citing Ramos v. Lamm, 713 F.2d at 553). "Counsel for the party claiming the fees has the burden of proving hours to the district court by submitting meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks." Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250 (citing Ramos v. Lamm, 713 F.2d at 553). "A district court is justified in reducing the reasonable number of hours if the attorney's time records are 'sloppy and imprecise' and fail to document adequately how he or she utilized large blocks of time." Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250 (quoting Jane L. v. Bangerter, 61 F.3d at 1511).

"Once the district court has adequate time records before it, it must then ensure that the winning attorneys have exercised 'billing judgment.'" Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250 (quoting Ramos v. Lamm, 713 F.2d at 553). "Billing judgment consists of winnowing the hours actually expended down to the hours reasonably expended." Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250 (citing Ramos v. Lamm, 713 F.2d at 553). "Hours that an attorney would not properly bill to his or her client cannot reasonably be billed to the adverse party, making certain time presumptively

unreasonable."  Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250 (citing

Ramos v. Lamm, 713 F.2d at 553-54).

"After examining the specific tasks and whether they are properly chargeable, the district

court should look at the hours expended on each task to determine if they are reasonable."  Case

v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250.  The Tenth Circuit has

stated:

> In determining what is a reasonable time in which to perform a given task or to
> prosecute the litigation as a whole, the court should consider that what is
> reasonable in a particular case can depend upon facts such as the complexity of
> the case, the number of reasonable strategies pursued, and the responses
> necessitated by the maneuvering of the other side. Another factor the court should
> examine in determining the reasonableness of hours expended is the potential
> duplication of services. "For example, [if] three attorneys are present at a hearing
> when one would suffice, compensation should be denied for the excess
> time." . . . The court can look to how many lawyers the other side utilized in
> similar situations as an indication of the effort required.

Ramos v. Lamm, 713 F.2d at 554 (quoting Copeland v. Marshall, 641 F.2d 880, 891 (D.C.

Cir. 1980)(en banc)).  The Tenth Circuit has also explained that "[t]he district court may also

reduce the reasonable hours awarded if 'the number [of compensable hours] claimed by counsel

include[s] hours that were unnecessary, irrelevant and duplicative.'"  Case v. Unified Sch. Dist.

No. 233, Johnson Cty., Kan., 157 F.3d at 1250 (quoting Carter v. Sedgwick County, Kan., 36

F.3d 952, 956 (10th Cir. 1994)).

With the guiding case law in mind, the Court turns to the hours that the Fallens' counsel

submitted to the Court as reasonable attorneys' fees to GREP Southwest and Camino Real.  The

Fallens attribute $28,058.76 of time to GREP Southwest and Camino Real collectively, as well

as two-sevenths of the $36,730.08 of time common to all the Defendants -- i.e., $ 10,494.30 --

for a sum of $38,553.06.  See Camino Real Time at 75.  This sum, plus the gross receipt tax of

$2,771.00, equals the fee that the Fallens request the Court to award against GREP Southwest and Camino Real collectively -- i.e., $41,324.06.  See Motion at 2.

The Court first determines as reasonable the Fallens' request that the Court award against GREP Southwest and Camino Real two-sevenths of the $36,730.08 of time attributable as common to all the Defendants.  See Common Time at 1-75.  The Court rejects GREP Southwest and Camino Real's argument that they should be treated as a single Defendant for the purpose of an attorneys' fee award, because GREP Southwest and Camino Real are separate parties, being the manager and owner of Camino Real Apartments, respectively.  See Second Amended Complaint ¶¶ 2-3, at 2.  The Court takes note of the Fallens' allegations regarding the separate actions that GREP Southwest and Camino Real took, which undergirded the Fallens' claims.  See Second Amended Complaint ¶¶ 2-3, 14-64, at 2, 4-9.  Accordingly, the Court concludes that the Fallens' attorneys reasonably billed $10,494.30, pre-gross-receipts tax, in time that is attributable to GREP Southwest and Camino Real, and reflected in Common Time.

The Court next reviews the time that the Fallens exclusively attribute to GREP Southwest and Camino Real.  See Camino Real Time at 1-75.  Upon careful inspection of Camino Real Time, the Court finds that $9,316.00, pre-gross-receipts tax, of the time accounted for in Camino Real Time is exclusively attributable to GREP Southwest and Camino Real.[10]  The Court also finds that many of the billing transactions in Camino Real Time, according to the description of

_____

[10]The Court arrives at this $9,316.00, pre-gross-receipts tax, figure by aggregating the amounts corresponding to the references in Camino Real Time that are exclusively attributable to GREP Southwest and/or Camino Real, and the Court finds that the following reference numbers in Camino Real Time are exclusively attributable to GREP Southwest and/or Camino Real: 19, 21, 23, 24, 25, 31, 33, 70, 94, 139, 140, 174, 175, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 197, 201, 202, 205, 209, 227, 228, 229, 263, 264, 269, 275, 303, 311, 324, 340, 362, 523, 532, 537, 539, 549, 568, 636, 665, 667, 679, and 712.  See Camino Real Time at 3-5, 9, 11, 16, 19-23, 25, 29-30, 33-35, 39, 56, 58, 60, 66, 69-70, 73.

the Fallens' counsel, correspond to work that is not exclusively attributable to GREP Southwest and/or Camino Real.  For many of these time entries, the Fallens have ex post facto attributed a percentage to GREP Southwest and Camino Real.  Some of the Fallens' attributions of time for prosecuting their claims against GREP Southwest and Camino Real appear to the Court as arbitrary, if not erroneous.  See Flitton v. Primary Residential Mortg., Inc., 614 F.3d 1173, 1178 (10th Cir. 2010)("When examining the adequacy of an attorney's billing entries, we are primarily concerned with the district court's ability to evaluate the propriety of the fee request based on the specific billing entries.")(citing Crumpacker v. Kan. Dep't of Human Res., 474 F.3d 747, 757 (10th Cir. 2007)).

For example, the Fallens ask the Court to award fifty percent of its fees against GREP Southwest and Camino Real for time allocated to the following tasks, as the Fallens' attorneys describe the work:

> [By Mr. Lowry:] confer with A. Lopez about the Transunion and Equifax results; calling Kenth to get the final reports . . . review the latest credit results; confer with A. Lopez about the Transunion file; review and forward A[licia] Lopez's email to Kenth so he can contract [sic] Transunion. . . .

> [By Ms. Lopez:] confer with S. Saavedra, M. Lowry, and M. Montoya regarding latest contacts from Transunion and Equifax, said to be missing from file; review e-file with C. Saavedra; place three phone calls to Equifax to re-order second investigation results (if any) and have them sent to the Fallens; phone call with TransUnion to get information needed to re-order second investigation results (if any); leave message for L. Fallen about steps needed on clients side; sent text to M. Lowry with information that K. Fallen will need to contact TransUnion

Camino Real Time at 13.  The Court does not credit that fifty percent of this attorney time reflected in this time entry is attributable to GREP Southwest and/or Camino Real.  Furthermore, taking another example from Camino Real Time, the Fallens ask the Court to award them fifty percent of its fees against GREP Southwest and Camino Real for time allocated to the following tasks, as the Fallens' attorneys describe the work: "Confer with M. Lowry as to next steps in

settlement negotiations with [the credit reporting agencies -- i.e., Equifax Information, Experian Information, and TransUnion LLC], Insureco, and NCS; litigation against Camino Real; with M. Lowry, call L. Fallen to discuss client's reviewing and responding to TransUnion's settlement offer[.]"  Camino Real Time at 65.  Again, the Court doubts that fifty percent of this attorney time is fairly attributable to GREP Southwest and/or Camino Real.

Moreover, for other time entries that, per the description of the Fallens' attorneys, are not exclusively attributable to GREP Southwest and/or Camino Real, the Fallens nevertheless seek to recover one hundred percent of their attorneys' fees from GREP Southwest and Camino Real. For example, the Fallens propose that the Court award one hundred percent of its fee from GREP Southwest and Camino Real for 0.90 hours spent on June 12, 2014, for "[a] call [to] TransUnion, Equifax, and Experian for filing information and [to] continue updating complaint."  Camino Real Time at 3.  Again, the Court cannot conclude that one hundred percent of the bill for this task is attributable to GREP Southwest and Camino Real.

Many of the time entries that the Fallens' attorneys submitted, as documented in Camino Real Time, correspond to work that is not exclusively attributable to GREP Southwest and Camino Real.  See Camino Real Time at 2-3, 6-10, 14-19, 22-24, 26, 33, 36, 51-58, 60, 63-65, and 68-74.[11]  The Court acknowledges that the Fallens apportioned a percentage of these fee

---

[11]The Court concludes that the time entries corresponding to the following reference numbers in Camino Real Time are for work that is not exclusively attributable to GREP Southwest and Camino Real: 8, 13, 15, 16, 42, 43, 44, 45, 47, 50, 51, 52, 53, 54, 56, 57, 58, 60, 61, 62, 63, 64, 65, 66, 67, 68, 82, 84, 85, 98, 105, 106, 107, 108, 115, 116, 117, 118, 119, 120, 122, 124, 125, 126, 127, 138, 144, 146, 149, 150, 152, 153, 155, 157, 163, 168, 170, 171, 198, 199, 200, 215, 230, 235, 236, 244, 271, 272, 273, 283, 284, 287, 325, 330, 331, 332, 333, 336, 482, 487, 491, 492, 493, 497, 500, 504, 508, 509, 512, 525, 526, 527, 534, 535, 536, 537, 538, 551, 569, 608, 610, 611, 619, 649, 653, 654, 655, 657, 658, 660, 662, 670, 672, 673, 675, 676, 692, 694, 695, 702, 704, 705, 711, 713, 714, 715, 716, 717, 719, 722, 739, 740, 760, 761, and 762. See Camino Real Time at 2-3, 6-10, 14-19, 22-24, 26, 33, 36, 51-58, 60, 63-65, and 68-74.

entries to GREP Southwest and Camino Real among other Defendants, but the Court does not

find persuasive GREP Southwest's and Camino Real's argument that the Court should not award

any fees against them corresponding to time entries that make reference to the credit reporting

agencies, because that attorney work was relevant to a calculation of the Fallens' damages.  See

Camino Real Response at 11.  In light of the foregoing examples of the Fallens' apportionment,

however, and further considering that the Fallens made these attributions of tasks by Defendant

ex post facto, the Court concludes that the approach the Fallens themselves suggest in Common

Time is better suited to calculate the fees that the Fallens concede are fairly attributable to both

GREP Southwest and Camino Real as well as other Defendants.  Under the approach that the

Fallens employ in Common Time, the Court aggregates the billing amounts indicated in Camino

Real Time that are attributable not only to GREP Southwest and Camino Real but also to the

other Defendants, and concludes that the Fallens' attorneys billed $44,474.75, pre gross-receipts

tax, in time that is attributable to GREP Southwest, Camino Real, and other Defendants.[12]  The

Court then allocates two-sevenths of that amount -- $12,707.07 -- as attributable to GREP

Southwest and Camino Real.  See Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157

F.3d at 1250 ("A district court is justified in reducing the reasonable number of hours if the

---

[12]Again, the Court concludes that the billing amounts corresponding to the following
reference numbers in Camino Real Time reflect attorney time that is attributable to not only to
GREP Southwest and Camino Real but also to other defendants: 8, 13, 15, 16, 42, 43, 44, 45, 47,
50, 51, 52, 53, 54, 56, 57, 58, 60, 61, 62, 63, 64, 65, 66, 67, 68, 82, 84, 85, 98, 105, 106, 107,
108, 115, 116, 117, 118, 119, 120, 122, 124, 125, 126, 127, 138, 144, 146, 149, 150, 152, 153,
155, 157, 163, 168, 170, 171, 198, 199, 200, 215, 230, 235, 236, 244, 271, 272, 273, 283, 284,
287, 325, 330, 331, 332, 333, 336, 482, 487, 491, 492, 493, 497, 500, 504, 508, 509, 512, 525,
526, 527, 534, 535, 536, 537, 538, 551, 569, 608, 610, 611, 619, 649, 653, 654, 655, 657, 658,
660, 662, 670, 672, 673, 675, 676, 692, 694, 695, 702, 704, 705, 711, 713, 714, 715, 716, 717,
719, 722, 739, 740, 760, 761, and 762.  See Camino Real Time at 2-3, 6-10, 14-19, 22-24, 26,
33, 36, 51-58, 60, 63-65, and 68-74.

attorney's time records are 'sloppy and imprecise' and fail to document adequately how he or she utilized large blocks of time.")(quoting Jane L. v. Bangerter, 61 F.3d at 1511).

In sum, to determine the reasonable time that is fairly attributable to GREP Southwest and Camino Real, the Court aggregates: (i) $ 10,494.30, reflecting two-sevenths of Common Time; (ii) $9,316.00, reflecting the time accounted for in Camino Real Time that is exclusively attributable to GREP Southwest and Camino Real; and (iii) $12,707.07, reflecting two-sevenths of the time accounted for in Camino Real Time that is attributable to GREP Southwest, Camino Real, and other Defendants.  These amounts sum to $32,517.37.  Adjusting for the 7.1875% gross receipts tax on this amount, see Ramah Navajo Chapter v. Babbitt, 50 F. Supp. 2d at 1109 ("The Court also awards New Mexico gross receipts tax on [reasonable] fees.")(alteration added), the Court concludes, under the lodestar analysis, that the Fallens' attorneys reasonably billed $34,854.56 attributable to GREP Southwest and Camino Real, see Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250 ("A district court is justified in reducing the reasonable number of hours if the attorney's time records are 'sloppy and imprecise' and fail to document adequately how he or she utilized large blocks of time.")(quoting Jane L. v. Bangerter, 61 F.3d at 1511).  Accordingly, the lodestar amount of fees that the Fallens' counsel reasonably seeks against GREP Southwest and Camino Real is $34,854.56.

### C.   THE COURT WILL NOT MAKE A DOWNWARD ADJUSTMENT TO THE LODESTAR AMOUNT RECOVERABLE FROM GREP SOUTHWEST AND CAMINO REAL.

"Having determined the lodestar, the Court next considers whether it should adjust the award."  Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d at 1208.  See Atherton v. Gopin, 2012-NMCA-023, ¶ 7, 272 P.3d at 701 (explaining that the lodestar value "serves as a starting point for the calculation of a reasonable fee")(emphasis added)(citation omitted).  Although the

lodestar is a "starting point," <u>Atherton v. Gopin</u>, 2012-NMCA-023, ¶ 7, 272 P.3d at 701, "there is a 'strong presumption' that the lodestar figure is reasonable, but that presumption may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee," <u>Perdue v. Kenny A. ex rel. Winn</u>, 559 U.S. at 554.  <u>See</u> <u>Obenauf v. Frontier Fin. Grp., Inc.</u>, 785 F. Supp. 2d at 1208-09.

The Court concludes that, under the UPA's and UORRA's fee-shifting provisions, a downward adjustment from the lodestar amount is not warranted.  <u>See</u> N.M. Stat. Ann. §§ 47-8-48(A) & 57-12-10(C).  GREP Southwest and Camino Real press that the Fallens recovered a settlement of only $2,000.00, which they emphasize is a paltry result in comparison to the Fallens' demand of $60,629.33, reduced from a global demand of $175,000.00.  <u>See</u> Camino Real Response at 2, 5.  GREP Southwest and Camino Real argue that, given this result, the lodestar does not reflect a reasonable attorney fee award, stating that "the Court will need to make a determination of just what is reasonable time to spend on a case worth $2,000 . . . ." Camino Real Response at 13.

The Court will not make a downward adjustment from the $34,854.56 lodestar value of the fee award that the UPA's and UORRA's fee-shifting provisions authorize, N.M. Stat. Ann. §§ 47-8-48(A) & 57-12-10(C), simply because the Fallens recovered only $2,000.00 from GREP Southwest and Camino Real.   A determination of a reasonable fee under the UPA's and UORRA's fee-shifting provisions does not myopically focus on the extent of a non-nominal result that a prevailing plaintiff obtained.  <u>See</u> <u>Atherton v. Gopin</u>, 2012-NMCA-023, ¶ 9, 272 P.3d at 702.  The Court of Appeals of New Mexico has stated that "the UPA contains no limitation on the award of attorney fees" and has further recognized "that even when the damage

award was small, the attorney fees 'should reflect the full amount of fees fairly and reasonably incurred' by the prevailing plaintiff." Atherton v. Gopin, 2012-NMCA-023, ¶ 9, 272 P.3d at 702 (quoting Jones v. General Motors Corp., 1998-NMCA-020, ¶ 25, 953 P. 2d 1104, 1109). The Court recognizes that, under UPA's and UORRA's fee-shifting provisions, the Court may consider "the amount involved and the results obtained" as one factor among several to determine a reasonable fee. Atherton v. Gopin, 2012-NMCA-023, ¶ 6, 272 P.3d at 702 (citation omitted). Moreover, attention to the settlement result that the Fallens reached with GREP Southwest and Camino Real is neither predominant nor necessary. See Atherton v. Gopin, 2012-NMCA-023, ¶ 6, 272 P.3d at 702 (explaining that "'the factors are not of equal weight, and all of the factors need not be considered'")(quoting In re N.M. Indirect Purchasers Microsoft Corp., 2007-NMCA-007, ¶ 78, 149 P.3d at 1004). Moreover, although the Fallens obtained only a $2,000.00 settlement with GREP Southwest and Camino Real, the Court's determination of the $34,854.56 lodestar "provides adequate fees to attorneys who undertake litigation that is socially beneficial." Atherton v. Gopin, 2012-NMCA-023, ¶ 7, 272 P.3d at 702.

## II.   THE COURT AWARDS THE FALLENS REASONABLE ATTORNEYS' FEES AGAINST NATIONAL CREDIT.

The Fallens are entitled to an award of reasonable attorneys' fees against National Credit, because the Fallens are the prevailing parties on their claims against National Credit. The Court calculates the reasonable fees of the Fallens' attorneys using a lodestar analysis. When considering the reasonable fees of the Fallens' attorneys, the Court concludes that any attorneys' fees that the Fallens incurred after National Credit tendered its rule 68 offer of judgment are unreasonable; accordingly, the Court will not award the Fallens post-offer fees against National Credit. The Court will, however, award the Fallens their reasonably-incurred pre-offer fees against National Credit.

A.    THE FALLENS ARE ENTITLED TO AN AWARD OF REASONABLE
       ATTORNEYS' FEES AGAINST NATIONAL CREDIT.

The Fallens are prevailing parties in this matter and, therefore are entitled to reasonable

attorneys' fees against National Credit.   Unlike with GREP Southwest and Camino Real, the

Fallens filed suit on federal claims against National Credit, asserting both a FDCPA claim and a

FCRA claim, see Second Amended Complaint ¶¶ 156-161, 189-202 at 21-22, 25-26; id. ¶¶ 162-

166, at 22, and the Fallens prevailed on those claims by obtaining a $1,000.00 settlement in the

Fallens' favor, see Settlement Conference Tr. at 10:20-22 (Yarbourgh, M.J.).   See Farrar v.

Hobby, 506 U.S. at 111 (stating, in the § 1988 context, that "to qualify as a prevailing party, a

civil rights plaintiff must obtain at least some relief on the merits of his claim.  The plaintiff must

obtain an enforceable judgment against the defendant from whom fees are sought, or comparable

relief through a consent decree or settlement.").   The FDCPA's and FCRA's fee-shifting

provisions, unlike the more frequently cited language in 42 U.S.C. § 1988(b), do not make

reference to a "prevailing party."   15 U.S.C. §§ 1681n(a)(2), 1681o(a)(2) & 1692k(a)(3).

Nevertheless, both the FCRA and the FDCPA contain fee-shifting provisions that clearly entitle

prevailing plaintiffs to an award of attorney's fees.  See 15 U.S.C. §§ 1681n(a)(2), 1681o(a)(2) &

1692k(a)(3).   The FDCPA's fee-shifting provision makes "any debt collector who fails to

comply with any [of its] provisions" liable for "the costs of the action, together with a reasonable

attorney's fee as determined by the court."  15 U.S.C. § 1692k(a)(3).  Similarly, the FCRA fee-

shifting provision provides that, "in the case of any successful action to enforce any liability

under [§§ 1681n and 1681o]," any person who willfully or negligently fails to comply with the

FCRA's requirement is liable to the consumer for "the costs of the action together with

reasonable attorney's fees as determined by the court."  15 U.S.C. § 1681n(a)(2).  See 15 U.S.C.

§ 1681o(a)(2).  See also Merrick v. Scott, No. 3:10-CV-2172-D, 2011 WL 1938188, at *10

(N.D. Tex. May 20, 2011)(Fitzwater, C.J.)(accepting the term "prevailing party" as sufficiently analogous to the FDCPA's "successful action to enforce the foregoing liability").   Accordingly, because the Fallens prosecuted their FDCPA and FCRA claims against National Credit to a favorable settlement, they are entitled to reasonable attorneys' fees under those statutes.   See 15 U.S.C. §§ 1681n(a)(2), 1681o(a)(2) & 1692k(a)(3).

## B.   LODESTAR ANALYSIS REGARDING FEES ATTRIBUTABLE TO NATIONAL CREDIT.

The Court turns to the calculation of a reasonable attorneys' fee award against National Credit.   The Supreme Court's case law governs the determination of what is a reasonable attorney's fee under the FDCPA's and FCRA's fee-shifting provisions.   See City of Burlington v. Dague, 505 U.S. at 562 (citing Flight Attendants v. Zipes, 491 U.S. 754, 758 n.2 (1989)). That case law reflects the "lodestar" as "the guiding light of [the Supreme Court's] fee-shifting jurisprudence."   Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 551 (quoting City of Burlington v. Dague, 505 U.S. at 562).   Because this matter does not involve a common fund, the lodestar is the appropriate first step to calculate the reasonable fees of the Fallens' attorneys that the Court may award against National Credit.   See Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 553; Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d 1243, 1249 (10th Cir. 1998).   Cf. Blum v. Stenson, 465 U.S. 900 n.16 (distinguishing common fund from statutory fee-shifting cases).[13]

---

[13]The Court observes that other courts have applied a "percentage-of-recovery method" to determine a reasonable attorney's fee under the FCRA's fee-shifting provision, 15 U.S.C. § 1681n(a)(3), "in cases involving a common fund, because it rewards counsel for success and penalizes counsel for waste or failure."   Serrano v. Sterling Testing Sys., Inc., 711 F. Supp. 2d 402, 418 (E.D. Pa. 2010)(Pratter, J.)(citing In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 821 (3d Cir. 1995)).   Because this case does not involve a common fund, the Court concludes that the percentage-of-recovery method should not supplant its use of the lodestar method.   See Perdue v. Kenny A. ex rel. Winn, 559 U.S. at 553; Case v.

"'To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate.'"  Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1249 (quoting Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995)).  The same standard applies to fees for services that non-lawyers, such as law clerks and paralegals, provide.  See Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1249 (citing Ramos v. Lamm, 713 F.2d 546, 552 (10th Cir. 1983)).  The Fallens, as fee applicants, bear the burden "'of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.'"  Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1249 (citing Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1201 (10th Cir. 1986)).

### 1.    The Fallens' Attorneys Seek Reasonable Rates.

Again, the Court first reviews the rates of the Fallens' counsel, and the Court notes that the Tenth Circuit has provided guidance regarding the determination of reasonable rates for attorney services.  "'The first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time.'"  Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1256 (10th Cir. 1998)(quoting Ramos v. Lamm, 713 F.2d at 555, and citing Blum v. Stenson, 465 U.S. at 895 ("The statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community . . . .")(alterations in original)).  See In re Continental Ill. Sec. Litig., 962 F.2d at 572 ("The object in awarding a reasonable attorney's fee . . . is to simulate the market where a direct market determination is infeasible.").  For the reasons stated above, see supra at §

---

Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d 1243, 1249 (10th Cir. 1998).

I.B.1, the Court concludes that the rates that Mr. Lowry charges, in addition to the rates that other Rothstein Donatelli lawyers, paralegals, and staff charge, to be reasonable and commensurate with the complexity of the federal claims that the Fallens assert against National Credit.

## 2. The Fallens' Attorneys Reasonably Allocated $8,803.47 in Time to Prosecute the Fallens' Claims Against National Credit.

The Court proceeds to determine the number of hours that the Fallens' attorneys reasonably spent in prosecuting their FDCPA and FCRA claims against National Credit. See, e.g., Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250; Jane L. v. Bangerter, 61 F.3d at 1511; Ramos v. Lamm, 713 F.2d at 553-54. The Fallens contend that, from November 2, 2013, to January 13, 2016, their attorneys allocated $16,676.33 in time attributable to National Credit. See National Credit Time at 74-75; Common Time at 2. The Fallens contend that $11,429.18 of this time is exclusively attributable to National Credit and that $5,247.15 is attributable to National Credit as one-seventh of the time that is attributable to all the Defendants in common. See National Credit Time at 75.

National Credit made an offer of judgment on October 22, 2015, in the amount of $4,000.01, plus reasonable attorneys' fees and costs. See National Credit Offer of Judgment at 1-2. At the January 13, 2016, settlement conference, Judge Yarbrough made clear that National Credit agreed to pay $1,000.00 to settle the Fallens' claims against it. Settlement Conference Tr. at 10:20-22 (Court). The Fallens therefore agreed to settle their claims against National Credit for an amount less than the amount that National Credit tendered in its October 22, 2015, offer of judgment.

Rule 68 does not necessarily entail that the Fallens must pay the attorneys' fees that they incurred after National Credit tendered its October 22, 2015, offer. Rule 68 provides that, "[i]f

the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." Fed. R. Civ. P. 68. Regarding the Fallens' FDCPA and FCRA claims against National Credit, whether "costs," as defined in rule 68, encompasses attorneys' fees depends on how the FDCPA and FCRA define "costs" in their respective fee-shifting provisions. See Marek v. Chesny, 473 U.S. at 9 (concluding that the substantive law that creates the cause of action on which the plaintiff files suit defines "costs" under rule 68). Neither the FDCPA nor the FCRA defines "costs" to include attorney's fees. 15 U.S.C. §§ 1692k(a)(3), 1681n(a)(2), & 1681o(a)(2). The FDCPA's fee-shifting provision makes "any debt collector who fails to comply with any [of its] provisions" liable for "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1692k(a)(3). Similarly, the FCRA fee-shifting provision provides that, "in the case of any successful action to enforce any liability under [§§ 1681n and 1681o]," any person who willfully or negligently fails to comply with the FCRA's requirement is liable to the consumer for "the costs of the action together with reasonable attorney's fees as determined by the court." 15 U.S.C. § 1681n(a)(2). See 15 U.S.C. § 1681o(a)(2). These statutory fee-shifting provisions are sufficiently unlike 42 U.S.C. § 1988(b), which provides "a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Accordingly, because the FDCPA and the FCRA do not define costs to include attorneys' fees, the attorneys' fees that the Fallens incurred after National Credit's October 22, 2015, offer of judgment are not subject to the cost-shifting provision of rule 68. See Solomon v. Onyx Acceptance Corp., 222 F.R.D. 418, 421 (C.D. Cal. 2004)(Cooper, J.)(holding that, in an FDCPA case, "the attorneys' fees are not necessarily subject to the cost-shifting provision of Rule 68"). Cf. Marek v. Chesny, 473 U.S. at 9 (holding that, because Congress expressly included "a reasonable attorney's fee as part of the costs" available to a

plaintiff in a § 1983 suit, 42 U.S.C. § 1988(b), "such fees are subject to the cost-shifting provision of Rule 68").

Although rule 68 does not dictate that the Fallens must pay the attorneys' fees they incurred after National Credit's offer of judgment, National Credit's offer nonetheless informs the reasonableness of the Fallens' post-offer attorneys' fees. If a statute does not define costs to include attorneys' fees, then the Court has discretion to decide whether to award attorneys' fees where the plaintiff obtains a judgment for less than the amount of an offer of judgment made pursuant to rule 68. See Haworth v. State of Nev., 56 F.3d 1048, 1052 (9th Cir. 1995)(holding "that in an FLSA case when a Rule 68 offer of judgment has been rejected, and judgment is obtained for less than the settlement offer, these circumstances must be considered by the district court in determining what fee is reasonable."); Costa v. Nat'l Action Fin. Servs., No. CIV S-05-2084 FCDKJM, 2008 WL 1925235, at *2 (E.D. Cal. Apr. 30, 2008)(Damrell, J.). The Court should award attorney's fees that a party incurs after a rule 68 offer of judgment only if the attorneys' post-offer efforts in continuing to prosecute the case are reasonable. See Haworth v. State of Nev., 56 F.3d at 1052; Solomon v. Onyx Acceptance Corp., 222 F.R.D. 418, 423 (C.D. Cal. 2004)(Cooper, J.)(concluding that counsel's actions in continuing to prosecute an FCRA action after a Rule 68 offer were unreasonable and, therefore, awarding counsel only pre-offer attorney's fees).

Regarding the reasonableness of attorney's fees incurred after a rule 68 offer of judgment, the United States Court of Appeals for the Ninth Circuit has said:

> In determining what fee is reasonable in this circumstance, the district court must take into consideration the amount of the Rule 68 offer, the stage of the litigation at which the offer was made, what services were rendered thereafter, the amount obtained by judgment, and whether it was reasonable to continue litigating the case after the Rule 68 offer was made. The enumeration of these factors is not meant to be an exhaustive list. The district court may take into consideration such

other factors as it deems appropriate in determining the amount of reasonable attorney fees to be awarded.

Haworth v. State of Nev., 56 F.3d at 1052-53.  See Solomon v. Onyx Acceptance Corp., 222 F.R.D. at 423 (concluding that it "must consider the results obtained by the plaintiff after he rejects a Rule 68 offer in determining the reasonableness of any fee award . . . .")(emphasis in original)(citing Haworth v. State of Nev., 56 F.3d at 1052).  The Ninth Circuit's guidance on the post-offer fees is consistent with the Tenth Circuit's general guidance regarding the reasonableness of attorney's fees.  See Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan., 157 F.3d at 1250 ("[T]he district court should look at the hours expended on each task to determine if they are reasonable."); Carter v. Sedgwick County, Kan., 36 F.3d 952, 956 (10th Cir. 1994)(stating that "it is within a district court's discretion to reduce the number of compensable hours upon determining that the claimed time spent is excessive").  Accordingly, the Court will rely on the above guidance in determining the reasonableness of the fees that the Fallens' counsel billed after National Credit's rule 68 offer of judgment.

The attorneys' fees that the Fallens incurred after National Credit tendered its October 22, 2015, offer of judgment were unreasonable, and the Court will not award those fees against National Credit.  This conclusion reflects the Court's inclination that the Court provided to the parties at the hearing, see Tr. at 36:9-11 (Court)(stating that "the offer of judgment as a cutoff point and . . . find anything beyond that should not be a reasonable claim"), and persuasive case law supports it.  In Solomon v. Onyx Acceptance Corp., 222 F.R.D. at 423-24, the Honorable Florence-Marie Cooper, United States District Judge for the Central District of California, applied the factors that the Ninth Circuit discussed in Haworth v. State of Nev., 56 F.3d at 1052-53, and concluded that "counsel's actions in continuing to prosecute this case after the offer of judgment was patently unreasonable."  Solomon v. Onyx Acceptance Corp., 222 F.R.D. at 424.

In reaching this holding, Judge Cooper considered: (i) the amount of the rule 68 offer in comparison with the amount that the plaintiff obtained; (ii) the stage of litigation at which the offeree tendered the rule 68 offer; (iii) what services the offeree's attorney provided after the rule 68 offer; and (iv) whether it was reasonable to continue litigating after the rule 68 offer.  See 222 F.R.D. at 424 (citing Haworth v. State of Nev., 56 F.3d at 1052-53).

The Court concludes that the approach that the Ninth Circuit suggested in Haworth v. State of Nevada, 56 F.3d at 1052-53, and that Judge Cooper applied in Solomon v. Onyx Acceptance Corp., 222 F.R.D. at 424-24, to be sound.   In this case, on October 22, 2015, National Credit made an offer of judgment of $4,000.01, exclusive of reasonable attorney's fees and costs.  See National Credit Offer of Judgment at 1-2.  By January 13, 2016, the Fallens had agreed to settle their claims against National Credit for $1,000.00, exclusive of reasonable attorney's fees and costs.  Settlement Conference Tr. at 10:20-22 (Court).  This comparison suggests that the post-offer attorneys' fees that the Fallens incurred were unreasonable.  See Haworth v. State of Nevada, 56 F.3d at 1052 (holding that a court must consider the results obtained after a plaintiff rejects a rule 68 offer, because "the only one who benefited by pursuing the litigation after the Rule 68 offer was made was the plaintiffs' attorney").

Second, National Credit tendered its offer of judgment early in the litigation, before discovery; accordingly, this factor also weighs against an award of post-offer attorneys' fees.  In Solomon v. Onyx Acceptance Corp., Judge Cooper reasoned:

> Rule 68 is meant to encourage settlement of cases without the resort to the expense of prolonged litigation and acceptance of offers of judgment that are reasonable.  By accepting the early offer of judgment, Plaintiff could have averted expending what amounts to over $330,000 in attorney time. This fact favors awarding no post-offer fees as well.

222 F.R.D. at 423.  Although the amounts in the present matter are less substantial than the fees at issue in Solomon v. Onyx Acceptance Corp., 222 F.R.D. at 423 (concluding that "[b]y accepting the early offer of judgment, Plaintiff could have averted expending what amounts to over $330,000 in attorney time"), the guiding principle is the same:

> When a plaintiff rejects a Rule 68 offer, the reasonableness of an attorney fee award . . . will depend, at least in part, on the district court's consideration of the results the plaintiff obtained by going to trial compared to the Rule 68 offer. This application of Rule 68 has the salutary benefit of encouraging settlement of cases that should be settled when reasonable settlement offers are made.

Haworth v. State of Nev., 56 F.3d at 1052.  In this case, the Fallens could have averted expending at least $7,986.04 in attorney time.[14]  This fact favors awarding no post-offer fees. See Solomon v. Onyx Acceptance Corp., 222 F.R.D. at 423.

Third, the post-offer billing records of the Fallens' attorneys do not suggest that the Fallens' attorneys advanced the ball toward a more successful result against National Credit after the October 22, 2015, offer of judgment.  See National Credit Time at 56-75.  Indeed, the overwhelming majority of the post-offer time entries that the Fallens' attorneys attribute to National Credit concerned the offer, settlement, or the calculation of attorneys' fees.  See National Credit Time at 56-75.[15]  This fact additionally favors awarding the Fallens no post-offer fees against National Credit.

_____

[14]The Court arrives at this calculation by subtracting the amounts corresponding to the time entries that the Fallens' counsel billed before National Credit tendered its rule 68 offer of judgment on October 22, 2015 -- i.e., 3,443.14 -- from the amount that the Fallens state is attributable exclusively to National Credit -- i.e., $11,429.18.  See National Credit Time at 1-75. See also infra at n.16.

[15]The Court concludes that the following reference numbers, listed in the order they appear in National Credit Time, which the Fallens' attorneys entered after National Credit's offer of judgment,  principally concerned National Credit's offer, settlement, or the calculation of attorneys' fees: 529, 545, 543, 533, 559, 558, 572, 596, 590, 593, 600, 624, 607, 699, 615, 622, 616, 617, 618, 700, 701, 627, 637, 639, 690, 638, 686, 642, 685, 660, 661, 662, 652, 653, 654,

Last, the Court considers whether it was reasonable for the Fallens to continue litigating their claims against National Credit after the rule 68 offer.  See Haworth v. State of Nev., 56 F.3d at 1052; Solomon v. Onyx Acceptance Corp., 222 F.R.D. at 423-24.  The Court observes that, after National Credit's offer, the Fallens' attorneys pursued a few lines of research regarding their FDCPA and FCRA claims against National Credit.  See National Credit Time at 59-60 (noting "research liability of entities who furnish information to the CRAs for failing to investigate fraud" and research concerning "the furnishers of information to the CRAs").  This line of attack was short lived, however, as the billing records indicate that, at least with respect to National Credit, the Fallens' attorneys turned their attention to settlement.  See National Credit Time at 62-75.  While it was reasonable for the Fallens' attorneys to continue building the Fallens' claims against National Credit, those efforts were delimited and circumscribed by attention to National Credit's offer and the hopes of a more favorable settlement.  See National Credit Time at 62-75.  Accordingly, after weighing the factors that the Ninth Circuit discussed in Haworth v. State of Nev., 56 F.3d at 1052-53, the Court concludes that, on balance, the attorneys' fees that the Fallens incurred after National Credit tendered its October 22, 2015, offer of judgment were unreasonable.

Upon concluding that the attorneys' fees that the Fallens incurred after National Credit tendered its October 22, 2015, offer of judgment are unreasonable, the Court calculates that, as of October 22, 2015, the Fallens had reasonably incurred $3,443.14 in fees that they attribute to National Credit.[16]  The Court also calculates that, before National Credit's offer of judgment, the

---

649, 658, 677, 678, 675, 669, 672, 673, 670, 694, 692, 761, 762, 702, 709, 715, 714, 704, 705, 722, 713, 740, 717, 719, and 716.  See National Credit Time at 56-75.

[16]The Court arrives at this sum by aggregating the time entries corresponding to the following reference numbers, each of which was entered before or on October 22, 2015: 768,

Fallens reasonably incurred $4,770.01 in Common Time that is fairly attributable to National Credit.  See Common Time at 1-75.[17]   Aggregating the time that is fairly attributable to National Credit, and adjusting for a 7.1875% gross receipts tax, the Court concludes that the Fallens' attorneys reasonably incurred $8,803.47 in fees before National Credit's rule 68 offer of judgment.  See Ramah Navajo Chapter v. Babbitt, 50 F. Supp. 2d at 1109 ("The Court also awards New Mexico gross receipts tax on [reasonable] fees.")(alteration added).  Accordingly, the Court awards the Fallens $8,803.47 in reasonable attorneys' fees against National Credit.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for Attorneys' Fees, filed March 16, 2016 (Doc. 104) is granted in part and denied in part; (ii) the Plaintiffs Kenth Fallen and Laura Fallen are awarded $17,427.28 in reasonable attorneys' fees against Defendant GREP Southwest, LLC, and $17,427.28 in reasonable attorneys' fees against Defendant SCI Camino Real Fund, LLC d/b/a Camino Real Apartments; and (iii) the Plaintiffs Kenth Fallen and Laura Fallen are awarded $8,803.47 in reasonable attorneys' fees against Defendant National Credit Systems, Inc.

_____
UNITED STATES DISTRICT JUDGE

---

769, 770, 8, 13, 127, 210, 211, 217, 236, 237, 244,   310, 319, 320, 321, 291, 292, 297, 294, 329, 338, 330, 331, 332, 333, 336, and 364.  See National Credit Time at 1-39.

[17]The Court arrives at this calculation by subtracting from the sum of Total Common Time -- i.e., $36,730.08 -- that amount corresponding to every time entry that the Fallens' attorneys entered after National Credit's October 22, 2015, offer of judgment, then dividing that sum by the seven Defendants.  Using this approach, the Court determines the Common Time which the Fallens incurred before October 22, 2015, that is fairly attributable to National Credit. Accordingly, the Court subtracts the attorney time corresponding to the following time entry reference numbers in Common Time, each of which was entered after October 22, 2015: 531, 530, 544, 527, 528, 585, 540, 548, 552, 554, 561, 562, 571, 572,   576, 570, 587, 633, 635, 697, 707, 760, 695, and 703.  See Common Time at 56-75.

*Counsel:*

Kristina Martinez
Coberly and Martinez, LLP
Santa Fe, New Mexico

-- and --

Marc M. Lowry
Alicia C. Lopez
Rothstein Donatelli LLP
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Claud E. Vance
Vance, Chavez & Associates
Albuquerque, New Mexico

     *Attorneys for Defendants GREP Southwest, LLC, and SCI Camino Real Fund, LLC*

-- and --

Charity Olson
Olson Law Group
Ann Arbor, Michigan

     *Attorneys for Defendant National Credit Systems, Inc.*